**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| IBT/HERE EMPLOYEE REPRESENTATIVES' COUNTIL, *Plaintiff,* | ) ) ) ) |
| *v.* | ) No. 1:05CV01210 (EGS) ) |
| GATE GOURMET DIVISION AMERICAS, and GATE GOURMET, INC., *Defendants.* | ) ) ) ) |

**MEMORANDUM OF LAW IN SUPPORT OF**
**APPLICATION BY PLAINTIFF FOR TEMPORARY RESTRAINING**
**ORDER AND MOTION FOR PRELIMINARY INJUNCTION**

John O'B. Clarke, Jr. (Bar No. 044685)
HIGHSAW, MAHONEY & CLARKE, P.C.
1050 17th Street, N.W., Suite 444
Washington, D.C. 20036
(202) 296-8500

Roland P. Wilder, Jr. (Bar No. 69069)
Susan Boyle (Bar No. 441102)
BAPTISTE & WILDER, P.C.
1150 Connecticut Ave., N.W., Suite 500
Washington, DC 20036
(202) 223-0723

DATE: June 24, 2005          Attorneys for Plaintiff Council

## TABLE OF CONTENTS

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

      A.    Gate Gourmet Agreed To Provide–With Limited Employee
           Contributions–Medical And Hospitalization Coverage For Its
           Craft or Class Employees. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

      B.    Gate Gourmet Invoked The "Major Dispute" Provisions Of
           The RLA To Propose Changes To The NMA, Including
           Changes To Gate Gourmet's Health Care Costs. . . . . . . . . . . . . . . . . . . 6

      C.    Gate Gourmet Has Threatened To Alter The Status Quo. . . . . . . . . . . . 7

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

      I.     THIS COURT SHOULD ENJOIN GATE GOURMET
           FROM DISCONTINUING PAYING ITS SHARE OF THE
           HEALTH CARE COSTS, FOR GATE GOURMET'S
           THREATENED CHANGE IN WORKING CONDITIONS
           VIOLATES ITS OBLIGATIONS UNDER THE RLA TO
           MAINTAIN THE STATUS QUO AND TO EXERT EVERY
           REASONABLE EFFORT TO MAKE AND MAINTAIN
           AGREEMENTS. THIS INJUNCTION IS ALSO
           NECESSARY TO PRESERVE THE JURISDICTION OF
           THE ADJUSTMENT BOARD. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

      A.    Standards For Interim Injunctive Relief. . . . . . . . . . . . . . . . . . . . . . . . 15

      B.    Gate Gourmet's And The Council's Proposals To Change The
           NMA, Including Gate Gourmet's Proposal To Reduce Its
           Labor Costs, Present A "Major Dispute" To Which The
           RLA's Status Quo Obligation Applies. . . . . . . . . . . . . . . . . . . . . . . . . 16

      C.    Gate Gourmet's Contract Defense Does Not Relieve It Of Its
           Status Quo Obligation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

      D.    Gate Gourmet's Putative Contractual-Right To Change
           Working Conditions Unilaterally Has Not Been Asserted In
           Good Faith, And, Thus, Does Not Raise A Dispute That Is
           Exempt From The Act's Major Dispute Processes. . . . . . . . . . . . . . . . 24

E.    The Availability of Preliminary Injunctive Relief In the Circumstances of This Case Does Not Turn on Whether the Parties' Dispute Is Categorized As "Major" or "Minor."  . . . . . . . . . . . 28

II.    THIS COURT SHOULD IMPOSE ONLY A MINIMAL BOND SINCE THE INJUNCTION IS NECESSARY TO ENFORCE THE COMMANDS OF AN ACT WHICH CONGRESS HAS ENACTED IN PART TO PROTECT THE PUBLIC'S INTERESTS IN INTERRUPTED INTERSTATE COMMERCE.  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

## TABLE OF AUTHORITIES

**CASES RELIED UPON:**

*Air Cargo Inc. v. Local 851, IBT*, 733 F.2d 241 (2d Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . 12, 24

*ALPA v. Eastern Air Lines, Inc.*, 869 F.2d 1518 (D.C. Cir. 1989) . . . . . . . . . . . . . . . . . . . 14, 31

*Alton & Southern Ry. v. BMWE*, 899 F.Supp. 646 (D.D.C.),
    *aff'd* 72 F.3d 919 (D.C. Cir. 1995) (table) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*American Postal Workers Union v. United States Postal Serv.*, ___ F.Supp.2d ___,
    2005 WL 1330429 (D.D.C. June 6, 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32, 33

*Baker v. UTU*, 455 F.2d 149 (3rd Cir. 1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*BLE v. Missouri-Kansas-Texas R.R.*, 363 U.S. 528 (1960) . . . . . . . . . . . . . . . . . . . . . . 15, 30, 31

*Boivin v. US Airways, Inc.*, 297 F.Supp.2d 110 (D.D.C. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Boys Markets, Inc. v. Retail Clerrks Union, Local 770*, 398 U.S. 235 (1970) . . . . . . . . . . . . . 30

*Brotherhood of Railroad Trainmen v. Jacksonville Terminal Co.*, 394 U.S. 369 (1969) . . . 17, 18

*BRT v. Chicago River & Indiana R.R.*, 353 U.S. 30 (1957) . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Carabillo v. Ullico Inc., Pension Plan and Trust*, 355 F.Supp.2d 49 (D.D.C. 2004) . . . . . . . . 38

*Chicago & North Western Ry. v. UTU*, 402 U.S. 570 (1971) . . . . . . . . . . . . . . . . . . . . . . . 13, 28

*CityFed Financial. Corp. v. Office of Thrift Supervision*, 58 F.3d 738 (D.C. Cir. 1995) . . . 15, 16

*Communication Workers of America, District 1, AFL-CIO v. NYNEX Corp.*,
    898 F.2d 887 (2d Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*Consolidated Rail Corp. v. RLEA*, 491 U.S. 299 (1989) . . . . . . . . . . . . . . . . . . . . . . . . *in passim*

*Crowley v. Local 82, Furniture Movers*, 679 F.2d 978 (1st Cir. 1982),
    *rev'd on other grounds*, 467 U.S. 526 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*CSX Transportation, Inc. v. Williams*, 406 F.3d 667 (D.C. Cir. 2005) . . . . . . . . . . . . . . . . . . 15

*Detroit & Toledo Shore Line R.R. v. UTU*, 396 U.S. 142 (1969) . . . . . . . . . . 2, 11, 12, 18-20, 23

*District 29, UMW v. New Beckley Mining Corp.*, 895 F.2d 942 (4th Cir. 1990) . . . . . . . . . . . . 39

*DSE, Inc. v. United States*, 169 F.3d 21 (D.C. Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*Elgin, Joliet & Eastern Ry. v. Burley*, 325 U.S. 711 (1945) . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Hawaiian Airlines, Inc. v. Norris*, 512 U.S. 246 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25-27

*IAM v. Eastern Air Lines, Inc.*, 847 F.2d 1014 (2d Cir. 1988) . . . . . . . . . . . . . . . . . . . . 14, 15, 31

*In re Dobbs International Services, Inc.*, 28 N.M.B. 7 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*In re Dobbs International Services–Findings On Jurisdiction*, 27 N.M.B. 537 (2000) . . . . . . . 3

*Local Lodge 2144, BRAC v. Railway Express Agency, Inc.*, 409 F.2d 312 (2d Cir. 1969) . . 31, 32

*Pittsburgh & Lake Erie R.R. v. RLEA,* 491 U.S. 490 (1989) . . . . . . . . . . . . . . . . . . . . 1, 12, 22, 23

*Risteen v. Youth For Understanding USA, Inc.*, 245 F. Supp. 2d 1 (D.D.C. 2002) . . . . . . . . . . 37

*Southern Ry. v. Brotherhood of Locomotive Firemen*, 337 F.2d 127
    (D.C. Cir. 1964) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 16, 20-22, 24

*Steelworkers v. American Manufacturing Co.*, 363 U.S. 564 (1960) . . . . . . . . . . . . . . . . . . . . . 25

*Steelworkers v. Fort Pitt Steel Casting*, 598 F.2d 1273 (3rd Cir. 1979) . . . . . . . . . . 15, 30, 36, 37

*Steelworkers v. Textron, Inc.*, 836 F.2d 6 (1st Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 36

*Temple University v. White*, 941 F.2d 201 (3rd Cir. 1991),
    *cert. denied*, 502 U.S. 1032 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*UTU v. Burlington Northern, Inc.*, 458 F.2d 354 (8th Cir. 1972) . . . . . . . . . . . . . . . . . . . . . . . 31

*Westchester Lodge 2186, BRAC v. Railway Express Agency*,
    329 F.2d 748 (2d Cir. 1964) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 31

*Whelan v. Colgan*, 602 F.2d 1060 (2d Cir. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

**STATUTES AND RULES RELIED UPON:**

Labor Management Relations Act, 29 U.S.C. § 141, *et seq*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

National Labor Relations Act, 29 U.S.C. § 151, *et seq*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Norris-LaGuardia Act, 29 U.S.C. § 101, *et seq*.
     Section 1, 29 U.S.C. § 101 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
     Section 7, 29 U.S.C. § 107 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 38
     Section 13(c), 29 U.S.C. § 113(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Railway Labor Act, 45 U.S.C. § 151, *et seq*.
     Section 2 First, 45 U.S.C. § 152 First . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 19, 23, 28
     Section 2 Third, 45 U.S.C. § 152 Third . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
     Section 2 Seventh, 45 U.S.C. § 152 Seventh . . . . . . . . . . . . . . . . . . . . . . . 13, 18, 26, 28
     Section 2 Ninth, 45 U.S.C. § 152 Ninth . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
     Section 5 First, 45 U.S.C. § 155 First . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 18, 19
     Section 6, 45 U.S.C. § 156 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 11, 18-21, 23, 26
     Section 10, 45 U.S.C. § 160 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18-19
     Section 204, 45 U.S.C. § 184 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Rule 65(c), Fed. R. Civ. P. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38-39

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IBT/HERE EMPLOYEE REPRESENTATIVES' COUNCIL,<br>　　　　　*Plaintiff,*<br><br>　　　　*v.*<br><br>GATE GOURMET DIVISION AMERICAS, and GATE GOURMET, INC.,<br>　　　　　*Defendants.* | )<br>)<br>)<br>)<br>)　　　Civil Action No. 05-01210 (EGS)<br>)<br>)<br>)<br>)<br>) |

**MEMORANDUM OF LAW IN SUPPORT OF**
**APPLICATION BY PLAINTIFF FOR TEMPORARY RESTRAINING**
**ORDER AND MOTION FOR PRELIMINARY INJUNCTION**

Plaintiff IBT/HERE Employee Representatives' Council ("Council") filed an Application For A Temporary Restraining Order and a Motion For A Preliminary Injunction to prohibit defendants Gate Gourmet, Inc. and its division, Gate Gourmet Division Americas (collectively, "Gate Gourmet") from implementing on July 1, 2005, the carrier's announced intention of discontinuing payment of its portion of the costs for the Health Care coverage which it is obligated by its collective bargaining agreement with the Council to provide for its employees. This Memorandum of Law is respectfully submitted by the Council in support of that Application and Motion.

**PRELIMINARY STATEMENT**

Plaintiff and Gate Gourmet have been engaged for the past eighteen (18) months in what is known as a "major dispute" under the Railway Labor Act ("RLA"), which is a dispute over *prospective changes* to the existing rates of pay, rules, or working conditions. *Pittsburgh & Lake Erie R.R. v. RLEA* [hereinafter, "*P&LE*"], 491 U.S. 490, 496 n. 4 (1989). This dispute began in December 2003 when Gate Gourmet proposed changes under RLA § 6, 45 U.S.C. § 156, to the

existing agreements with the Council establishing rates of pay, rules, and working conditions for its employees who are represented for collective bargaining purposes by the Council. By its "Section 6" proposals, Gate Gourmet seeks to reduce its labor costs, including the costs it has agreed to pay to provide its employees with Medical and Hospitalization coverage. In plain disregard of the RLA's status quo obligation, which the Supreme Court has described as being "central" to the design of the Act,[1] Gate Gourmet decided to reduce its labor costs unilaterally by transferring to its employees, effective July 1, 2005, the total costs for the Health Care program it is required by the collective bargaining agreement to provide for its employees.

Ignoring the limitations which the RLA's status quo obligation places upon it during a major dispute, Gate Gourmet claims it has a contractual right to take this action. It seeks to support that assertion by relying upon a portion of its agreement with the Council, which provides that the employees' "contribution rates . . . will be the same each year as the contribution rates for management/salaried employees." 1st Amended Complaint at ¶ 10, *quoting* NMA Art. 24. That reliance upon a purported contractual right, however, has not been asserted in good faith, for at the same time it claims its management employees will be paying increased premiums, it has increased its management's pay to rebate all or a substantial part of the planned increase in Health Care premiums those managers ostensibly are to pay. This bad faith claim of a contractual justification, and Gate Gourmet's threatened alteration of the status quo, violate Gate Gourmet's judicially enforceable duties under the RLA.

---

[1]    *Detroit & Toledo Shore Line R.R. v. UTU*, 396 U.S. 142, 150 (1969) ("The Act's status quo requirement is central to its design").

Plaintiff has filed this complaint both to enforce Gate Gourmet's obligations under the RLA and to preserve the jurisdiction of the adjustment board that Gate Gourmet and the Council have established under RLA § 204, 45 U.S.C. § 184, to resolve in a meaningful manner the contract interpretation dispute raised by Gate Gourmet's bad faith reliance on the NMA to justify its discontinuance of its Health Care payments.[2/] Since Gate Gourmet intends to discontinue those payments, effective July 1, 2005, plaintiff asks this Court to issue, first, a Temporary Restraining Order and, then, a preliminary injunction, prohibiting Gate Gourmet from discontinuing funding its Health Care Plan at the same level it was funding that plan prior to its announcement in May 2005 that it will discontinue its Health Care contributions.

## STATEMENT OF FACTS

Plaintiff IBT/HERE Employee Representatives' Council is a labor organization established in 2000 by the chief executive officers of the International Brotherhood of Teamsters ("IBT") and the former Hotel Employees and Restaurant Employees International Union ("HERE")[3/] to represent for collective bargaining purposes employees of Dobbs International Services, Inc., d/b/a Gate Gourmet. 1st Amended Complaint at ¶ 7. Prior to its acquisition in 1999 by Gate Gourmet, Dobbs was subject to the National Labor Relations Act, 29 U.S.C. § 151, *et seq.* (1st Amended Complaint at ¶¶5-6), but once Dobbs was acquired by Gate Gourmet it became subject to the RLA. *In re Dobbs International Services–Findings On Jurisdiction*, 27 N.M.B. 537 (2000). Since the IBT and HERE together, albeit in separate units, represented more than half of Dobbs employees prior to the

---

[2/]    On June 22, 2005, plaintiff amended that complaint to add Gate Gourmet, Inc. as a defendant.

[3/]    HERE has since merged with the Union of Needletrades, Industrial and Textile Employees (UNITE) to form UNITE HERE. 1st Amended Complaint at ¶ 1.

acquisition, the Council asked the National Mediation Board ("NMB") to conduct an investigation under RLA § 2 Ninth, 45 U.S.C. § 152 Ninth, and to certify the Council as the duly designated representative of Gate Gourmet's craft or class employees systemwide. 1st Amended Complaint at ¶¶6-7. On October 11, 2000, the NMB issued a certification, certifying the Council as the duly designated representative of the craft or class of Kitchen, Commissary, Catering and Related Employees employed by Dobbs International Services, Inc., d/b/a Gate Gourmet, its successors and assigns. *In re Dobbs International Services, Inc.*, 28 N.M.B. 7 (2000).

Prior to Gate Gourmet's acquisition of Dobbs' flight kitchen and related operations in 1999, several non-Council labor organizations represented approximately 15% of Dobbs employees. When the Council sought to be certified by the NMB as the representative of the craft or class systemwide, it informed the NMB that it intended to designate the AFL-CIO non-Council unions as the Council's bargaining agents for the facilities where they represented Dobbs employees prior to the acquisition. *In re Dobbs International Services, Inc.*, 28 N.M.B. at 10, n.3. Following the NMB's certification, the Council designated those organizations as its bargaining agent for those facilities.[4/]

A.    **Gate Gourmet Agreed To Provide–With Limited Employee Contributions–Medical And Hospitalization Coverage For Its Craft or Class Employees.**

Prior to the NMB's certification, Gate Gourmet recognized the Council as the representative of its employees (except for those employees represented by the non-Council unions) and entered into a collective bargaining agreement with the Council, effective June 1, 2000. 1st Amended

---

[4/]    At the present time, three non-Council unions act as the Council's bargaining agents for approximately 869 of Gate Gourmet's more than 7,000 craft or class employees. Those bargaining agents are: The Bakery, Confectionery, Tobacco Workers and Grain Millers International Union; the International Association of Machinists and Aerospace Workers; and the Retail, Wholesale and Department Store Union District Council, UFCW.

Complaint at ¶8. As relevant here, that agreement, called the National Master Agreement ("NMA"),

provided as follows in Article 24 (1st Amended Complaint at ¶10):

> Regular, full-time bargaining Employees will be eligible to participate
> in the Company's Health Care Program and the Basic and
> Supplemental Group Term Life/AD&D Insurance. . . .
>
> While administration of the plan remains a Company
> prerogative, bargaining unit Employee's contribution rates for the
> various health plans and optional life insurance will be the same each
> year as the contribution rates for management/salaried employees.

Except for the provision of the NMA establishing the Gate Gourmet-Council System Board

of Adjustment ("SBA") to resolve disputes arising from grievances or involving the interpretation

or application of agreements,[5] the NMA did not apply to those employees who were employed at

facilities where, prior to the NMB certification, the employees were represented by AFL-CIO unions

other than IBT or HERE. 1st Amended Complaint at ¶9. Employees at those facilities were to remain

covered by the collective bargaining agreements negotiated with the non-Council unions, unless

those unions (which the Council designated as its bargaining agent) adopted the NMA. *Id.*

Similarly, the NMA recognized that Gate Gourmet employees who were represented by IBT

and HERE prior to the acquisition were covered by collective bargaining agreements, some of which

provided benefits through local employee welfare benefit plans. As to those agreements–*i.e.*, the

"local Addendums"–the NMA provided as follows in Article 34 (1st Amended Complaint at ¶11):

> It is understood between the Company and the Union that no
> employee in any location will suffer a reduction in any wages, or
> benefits from his present level as a direct result of this Master
> Agreement. Furthermore, if any local Addendums terms and

---

[5]    The SBA provision in the NMA was modified after the Council was certified to apply
to the entire system, including to those facilities where the Council had designated non-Council
unions as its bargaining agents.

> conditions exceed the terms and conditions of the Master, then the
> local Addendum shall apply during the term of the Master
> Agreement. In instances where the Master Agreement language
> and/or benefits are superior to the local addendum, the Master
> Agreement will apply at the time the Local Addendum is subject to
> amendment.

As of April 2005, Gate Gourmet employed over 7,000 employees who are represented for collective bargaining purposes by the Council, including approximately 869 employees at facilities where the Council, as authorized by RLA § 2 Third, 45 U.S.C. § 152 Third, has designated non-Council unions to act as the Council's bargaining agent. Declaration of K.C. Paulsen, executed June 24, 2005, at ¶18. Prior to January 2005, approximately 5,400 of those employees (including 492 employees for whom non-Council unions have been designated as the Council's bargaining agent) were covered by Gate Gourmet's Health Care plan, while approximately 2,200 were covered by local employee welfare benefit plans. *Id*.

**B.      Gate Gourmet Invoked The "Major Dispute" Provisions Of The RLA To Propose Changes To The NMA, Including Changes To Gate Gourmet's Health Care Costs.**

In December 2003, Gate Gourmet invoked the provisions of RLA § 6, 45 U.S.C. § 156, to propose various changes to the NMA, and in April 2004, the Council served upon Gate Gourmet its own Section 6 notice to change the NMA. 1st Amended Complaint at ¶13. After several months of negotiations, Gate Gourmet informed the Council on October 21, 2004, that its competitive situation was such that it needed deep, across-the-board cuts in wages and benefits, as well as other forms of cost relief. 1st Amended Complaint at ¶ 14. Shortly after it made that announcement, Gate Gourmet informed the Council that, effective January 1, 2005, it would both reduce the benefits provided by its Health Care Plan and at the same time increase the premiums its employees must pay for that

-6-

reduced coverage. *Id*. Those changes were made on January 1, 2005 (Paulsen Dec. at ¶12), despite the Council's contention that the benefit and premium changes were both in violation of the RLA and a breach of the NMA. 1st Amended Complaint at ¶15. As a result of those increases in premiums and decreases in benefits, many Gate Gourmet employees reduced their coverage or dropped their coverage entirely. Declaration of S.P. Vairma, executed June 16, 2005, at ¶¶7-9. After January 1, 2005, only 2,706 of 4,530 eligible craft or class employees were enrolled in Gate Gourmet's Health Care plan, and more than half of those participants, 1,545, had elected employee only coverage. 2nd Declaration of S.P. Vairma, executed June 22, 2005, at Ex. 5. Gate Gourmet and the Council have been unable to resolve the grievance that the Council filed over those contract changes and that unresolved grievance has been referred by the Council to the Gate Gourmet-Council SBA; it is currently scheduled to be heard on August 9, 2005. 1st Amended Complaint at ¶17.

In May 2005, Gate Gourmet presented the Council with what it termed was its "last best offer," which the Council submitted to the IBT and HERE membership for their consideration. 1st Amended Complaint at ¶18. That proposal, which would have significantly reduced pay and increased Health Care costs, was rejected by 94% of the craft or class who voted. *Id*.

### C.    Gate Gourmet Has Threatened To Alter The Status Quo.

Shortly before the voting was scheduled to begin on Gate Gourmet's "last best offer," Gate Gourmet caused a communication to be posted and mailed to its employees who were covered by its Health Care Plan (Vairma Dec. at ¶16) informing them that: "Because our Divisional financial performance continues to decline and our labor costs remain uncompetitive under the current labor contract, the company Medical Plan subsidy will end on June 30, 2005 if the new contract is not approved by the union membership." 1st Amended Complaint Ex. 4. That communique further

informed the employees that the premiums employees must pay to remain covered by Gate Gourmet's plan would increase, beginning July 1, 2005, from $119.07 monthly for Employee Only coverage to $390.57 for that coverage; from $228.66 monthly for Employee and Children coverage to $757.25; from $267.90 for Employee and Spouse coverage to $796.49 monthly; and from $362.61 for Family coverage to $1,148.27 monthly.[6] *Id*. Employees were given up to June 1, 2005, to inform Gate Gourmet whether they wished to re-enroll for coverage and what coverage they wish to elect. *Id*. That deadline was subsequently extended to June 8, 2005. Vairma Dec. at ¶19. The Council has since been informed by Gate Gourmet that of the 2,706 employees who remained covered by Gate Gourmet's Health Care plan after the January 1, 2005 changes, 2,214 have dropped their coverage entirely. 2nd Vairma Dec. at Ex. 5. Of the 4,519 employees who are eligible for coverage, only 492 have re-enrolled, and of those only 35 have re-enrolled for Family coverage. *Id.*

This inability to continue Health Care coverage is the natural outcome of the drastic increases in costs Gate Gourmet has unilaterally imposed, for Gate Gourmet craft or class employees are paid on average $11.10 per hour, with the hourly rates ranging from $8.10 to $18.25 per hour. Vairma Dec. at ¶4. These hourly rates provide employees with gross pay of approximately $1,400 to $3,200 per month for working forty (40) hours per week.

On June 3, 2005, the Council reminded Gate Gourmet of its obligation to maintain the status quo while the parties attempted to resolve the dispute raised by the proposals to modify the existing collective bargaining agreements, and asked that Gate Gourmet immediately rescind its announced

---

[6]    The announced increases, as noted above, follow significant reductions in benefits and increases in premiums that occurred as of January 1, 2005. For example, the monthly premium for Employee Only coverage increased on January 1, 2005, from $31.32 to $119.07 per month, and the monthly premium for Family coverage went from $155.63 to $362.61 per month on January 1, 2005. 1st Amended Complaint at ¶ 14.

discontinuance of its funding of its Health Care Plan. 1st Amended Complaint Ex. 5. Gate Gourmet, however, has informed the Council that will not rescind the changes that will be effective as of July 1, 2005. 1st Amended Complaint at ¶ 24.

In addition to reminding Gate Gourmet of its status quo obligation, the Council also notified Gate Gourmet that it considered the company's actions to be a violation of the NMA. 1st Amended Complaint at ¶ 25. Gate Gourmet has denied the Council's grievance, asserting that it has the contractual right to change the employees' contribution rates. 1st Amended Complaint at ¶29. Apparently, Gate Gourmet is relying upon Article 24 of the NMA to contend that the contract gives it the right to halt its Health Care contributions for craft or class employees altogether on the supposed ground that it made the same changes in contributions required of management and supervisory employees. On June 17, 2005, the Council referred that grievance to the Gate Gourmet-Council SBA for final and binding resolution. 1st Amended Complaint Ex. 9. That grievance is scheduled to be heard by the SBA on August 9, 2005. 1st Amended Complaint at ¶30. However, plaintiff expects that the board will deadlock and the dispute will then be referred to arbitration under the SBA provisions of the NMA. Paulsen Dec. at ¶16.

Gate Gourmet's contractual justification for its announced change of the status quo is being asserted in bad faith. The Council has learned that Gate Gourmet has informed its managers and supervisors who are covered by Gate Gourmet's Health Care Plan that effective July 1, 2005, it will pay those employees a "retention payment" of between $350 to $500 per month. 1st Amended Complaint at ¶22; Declaration of J.E. Brainer, executed June 10, 2005, at ¶¶6-9. That increased pay is effectively a rebate of the increased premiums the managers and supervisors are being asked to pay for their Health Care coverage.

On June 10, 2005, the Council informed Gate Gourmet that conferences over the proposed changes in agreements affecting rates of pay, rules, and working conditions were terminated. 1st Amended Complaint Ex. 7. As the Council informed Gate Gourmet, the membership's overwhelming rejection of Gate Gourmet's "last best offer," together with Gate Gourmet's refusal to rescind its announced increase in the employees' Health Care costs, made further conferences futile. *Id.*

Gate Gourmet responded to the Council's notice by filing an application with the NMB on June 15, 2005, invoking the board's mediatory services under RLA § 5 First (a), 45 U.S.C. § 155 First (a). The Board docketed Gate Gourmet's request as NMB Case No. A-13373 and reminded the parties that they may not change the status quo while the Board attempts to bring about a resolution to the disputes through mediation. 1st Amended Complaint Ex. 8 at 2. Despite that reminder, Gate Gourmet still intends to implement its discontinuance of its payment of Health Care costs as of July 1, 2005.

## ARGUMENT

I.    **THIS COURT SHOULD ENJOIN GATE GOURMET FROM DISCONTINUING PAYING ITS SHARE OF THE HEALTH CARE COSTS, FOR GATE GOURMET'S THREATENED CHANGE IN WORKING CONDITIONS VIOLATES ITS OBLIGATIONS UNDER THE RLA TO MAINTAIN THE STATUS QUO AND TO EXERT EVERY REASONABLE EFFORT TO MAKE AND MAINTAIN AGREEMENTS. THIS INJUNCTION IS ALSO NECESSARY TO PRESERVE THE JURISDICTION OF THE ADJUSTMENT BOARD.**

There can be no disagreement that Gate Gourmet and the Council are engaged in what is known as a "major dispute" under the RLA and that both Gate Gourmet and the Council are required by the RLA, during the period in which the Act's status quo obligation applies, "to preserve and

maintain unchanged those actual, objective working conditions and practices, broadly conceived, which were in effect prior to the time the pending dispute arose and which are involved in or related to that dispute." *Detroit & Toledo Shore Line R.R. v. UTU*, 396 U.S. 142, 153 (1969). Indeed, when the NMB docketed Gate Gourmet's request for mediation, the Board "reminded" the parties of the Act's status quo obligation. 1st Amended Complaint Ex. 8 at 2. There also can be no question that the working conditions that Gate Gourmet intends to change as of July 1, 2005, are directly involved in and related to the agreement changes Gate Gourmet has proposed under RLA § 6: The parties are bargaining over those changes and Gate Gourmet emphasized the indisputable relationship between Health Care coverage and its labor costs when it informed its employees on May 12, 2005 that, if the employees rejected the new contract it was proposing, it would "end" its "subsidy" of the company's Health Care Plan. 1st Amended Complaint Ex. 4. Nor can there be any legitimate argument over the subject-matter jurisdiction of this Court "to enjoin a violation of the status quo pending completion of the [RLA's] required procedures, without the customary showing of irreparable injury." *Consolidated Rail Corp. v. RLEA* [hereinafter, "*Conrail*"], 491 U.S. 299, 303 (1989); *see also*, *Southern Ry. v. Brotherhood of Locomotive Firemen*, 337 F.2d 127, 133-34 (D.C. Cir. 1964).[7]

---

[7]    As the Court of Appeals explained in *Southern Railway*, 337 F.2d at 133-34:
        Contrary to its [Southern Railway's] contentions, we think that a showing of irreparable injury is not required before the instant status quo injunction may issue, particularly because the question before us is concerned with far more than the private rights and duties of the parties. In the first place, Section 6 of the Act imposing the duty to maintain the status quo contains no qualification to the effect that the carrier has no obligation to do so unless irreparable injury would otherwise result. Moreover, the public interest in peaceful settlement of labor disputes through utilization of statutory procedures is also involved, and irreparable injury to the complaining

-11-

Nevertheless, Gate Gourmet asserts that it need not abide by the RLA's status quo obligation because it has the contractual right to change unilaterally the "contribution rate" for its "various health plans." NMA Art. 24, § 1 (Paulsen Ex. 1 at 17). According to Gate Gourmet, that contractual right is not affected by the Act's status quo obligation. Thus, it asserts, any dispute over whether it may take the contested action raises a "minor dispute" under the RLA, which may be resolved *only* by an adjustment board established under the RLA. That argument is without merit for two separate reasons.

First, as the Court of Appeals for this Circuit held in *Southern Railway*, the status quo includes the manner in which the parties have applied their agreements in the past. 337 F.2d at 132 ("[W]e are equally clear that the injunction under this 'claim' [*i.e.*, change of status quo] must forbid also a change in the long-standing interpretation [of the contract] . . . which had been given by the parties to the existing contract"). Moreover, as a comparison of *Conrail* with *Detroit & Toledo* and *P&LE* shows, once the status quo obligation is triggered, *Conrail*'s holding that the status quo does not apply to a minor dispute becomes irrelevant. Since the district courts have "exclusive jurisdiction to ensure that the status quo is being maintained" (*Air Cargo Inc. v. Local 851, IBT*, 733 F.2d 241, 247 (2d Cir. 1984)), any dispute over what is the actual practice that must be maintained during the status quo period is for this Court–not an adjustment board–to decide. *Pittsburgh & Lake Erie R.R. v. RLEA*, 491 U.S. 490, 504-11 (1989).

And second, Gate Gourmet's putative contractual defense has not been raised in good faith and is in violation of Gate Gourmet's judicially enforceable duty under RLA § 2 First "to exert every

---

party is not an element which bears significantly or relevantly on furthering the public interest.

reasonable effort to make and maintain agreements concerning rates of pay, rules, and working conditions . . . ." 45 U.S.C. § 152 First; *Chicago & North Western Ry. v. UTU*, 402 U.S. 570, 577 (1971) (§ 2 First "was designed to be a legal obligation, enforceable by whatever appropriate means might be developed on a case-by-case basis"). Here, Gate Gourmet is claiming that it is justified in increasing the employees' Health Care premiums because its managers will be paying increased premiums, but the true facts are that it has increased the premiums its managers will be paying *solely* to increase its employees' premiums *and* it is rebating to its managers in whole or in substantial part those increased premiums. Brainer Dec. at ¶¶6-9. Thus, even if Gate Gourmet could by some slight of hand ignore the fact that the Act's status quo obligation has been triggered by the various proposals to change the existing agreements, its claimed contractual right to end its subsidy of the Health Care plan would still not justify its announced unilateral change. This is so because RLA § 2 Seventh prohibits Gate Gourmet from "chang[ing] the rates of pay, rules, or working conditions of its employees, as a class as embodied in agreements, except in the manner prescribed in such agreements or in section 6" of the RLA. 45 U.S.C. § 152 Seventh. Where, as in this case, a carrier raises a contractual justification in bad faith, giving rise to the inference that it has raised that contractual defense to avoid the strictures of the RLA's major dispute processes, the underlying dispute raised by its intention to change the current application of an agreement is one subject to the Act's major dispute procedures. *Conrail*, 491 U.S. at 307; *see also*, *Id*., 491 U.S. at 320-21 (White, J., concurring).

However, at this stage of the proceedings, where plaintiff is requesting *interim* injunctive relief, this Court need not address the legal issues raised as to the proper characterization of the underlying controversy caused by gate Gourmet's announced termination of its Health Care

payments, for even if Gate Gourmet were correct that the RLA did not prohibit it from implementing those changes on July 1, 2005 (and plaintiff submits that Gate Gourmet's interpretation of the RLA is incorrect), this Court should still enjoin the announced changes. This is so because this Court has jurisdiction to preserve the jurisdiction of the Gate Gourmet-Council System Board of Adjustment to resolve the contract interpretation issue raised by Gate Gourmet's claim that it has a contractual right to take the disputed action. *See*, *ALPA v. Eastern Air Lines, Inc.*, 869 F.2d 1518, 1520-21, n. 2 (D.C. Cir. 1989) (Court may require carrier to maintain status quo in minor dispute "when an injunction is necessary to preserve the arbitrator's ability to decide the dispute"); *IAM v. Eastern Air Lines, Inc.*, 847 F.2d 1014, 1017 (2d Cir. 1988) (same); *Westchester Lodge 2186, BRAC v. Railway Express Agency*, 329 F.2d 748, 752-53 (2d Cir. 1964) (same).

Here, a status quo injunction is necessary to make sure that the Gate Gourmet-Council SBA will be able to issue meaningful relief when it rejects (as it must) Gate Gourmet's assertion that it has the contractual right to alter unilaterally, especially in mid-year, the contribution rate employees (but not its managers) pay for their Health Care protection. If the status quo is not preserved, over 2,000 Gate Gourmet employees and for many, their dependants, will be deprived of needed medical care while the adjustment board considers Gate Gourmet's bad faith contract interpretation claim, but the adjustment board will have no power to restore those employees to the medical health they and their families enjoyed before they were deprived of the medical coverage to which they are entitled under the collective bargaining agreement between Gate Gourmet and the Council. Thus, Gate Gourmet's implementation of its planned discontinuance of Health Care payments as of July 1, 2005, and the resultant loss of Health Care coverage, will make it impossible for the adjustment board to render meaningful relief once it rejects Gate Gourmet's contention that the company has

a contractual right to take the contested action. This Court, plaintiff submits, has jurisdiction to effectuate the purposes of the RLA by ensuring the adjustment board's award in favor of the Council will not be a hollow victory.  *See*, *BLE v. Missouri-Kansas-Texas R.R.*, 363 U.S. 528, 534 (1960) (While leaving open question of ability of court to enjoin unilateral change by carrier in minor dispute independent of strike injunction, Court upheld jurisdiction of federal court in minor dispute "to preserve the [Adjustment] Board's jurisdiction"); *IAM v. Eastern Air Lines, Inc.*, 847 F.2d at 1017; *accord*, *Steelworkers v. Textron, Inc.*, 836 F.2d 6 (1ˢᵗ Cir. 1987); *Steelworkers v. Fort Pitt Steel Casting*, 598 F.2d 1273, 1282-83 (3ʳᵈ Cir. 1979) (Federal courts have jurisdiction "to enjoin conduct stemming from a labor dispute when that conduct 'frustrate(s) the arbitral processes[,]'" such as elimination of health care coverage).

## A.     Standards For Interim Injunctive Relief.

It is well settled that in considering whether to grant interim injunctive relief, a district court "must consider whether: (1) the party seeking the injunction has a substantial likelihood of success on the merits; (2) the party seeking the injunction will be irreparably injured if relief is withheld; (3) an injunction will not substantially harm other parties; and (4) an injunction would further the public interest." *CSX Transportation, Inc. v. Williams*, 406 F.3d 667, 670 (D.C. Cir. 2005). As the *Williams* court further explained (*Id.*):

> The test is a flexible one. "If the arguments for one factor are particularly strong, an injunction may issue even if the arguments in other areas are rather weak." *CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 747 (D.C. Cir. 1995). We have often recognized that injunctive relief may be justified, for example, "where there is a particularly strong likelihood of success on the merits even if there is a relatively slight showing of irreparable injury." *Id.*

There are, however, two caveats to the typical balancing of the interim injunctive relief factors in this case. First, this case involves a "labor dispute" as that term is defined by Section 13(c) of the Norris-LaGuardia Act, 29 U.S.C. § 113(c),[8/] and thus, this Court may not issue injunctive relief "except in a strict conformity with the provisions of" the Norris-LaGuardia Act. 29 U.S.C. § 101. As relevant here, Section 7 of the Norris-LaGuardia Act imposes various procedural requirements and limits the duration of a temporary restraining order to five (5) days. The second caveat is that, as this Circuit held in *Southern Railway*, 337 F.2d at 133-34, and as the Supreme Court recognized in *dicta* in *Conrail*, 491 U.S. at 303, this Court has jurisdiction "to enjoin a violation of the status quo pending completion of the required [major dispute] procedures, without the customary showing of irreparable injury."

When these factors are balanced here, it is clear that the Council is entitled to the injunctive relief it is requesting, first, to enforce the RLA's commands and, alternatively, to preserve the adjustment board's jurisdiction to provide meaningful relief.

> **B.    Gate Gourmet's And The Council's Proposals To Change The NMA, Including Gate Gourmet's Proposal To Reduce Its Labor Costs, Present A "Major Dispute" To Which The RLA's Status Quo Obligation Applies.**

Disputes involving rates of pay, rules, or working conditions in industries subject to the Railway Labor Act may take either of two forms–"Major" or "Minor"–and, depending upon their

---

[8/]    Section 13(c), 29 U.S.C. § 113(c), provides as follows:
The term "labor dispute" includes any controversy concerning terms or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment, regardless of whether or not the disputants stand in the proximate relation of employer and employee.

-16-

proper classification, are subject to different, albeit related, dispute resolution procedures. As the

Supreme Court explained in *Conrail*, 491 U.S. at 302, *quoting Elgin, Joliet & Eastern Ry. v. Burley*,

325 U.S. 711, 723 (1945):

> ["Major" disputes] "relate[ ] to disputes over the formation of collective bargaining agreements or efforts to secure them. They arise where there is no such agreement or where it is sought to change the terms of one, and therefore the issue is not whether an existing agreement controls the controversy. They look to the acquisition of rights for the future, not to assertion of rights claimed to have vested in the past."

"Minor" disputes, in contrast, are disputes arising from or involving grievances or the interpretation

or application of *existing* agreements. *Conrail*, 491 U.S. at 303. They "'contemplate[ ] the existence

of a collective agreement already concluded or, at any rate, a situation in which no effort is made to

bring about a formal change in terms or to create a new one. The dispute relates either to the meaning

or proper application of a particular provision with reference to a specific situation or to an omitted

case.'" *Conrail*, 491 U.S. at 303, *quoting Elgin, Joliet & Eastern Ry. v. Burley*, 325 U.S. at 723.

Properly characterizing a dispute over rates of pay, rules, or working conditions is important

because the Act provides significantly different procedures for their resolution. "Major" disputes are

subject to "a detailed framework [designed] to facilitate the *voluntary settlement* of" the dispute.

*Brotherhood of Railroad Trainmen v. Jacksonville Terminal Co.*, 394 U.S. 369, 378 (1969)

(emphasis added). On the other hand, "minor" disputes, if they are not resolved by conferences, are

"subject to *compulsory and binding arbitration* before" adjustment boards established under the Act.

*Conrail*, 491 U.S. at 303 (emphasis added).

As the Court explained in *Jacksonville Terminal*, 394 U.S. at 378, with respect to "major

disputes":

The Act provides a detailed framework to facilitate the voluntary settlement of major disputes. A party desiring to effect a change of rates of pay, rules, or working conditions must give advance written notice. § 6. The parties must confer, § 2 Second, and if conference fails to resolve the dispute, either or both may invoke the services of the National Mediation Board, which may also proffer its services sua sponte if it finds a labor emergency to exist. § 5 First. If mediation fails, the Board must endeavor to induce the parties to submit the controversy to binding arbitration, which can take place, however, only if both consent. §§ 5 First, 7. If arbitration is rejected and the dispute threatens "substantially to interrupt interstate commerce to a degree such as to deprive any section of the country of essential transportation service, the Mediation Board shall notify the President," who may create an emergency board to investigate and report on the dispute. § 10. While the dispute is working its way through these stages, neither party may unilaterally alter the status quo. §§ 2 Seventh, 5 First, 6, 10.

An essential feature of the Act's major dispute procedures is the Act's status quo obligation, for as the Supreme Court explained in *Detroit & Toledo Shore Line*, 396 U.S. at 150:

The Act's status quo requirement is central to its design. Its immediate effect is to prevent the union from striking and management from doing anything that would justify a strike. In the long run, delaying the time when the parties can resort to self-help provides time for tempers to cool, helps create an atmosphere in which rational bargaining can occur, and permits the forces of public opinion to be mobilized in favor of a settlement without a strike or lockout. Moreover, since disputes usually arise when one party wants to change the status quo without undue delay, the power which the Act gives the other party to preserve the status quo for a prolonged period will frequently make it worth-while for the moving party to compromise with the interests of the other side and thus reach agreement without interruption to commerce.

RLA §§ 5 First, 6, and 10, 45 U.S.C. §§ 155 First, 156, and 160, set forth the Act's status quo obligation, which the *Detroit & Toledo* Court held must be read in conjunction with the duty imposed by RLA § 2 First "'to exert every reasonable effort' to settle disputes without interruption to interstate commerce." 396 U.S. at 151, *quoting* 45 U.S.C. § 152 First. Together, those provisions

-18-

form "an integrated, harmonious scheme for preserving the status quo from the beginning of the major dispute through the final 30-day 'cooling-off' period." 396 U.S. at 152. As the Court further explained (396 U.S. at 152-53; footnotes omitted; emphasis added):

> [T]he intent and effect of each [provision] is identical so far as defining and preserving the status quo is concerned. *The obligation of both parties during a period in which any of these status quo provisions is properly invoked is to preserve and maintain unchanged those actual, objective working conditions and practices, broadly conceived, which were in effect prior to the time the pending dispute arose and which are involved in or related to that dispute.*

"Minor" disputes, on the other hand, while subject to the duty imposed by RLA § 2 First (as are major disputes) to "exert every reasonable effort . . . to settle all disputes, whether arising out of the application of such agreements or otherwise" (45 U.S.C. § 152 First), are not subject to the Act's long and drawn dispute resolution procedures, which are designed to bring about a *voluntary* resolution of the dispute. Rather, unresolved minor disputes are subject to *compulsory adjustment* before an adjustment board established under the Act. *Conrail*, 491 U.S. at 303-04. Moreover, minor disputes are not *per se* subject to the Act's status quo obligation. *Conrail*, 491 U.S. at 310.

In this case, there can be no legitimate disagreement with the conclusion that Gate Gourmet and the Council are engaged in a major dispute. Indeed, Gate Gourmet's invocation of the NMB's mediatory jurisdiction (1st Amended Complaint at ¶28) conclusively establishes that fact. Nor can there be any dispute over the fact that the Act's status quo obligation has been triggered by the service of the various proposals to change the NMA. Indeed, the NMB has "reminded" the parties of that fact when it docketed Gate Gourmet's request for mediation. 1st Amended Complaint Ex. 8. Nor can there be any genuine disagreement over the fact that the rates of pay and working conditions that Gate Gourmet intends to change on July 1, 2005–its contractual obligation to provide Health

Care benefits for its employees mainly at its expense–is one of those "actual, objective working conditions and practices, broadly conceived, which were in effect prior to the time the pending dispute arose and which are involved in or related to that dispute." *Detroit & Toledo Shore Line*, 396 U.S. at 153. Any assertion that the July 1, 2005 change is *not* related to the pending Section 6 negotiations has been conclusively laid to rest both by the fact that the parties are *bargaining* over those costs and by Gate Gourmet's announcement of the proposed change: It will eliminate its "subsidy" of the "Medical Plan" effective July 1, 2005 "if the new contract is not approved by the union membership." 1st Amended Complaint Ex. 4.

Two conclusions are thus inescapable: First, plaintiff stands a substantial likelihood of success on the merits; and second, this Court's obligation to enforce the RLA requires that Gate Gourmet be enjoined from changing the status quo it has threatened it alter as of July 1, 2005. *Southern Ry. v. Brotherhood of Locomotive Firemen*, 337 F.2d at 133-34 (No showing of irreparable harm is needed to preserve status quo).

### C.    Gate Gourmet's Contract Defense Does Not Relieve It Of Its Status Quo Obligation.

Gate Gourmet has informed the Council that it has the right to eliminate its funding of its employees' Health Care coverage because, it asserts, the NMA gives it that right. Gate Gourmet will also undoubtably argue to this Court that since it claims a contractual right to take the disputed action, the RLA's status quo obligation does not preclude it from exercising its putative contractual right *while* the parties utilize the NMA's SBA procedures to resolve its claimed-contractual right. That assertion, if made, will be without merit, for a claimed contractual right to change an actual, objective working condition during a major dispute over changes to that working condition does not

relieve the carrier of its duty under the RLA to *preserve* the status quo during the major dispute. *Southern Ry. v. Brotherhood of Locomotive Firemen*, 337 F.2d at 132.

In *Southern Railway*, the railroad was party to an agreement with its Firemen that provided that a "fireman, or a helper, taken from the seniority ranks of the firemen, shall be employed on all locomotives." 337 F.2d at 129, *quoting* Agreement. While the railroads and the Firemen's union were bargaining over the carriers' proposal to eliminate the fireman position, one of the railroads involved in that bargaining, Southern, began to interpret the agreement as requiring it to use firemen *if* it had firemen, but not as requiring it to hire additional firemen if it did not have enough firemen to staff all of its trains. *Id.* Even though all recognized that the contract interpretation dispute was arbitrable, the district court enjoined Southern from operating trains without firemen until either the parties exhausted the Act's major dispute provisions *or* the adjustment board resolved the contract-interpretation dispute. 337 F.2d at 131. That injunction was upheld on appeal. As the Court of Appeals explained (337 F.2d at 132; footnote omitted):

> With respect to this "claim" (count) of the complaint [that Southern was violating its status quo obligation], we think that the District Court was clearly correct in enjoining any effort by Southern to effectuate a change in the working practice under its contract, prior to 1960, of operating all locomotives with a fireman present in the cab pending a modification or change of that contract in accordance with the Act. And further in this particular we are equally clear that the injunction under this "claim" must forbid also a change in the long-standing interpretation in this respect which had been given by the parties to the existing contract. To allow a change in the construction of the contract in the way sought here would in substance and effect change the contract itself, as acted upon and applied by the parties from the beginning. As the District Court said, to permit this would subvert the purpose and intent of Section 6 of the Act.

Additionally, the *Southern Railway* court explained the relationship between the Act's status quo obligation and the Act's minor dispute resolution procedures by stating (337 F.2d at 132-33; emphasis added):

> And for reasons already referred to, we think that the District Court properly ordered, under the second claim of the complaint [*i.e.*, to preserve the status quo], that the injunction will remain effective until either the NRAB [National Railroad Adjustment Board] interprets the contract in Southern's favor or until the contract is modified or changed under the Railway Labor Act. The NRAB of course is not ordinarily concerned with Section 6 proposals, but here the contract change proposed under Section 6 would be put into effect immediately by the change in the long-standing prior interpretation and application of the old contract. To be effective and to effectuate the command of Section 6, the injunction under the Section 6 claim must, pending exhaustion of the statutory processes for negotiation of a new contract under the Act, properly preclude such a change in interpretation until such change is authorized by the NRAB, *even granting that ordinarily the change could not be enjoined*.

Although *Southern Railway* pre-dates both *Conrail* and *P&LE*, nothing in those later cases calls *Southern* into question. First, *Conrail* does not apply to the status quo issue raised in this case. While *Conrail* held that when the underlying controversy is properly classified as minor dispute, the Act's status quo requirement does not apply (*Conrail*, 491 U.S. at 310 (in such a case "the employer may make the change and the courts must defer to the arbitral jurisdiction of the [Adjustment] Board")), here, there can be no legitimate argument over the applicability of the Act's status quo obligation, for the parties are engaged in a major dispute and are unquestionably subject to the Act's status quo obligation. Thus, the issue that Gate Gourmet will be arguing to this Court–*i.e.*, Does the fact that a carrier claims a contractual right to change employment terms, relieve it of the status quo obligation applicable to major disputes?–was not the issue addressed in *Conrail.* Indeed, the *Conrail* Court emphasized the fact that the case before it did not involve *enforcement* of the status quo during

-22-

a major dispute when it rejected RLEA's reliance on *Detroit & Toledo* in asserting that RLA § 2

First provides a status quo obligation applicable to minor disputes. As the Court explained (491 U.S.

at 305, n. 5 contd.; emphasis added):

> The language [in *Detroit & Toledo*] upon which the Union relies (a
> reference to "the implicit status quo requirement in the obligation
> imposed upon both parties by § 2 First, 'to exert every reasonable
> effort' to settle disputes without interruption to interstate commerce")
> appears in the context of explaining that the express status quo
> requirements applicable to a *major* dispute must be broadly
> interpreted. It has no direct application to a minor dispute.

And second, *P&LE* does not assist Gate Gourmet. There, the Court observed that where a

collective bargaining agreement gives a carrier the right to change working conditions, the Act's

status quo obligation does not "trump" that contractual right. *P&LE*, 491 U.S. at 509 ("The RLEA

concedes that had the collective-bargaining agreements *expressly* waived bargaining concerning sale

of P&LE's assets, the unions' § 156 notices to change the agreements could not trump the terms of

the agreements and could not delay the sale") (emphasis added). *See also*, *Baker v. UTU*, 455 F.2d

149, 156 (3rd Cir. 1971) ("[W]hen the railroad has engaged in certain activity over a sufficient period

of time for the union to become aware of it . . . such past activity by the railroad absent objection by

the union can become part of the actual status quo"). However, the issue presented here is not the

one alluded to in *P&LE*, for the question Gate Gourmet will pose is, in a dispute where the Act's

status quo obligation undoubtably applies, does a carrier's *disputed* claim of a contractual

justification "trump" the Act's status quo requirement. That question raises a dispute over what are

the "actual, objective working conditions" that the Act's status quo obligation mandates be

maintained–and that issue, in turn, presents a question of statutory interpretation over which the

Act's adjustment boards have no jurisdiction. *Air Cargo Inc. v. Local 851, IBT*, 733 F.2d at 246-47.

As the Second Circuit explained in *Air Cargo Inc.*, 733 at 246-47 (footnote omitted; emphasis added):

> The System Board of Adjustment has exclusive jurisdiction in cases of minor disputes. . . . But no statutory jurisdiction has been accorded to the System Board in cases of major disputes, including disputes over proposed changes in working conditions, and the System Board thus cannot have any jurisdiction to determine the parties' obligations during such disputes. As a result, while the major dispute procedures of Section 6 are being carried out, the district court has exclusive jurisdiction to ensure that the status quo is being maintained. *It therefore has exclusive jurisdiction to determine what the status quo is.*

*Southern Railway*, plaintiff submits, properly balanced the Act's status quo obligation with respect for a disputant's contractual rights, for *Southern Railway* recognized, as *Conrail* subsequently held, that the Act's status quo obligation does not apply to contract interpretation questions. But *Southern Railway* also recognized that, for the Act's status quo obligation to be meaningful, a carrier's disputed claim of a contractual right to alter the status quo cannot be viewed as "trumping" the Act's requirement that the status quo be preserved during the admittedly major dispute. 337 F.2d at 132-33.That holding is controlling here.

> **D.    Gate Gourmet's Putative Contractual-Right To Change Working Conditions Unilaterally Has Not Been Asserted In Good Faith, And, Thus, Does Not Raise A Dispute That Is Exempt From The Act's Major Dispute Processes.**

A second flaw in Gate Gourmet's putative contractual defense to plaintiff's demand that it preserve the status quo, is that, even if the dispute raised by its claim of a contractual right to end its funding of its employees' Health Care coverage unilaterally could be divorced from the major dispute currently before the NMB (which it cannot), the underlying controversy posed by its claim of a contractual right raises a dispute subject to the Act's major dispute procedures–including the

-24-

Act's status quo obligation. This is so because Gate Gourmet's claim of a contractual right to end its funding of Health Care coverage for its employees has *not* been asserted in good faith. *Hawaiian Airlines, Inc. v. Norris*, 512 U.S. 246, 266 (1994) ("[A] dispute would be deemed minor only if there was a sincere, nonfrivolous argument that it turned on the application of the existing agreement, that is, if it was 'arguably justified' by that agreement"); *Conrail*, 491 U.S. at 307.

In *Conrail*, and again in *Norris*, the Court has emphasized that the test it enunciated in *Conrail* did not attempt to determine whether the claimed contractual right raised an issue that was subject to the Act's adjustment boards' jurisdiction, for even a *frivolous* or insincere claim grounded in a collective bargaining agreement is arbitrable. *See, Steelworkers v. American Manufacturing Co.*, 363 U.S. 564, 568 (1960) ("The courts [in considering a request to compel arbitration of a labor dispute] . . . have no business weighing the merits of the grievance, considering whether there is equity in a particular claim, or determining whether there is particular language in the written instrument which will support the claim. The agreement is to submit all grievances to arbitration, not merely those which the court will deem meritorious. The processing of even frivolous claims may have therapeutic values of which those who are not a part of the plant environment may be quite unaware") (footnotes omitted). Rather, the *Conrail* test is to police the line between major and minor disputes so that a carrier does not impermissibly avoid the Act's major dispute procedures through an inappropriate claim that the underlying controversy is a minor dispute. *Norris*, 512 U.S. at 265 ("This 'arguably justified' standard . . . was employed only for policing the line between major and minor disputes"). As the Court explained in *Conrail*, 491 U.S. at 305-06:

> To an extent . . . the distinction between major and minor disputes is a matter of pleading. The party who initiates a dispute takes the first step toward categorizing the dispute when it chooses

-25-

> whether to assert an existing contractual right to take or to resist the action in question. But the Courts of Appeals early recognized that there is a danger in leaving the characterization of the dispute solely in the hands of one party. In a situation in which the party asserting a contractual basis for its claim is "insincere" in so doing, or its "position [is] founded upon insubstantial grounds," the result of honoring that party's characterization would be to undercut "the prohibitions of § 2, Seventh, and § 6 of the Act" against unilateral imposition of new contractual terms. . . . In such circumstances, protection of the proper functioning of the statutory scheme requires the court to substitute its characterization for that of the claimant.

The test that *Conrail* sanctioned is (491 U.S. at 307):

> Where an employer asserts a contractual right to take the contested action, the ensuing dispute is minor if the action is arguably justified by the terms of the parties' collective-bargaining agreement. Where, in contrast, the employer's claims are frivolous or obviously insubstantial, the dispute is major.

*Norris*, which was authored by Justice Blackmun, the author of *Conrail*, adds a further gloss to this test by explaining that the *Conrail* "Court held that a dispute would be deemed minor only if there was a *sincere, nonfrivolous argument* that it turned on the application of the existing agreement, that is, if it was 'arguably justified' by that agreement." 512 U.S. at 266 (emphasis added).

Here, Gate Gourmet cannot satisfy the *Conrail/Norris* test, for the company's reliance on the NMA to justify its unilateral discontinuance of the funding for its Health Care plan is not sincere–it has been taken in patent bad faith. Putting aside the obvious contractual interpretation problems with Gate Gourmet's reliance–*e.g.*, a mid-year reduction for employees by relying upon a contractual provision calling for yearly contribution rates driven by the rates management pays–here Gate Gourmet has *not in fact* attempted to match the employee contribution rates to the management rates. Rather, Gate Gourmet has adjusted the management-contribution rates to match the unilateral

-26-

increases it has made to the employee-contribution rates and is essentially rebating to its managers

the premium increases it has instituted to abrogate its contractual Health Care obligations. Moreover,

Gate Gourmet's actions are obviously driven by the contract negotiations. It announced its

discontinuance of its funding of the Health Care coverage both to coerce its employees into accepting

the contract proposal they rejected and to immediately cut its labor costs under the existing

agreements, notwithstanding the Act's status quo requirement. This bad faith conduct is made plain

by the declaration of Jennifer Brainer, where she states (Brainer Dec. at ¶8):

> [Gate Gourmet's Chicago General Manager Bill Webb] told me we
> had a choice; we could have accepted the contract and kept our
> insurance premiums down. I responded that their blackmail of higher
> insurance premiums wasn't going to work if they took our pay, our
> vacation, our overtime; everything we have. I told him that the most
> upsetting thing to me is that the company thinks I am so stupid that
> I can't see this as a way to circumvent the agreement. I asked him if
> it was so important to them to keep their management, why are they
> waiting until July to make the bonus payment when, coincidently, our
> insurance premiums will skyrocket? He had no answer.

Plaintiff submits that the answer to Ms. Brainer's question is apparent: Gate Gourmet's

claimed contractual justification for its unilateral alteration of the status quo–and the abrogation of

its contractual obligation to fund its Health Care plan–is an insincere, bad faith attempt to avoid its

obligations under the RLA. However, Gate Gourmet's bad faith claim of a contractual right to act

unilaterally does not immunize Gate Gourmet from the Act's status quo obligation, or from the Act's

command in RLA § 2 Seventh, which is independent of the Act's status quo obligation, that it not

change agreements except in the manner prescribed in the agreement (which it is not doing) or in the

manner prescribed in Section 6 of the Act (commands with which it yet to fully comply). *Conrail,*

491 U.S. at 310 (Carrier may not change working condition unilaterally based on bad faith contractual claim).

Additionally, Gate Gourmet's threatened unilateral change also violates Gate Gourmet's judicially enforceable duty under RLA § 2 First "to exert every reasonable effort to make and maintain agreements concerning rates of pay, rules, and working conditions, and to settle all disputes, whether arising out of the application of such agreements or otherwise . . . ." This Court clearly has jurisdiction to enjoin Gate Gourmet's threatened violation of its RLA duties. *Conrail*, 491 U.S. at 303; *Chicago & North Western Ry. v. UTU*, 402 U.S. at 577 ("[W]e think it plain that § 2 First was intended to be more than a mere statement of policy or exhortation to the parties; rather, it was designed to be a legal obligation, enforceable by whatever appropriate means might be developed on a case-by-case basis"); *Id.*, 402 U.S. at 581 ("[W]e think the conclusion inescapable that Congress intended the enforcement of § 2 First to be overseen by appropriate judicial means").

In short, Gate Gourmet's bad faith contractual justification does not immunize it from the Act's status quo obligation, which applies here and outlaws the threatened changes to the employee Health Care plan.

      **E.**    **The Availability of Preliminary Injunctive Relief In the Circumstances of This Case Does Not Turn on Whether the Parties' Dispute Is Categorized As "Major" or "Minor."**

We have shown above that the parties' dispute over the termination of health care contributions is "major," involving changes in rates of pay, rules and working conditions, because it is part and parcel of an acknowledged major dispute before the NMB and the defendants' purported contract justification for ending its contributions has been asserted in bad faith. Injunctive

relief to restore the status quo is required. Under the unique facts of this case, however, the Court need not address either the status quo or proper characterization issues at this time, since there is an independent, alternative basis upon which to issue interim injunctive relief: Interim injunctive relief should be granted to preserve the status quo pending adjudication of the Plaintiff's grievance by the adjustment board even if the parties' dispute is "minor," involving no more than an issue of contract interpretation. This is because the defendants' unilateral action is so sweeping and devastating in its impact on employees as to prevent the adjustment board from granting meaningful relief. Injunctive relief in aid of the board's jurisdiction is warranted.

The appropriate remedy in this case, where Gate Gourmet has made unilateral changes without complying with the requirements of conference or good faith negotiation would be to order the maintenance of the terms and conditions in effect before the May 12, 2005 announcement, pending exhaustion of the Act's procedures, whether they be for major or minor dispute resolution.

Ever since *BLE v. Missouri-Kansas-Texas R. Co.* [hereinafter, "*M-K-T*"], 363 U.S. at 534-35, where the Court relied in part on the duty of federal courts to preserve the jurisdiction of the RLA's adjustment boards in upholding conditions applied to a strike injunction, it is settled law that a federal district court, upon proper equitable showing, has jurisdiction to issue injunctive relief to a union to preserve the status quo pending an arbitration decision by a System Board.[9/] In *M-K-T*, the

---

[9/]       The Court in *M-K-T*, 363 U.S. at 531, n. 3, and again in *Conrail*, 491 U.S. at 304-05, n. 5, noted that it was not deciding in those cases whether a status quo injunction could issue independent of a suit by the railroad for injunctive relief. However, the *M-K-T* Court relied in part upon the its ruling in *BRT v. Chicago River & Indiana R.R.*, 353 U.S. 30 (1957), that "an injunction may issue to preserve the [Adjustment] Board's jurisdiction" (363 U.S. at 534), and then added (*Id.*): "We think that, in logic, we must hold that the conditions are proper also, at least where they are designed not only to promote the interests of justice [*i.e.*, the rationale used to uphold *conditioning* the strike injunction], but also to preserve the jurisdiction of the Board." The Court subsequently relied upon *Chicago River*'s preservation of the arbitral tribunal's jurisdiction rationale to uphold

-29-

Court held that a district court, while a grievance was pending before a National Railroad Adjustment Board, properly conditioned a strike injunction upon an order which enjoined the carrier from effectuating the changes which gave rise to and constituted the subject matter of the grievance before the Board. The action of the district judge, the Court held, "rather than defeating the Board's jurisdiction, [operated] to preserve that jurisdiction by preventing injury so irreparable that decision of the Board in the Union's favor would be but an empty victory." *Id.*, 363 U.S. at 534.

Since *M-K-T*, Courts have uniformly held that they have power to stay employer actions where changes in the status quo would frustrate the arbitral process or deprive the union of an otherwise effective arbitral remedy. *IAM v. Eastern Air Lines, Inc.*, 847 F.2d at 1017 ("[T]he Supreme Court has authorized federal courts to preserve the status quo pending resolution of a minor dispute by a system board of adjustment, where an injunction 'rather than defeating the Board's jurisdiction, would operate to preserve that jurisdiction by preventing injury so irreparable that a decision of the Board in the union's favor would be but an empty victory'") (*quoting*, *M-K-T-, 363 U.S. at 534); Local Lodge 2144, BRAC v. Railway Express Agency, Inc.*, 409 F.2d 312, 316 (2d Cir. 1969); *see also*, *ALPA v. Eastern Air Lines, Inc.*, 869 F.2d at 1520-21, n. 2 (Dicta that court may issue injunction preserving status quo in minor dispute "when an injunction is necessary to preserve the arbitrator's ability to decide the dispute"); *Westchester Lodge 2186, BRAC v. Railway Express*

---

a strike injunction in a contract interpretation dispute under the Labor Management Relations Act (LMRA), 29 U.S.C. § 141, *et seq.*, in *Boys Markets, Inc. v. Retail Clerrks Union, Local 770*, 398 U.S. 235, 251-52 (1970), and it is now settled under the LMRA that federal courts have jurisdiction to preserve the jurisdiction of arbitral tribunals independent of a request by an employer to enjoin a strike. *Steelworkers v. Fort Pitt Steel Casting*, 598 F.2d at 1282-83. Thus, there can be no legitimate challenge to the jurisdiction of this Court to issue an injunction at plaintiff's request to preserve the SBA's jurisdiction.

*Agency, Inc.*, 329 F.2d at 753 (same); *UTU v. Burlington Northern, Inc.*, 458 F.2d 354, 357 (8th Cir. 1972) (same).

The Second Circuit Court of Appeals, in *Railway Express,* upheld an injunction issued to prevent a transfer and consolidation of work, which constituted a minor dispute under the Railway Labor Act. *Railway Express*, 409 F.2d at 315-16. The Court stated that in such cases, a district court may "enjoin a carrier from effectuating the changes which gave rise to and constitute the subject matter of the dispute, independently of any suit by the railroad for equitable relief." *Id*. at 316 (citing *M-K-T*, 363 U.S. at 531 n.3). The Court went on to note, in upholding the union's request for preliminary relief, that, as in the present case, it was the employer, not the union, "that took the bit in its teeth and made the move despite the legal risk . . . . In balancing the equities it is surely not irrelevant that [the employer] took its chances . . . ." *Id.* at 317. The fact that the company had been faced with very heavy operating losses was held not to outweigh the irreparable injury which would be suffered by the employees as a result of losing their jobs, and could not prevent the issuance of the preliminary injunction. *Id*. at 316.

Recently, this district Court issued an injunction to preserve the integrity of the arbitral process in *American Postal Workers Union v. United States Postal Serv.*, ___ F.Supp.2d ___, 2005 WL 1330429 (D.D.C. June 6, 2005). The Court stated that (*id*. at *6):

> "When the parties have agreed to arbitrate a dispute, a court may issue an injunction if, in addition to the usual equitable concerns, the integrity of the arbitration process would be threatened absent interim relief.' *Int'l Bhd. of Elec. Workers, Local 1900 v. Potomac Elec. Power Co.*, 634 F. Supp. 642, 643 (D.D.C. 1986). In evaluating these concerns, "[i]f the arguments for one factor are particularly strong, an injunction may issue even if the arguments in other areas are rather weak." *CityFed Fin. Corp.*, 58 F.3d at 747. Here, there is no question that the APWU will be irreparably harmed if it is not

afforded the opportunity to have its dispute with the USPS subjected to the arbitration process prior to July 1, 2005. "The Supreme Court in *Boys Markets* established that the existence of actual or threatened irreparable injury is a prerequisite to an award of injunctive relief from breaches of collective bargaining agreements." *Int'l Ass'n of Machinists and Aerospace Workers v. Panoramic Corp.*, 668 F.2d 276, 285 (7th Cir. 1981) (citing *Boys Mkts.*, 398 U.S. at 254). Indeed, [i]rreparable injury means not simply any injury resulting from a breach of contract that would not be fully redressed by an arbitral award, but rather 'injury so irreparable that a decision of the (arbitration) Board in the union('s) favor would be but an empty victory.'" *Id.* at 285-286 (quoting *Bhd. of Locomotive Engineers v. Miss.-Kan.-Tex. R.R.*, 363 U.S. 528, 534 . . . (1960)). Thus, "[a]n injunction in aid of arbitration is appropriate . . . only when the actual or threatened harm to the aggrieved party amounts to a frustration or vitiation of arbitration." *Id*. at 286. Here, if the dispute is not submitted to arbitration on an expedited basis, the arbitration process will not merely be "frustrated" but will be effectively vitiated because permitting the process to proceed in its normal course would result in the dispute being arbitrated only after the USPS's authority to authorize voluntary early retirement had already expired. Thus, if the APWU prevailed after the USPS's authority expired, its success "would be but an empty victory." *Id.* at 286. Accordingly, because the APWU will be irreparably harmed if this matter is not submitted to arbitration on an expedited basis, and because irreparable harm to the moving party is "[t]he basis of injunctive relief in the federal courts," *CityFed Fin. Corp.*, 58 F.3d at 747 (quoting *Sampson v. Murray*, 415 U.S. 61, 88 . . . (1959), this Court orders that the parties' dispute be submitted to arbitration prior to July 1, 2005.

Likewise, in this instance, an eventual award in favor of the Council "would be but an empty victory" because it could not remedy the employees' inability to obtain medical treatment in the time period from July 1–when most employees will lose their health coverage under the Gate Gourmet Benefit Plan–and the date an arbitration decision finally issues. The underlying dispute over whether Gate Gourmet may discontinue its contribution under the NMA will not be finally resolved for several months. Paulsen Dec. at ¶16. The Council has requested that Gate Gourmet agree to expedite the grievance procedures for this matter. In response, Gate Gourmet agreed to hear this grievance

-32-

at the next system board, where it is expected to be deadlocked. The parties will then choose an arbitrator.  Paulsen Ex. 1 at 8 (Art. 10). Even under an expedited schedule, it will still take weeks, if not months, for a hearing to be conducted and a decision to be issued.

In the meantime, employees who did not "re-enroll" and the family members of employees who were dropped from coverage effective July 1, will have been unable to obtain medical treatment. Of the 4,519 employees eligible to participate in the Gate Gourmet Health Benefits Plan, only 492 "re-enrolled" by the June 8 deadline.  2nd Vairma Dec. at ¶ 4.  As of May 12th, as a result of the January 2005 changes, only 2,706 employees had been enrolled. 2nd Vairma Dec. Ex. 5. Furthermore, many employees who did "re-enroll" were forced to reduce coverage to employee only. *Id*. Only approximately ten percent of those employee who had family coverage "re-enrolled" for family coverage. *Id.* Employees under the NMA average approximately $11.10 an hour and they simply cannot afford monthly payments of $390.57 for individual coverage, $796.49 for employee and spouse coverage and $757.25 for employee and child coverage. Paying for family coverage at $1,148.27 a month would leave these employees with little or no wages for other living expenses, including the additional costs for medical care such as deductions and co-pays. See, Nelson Decl at ¶2; Bui Dec. at ¶2.

It is indisputable that employees and their family members who were covered under the Gate Gourmet Medical Plan will suffer from untreated health problems if Gate Gourmet discontinues its contribution in July. Authorization for necessary medical service has already been improperly denied for at least one employee who did not "re-enroll" even though she is still covered by the Gate Gourmet Medical Plan. Annie Rolack has epilepsy that she controls with medication and her doctor believes that she has emphysema. Rolack Decl at ¶3 and Second Rolack Dec. at ¶ 2. Ms. Rolack

cannot afford the premium payment for individual coverage on her salary of $13.02 an hour, so she did not "re-enroll." Rolack Dec. at ¶¶2, 3. She will not have any insurance as of July 1. *Id.* at ¶3. On June 13, 2005 she went to the hospital for a CAT Scan, which had been ordered by her doctor. However, she was told that the hospital would not perform the CAT Scan because her insurance would not authorize it. Second Rolack Dec. at ¶¶2-3. The insurance representative who spoke to Ms. Rolack would not state a reason for the refusal to authorize the procedure. *Id.* at ¶4. Ms. Rolack cannot afford to pay for the CAT Scan herself and, therefore, has been unable to have the procedure performed. At this moment, she is unable to get necessary treatment for her condition. *Id.* at ¶6.

Ms. Rolack is the Chief Shop Steward at the Gate Gourmet facility in Memphis, Tennessee. Rolack Dec. at ¶1. She is not aware of anyone who "re-enrolled" and, in fact, knows two employees who were forced to retire because of the impending increases in health insurance. Rolack Dec. at ¶4. The premium payment for the Gate Gourmet Medical Plan is simply cost prohibitive for its hourly employees.

For example, thirty-four year employee Willie Maud Anderson is the sole provider for her daughter, her husband and herself. Anderson Dec. at ¶2. Her husband is very ill and has been unable to work for two years. *Id.* at ¶2. Ms. Anderson did not "re-enroll" for family coverage because paying the total monthly premium by herself would leave her only approximately $200 of her $1,356 monthly take home pay. *Id.* at ¶1. She and her family will not have health insurance as of July 1. Ms. Anderson takes medication to control high cholesterol and high blood pressure.  Her husband takes four to six medications and is under the care of a specialist. *Id.* at ¶4.

Even Joseph Nelson who makes up to $14.52 an hour, which is more than three dollars above the average salary, was unable to "re-enroll" because he could not afford to pay the total premium

-34-

for family coverage on a take home pay of approximately $1,560 a month. Nelson Dec. at ¶1. Mr. Nelson, who is a diabetic and has high blood pressure, his wife, who takes medication for a chemical imbalance and his daughter will not have any health insurance if Gate Gourmet fails to contribute to the July premium payment. *Id.* at ¶¶2, 4.

Similarly, Lan Chi Bui also dropped family medical coverage because the total premium payment would leave her with approximately $60 of her monthly take home pay. She, too, will be uninsured in July even though she is several weeks pregnant. Bui Dec. at ¶¶1-3.

Shirley Lewis, who makes $10.22 an hour, did not re-enroll for employee only coverage because she cannot afford a $796 monthly premium. Lewis Dec. at ¶¶1-2. Ms. Lewis controls high blood pressure with three medications. *Id.* At ¶3.

Dora Dominguez makes $8.75 an hour. Dominguez Dec. at ¶1. Until January 1, 2005, she was enrolled in employee and spouse coverage. *Id.* at ¶2. She dropped coverage for her disabled husband when Gate Gourmet unilaterally implemented increases in the employees' contribution rates and reductions in benefits in January. *Id.* Now, she cannot afford the increased contribution for individual coverage and did not "re-enroll." *Id.* Ms. Dominguez has been under treatment for a kidney problem for approximately three years. She was paying off her last operation before having another required surgery. She will have no insurance as of July 1 and no way to pay for the surgery, which will cost at least $11,000. *Id.* at ¶4.

Like Ms. Dominguez, Mildred Washington has had repeated kidney problems requiring surgery. Ms. Washington could not afford to "re-enroll" for individual coverage because she could not afford the premium payment on her salary of $11.29 an hour. Washington Dec. at ¶¶1-2. The premium payments were a financial hardship along with the required co-payments, deductions and

other expenses for her health care after the changes to the Gate Gourmet Health Insurance in January. *Id.* at ¶3. Ms. Washington is under treatment by specialists for thyroid and kidney problems. *Id.* at ¶4. Until she can afford extensive surgery to relieve her kidney problem, she has minor surgery to replace a stint every three to six months. *Id.* at ¶¶4, 5. The last time she underwent this procedure was in April. *Id.* She will not have medical insurance as of July 1 and no way to pay for her needed surgery. *Id.* at ¶¶2, 4.

The inability to receive proper medical treatment is irreparable. *Steelworkers v. Textron, Inc.*, 836 F.2d at 8-9; *Steelworkers v. Fort Pitt Casting*, 598 F.2d at 1280. As the *Fort Pitt* court observed, 598 F.2d at 1280, the fact that an arbitrator may be able to require an employer to compensate an employee for the costs of health insurance that the employee acquired due to the employer's failure to continue to provide that coverage, does not make the loss of insurance coverage reparable. "If the risk of 'water pipes freezing' can constitute irreparable injury, . . . then surely the possibility that a worker would be denied adequate medical care as a result of having no insurance would constitute 'substantial and irreparable injury.'"

The Second Circuit Court of Appeals has also found that "the threatened termination of benefits such as medical coverage for workers and their families obviously raised the specter of irreparable injury." *Whelan v. Colgan*, 602 F.2d 1060, 1062 (2d Cir. 1979). *See also*, *Communication Workers of America, District 1, AFL-CIO v. NYNEX Corp.*, 898 F.2d 887, 891 (2d Cir. 1990) (the threat of termination of medical benefits to striking workers constitutes irreparable harm).

Here, without insurance, Ms. Rolack will not be able to obtain a complete diagnosis and proper treatment of her condition. Her epilepsy, like Mr. Nelson's diabetes and high blood pressure, Ms. Anderson's husband's illness, Ms. Bui's pregnancy, Ms. Lewis' high blood pressure, the kidney

problems of Ms. Washington and of Ms. Dominguez and all other new and continuing medical problems will go untreated.

"The loss of health insurance benefits . . . constitutes irreparable harm for purposes of a preliminary injunction." *Risteen v. Youth For Understanding USA, Inc.*, 245 F. Supp. 2d 1, 16 (D.D.C. 2002). While the employees here are not unemployed, as was the plaintiff in *Risteen*, they are low-paid hourly employees who must pay other costs related to health coverage since benefits were reduced and co-payments and deductions increased in January. These payments alone are a financial hardship. Moreover, the monthly health insurance premium payments they must make to continue coverage are enormous, in some cases almost equaling the employee's take home pay.

Moreover, this is not a situation like that in *Boivin v. US Airways, Inc.*, 297 F.Supp.2d 110 (D.D.C. 2003), were the District Court denied the request of a group of retired pilots for the issuance of a preliminary injunction requiring the Pension Benefit Guaranty Corporation to make certain payments to them. The District Court found that the retired pilots had not demonstrated irreparable harm because they had alleged injuries such as the forced sale of a boat, a house or stock, which could be remedied by a monetary reimbursement with interest. Here, there is no monetary amount that can remedy the inability to obtain medical treatment needed by the employees and their dependents. This certainly constitutes an" imminent threat" that is "non-compensable." *Carabillo v. Ullico Inc., Pension Plan and Trust*, 355 F.Supp.2d 49, 54 (D.D.C. 2004).

## II. THIS COURT SHOULD IMPOSE ONLY A MINIMAL BOND SINCE THE INJUNCTION IS NECESSARY TO ENFORCE THE COMMANDS OF AN ACT WHICH CONGRESS HAS ENACTED IN PART TO PROTECT THE PUBLIC'S INTERESTS IN INTERRUPTED INTERSTATE COMMERCE.

Plaintiff recognizes that both Section 7 of the Norris-LaGuardia Act, 29 U.S.C. § 107,[10] and

---

[10]    Section 7 of the Norris-LaGuardia Act, 29 U.S.C. § 107, provides in pertinent part that:

Rule 65(c), Fed. R. Civ. P.,[11/] provide that this Court must condition the grant of injunctive relief by requiring plaintiff to post a bond. *See*, *Alton & Southern Ry. v. BMWE*, 899 F.Supp. 646, 650-51 (D.D.C.), *aff'd* 72 F.3d 919 (D.C. Cir. 1995) (table). This Court, however, has "broad discretion . . . to determine the appropriate amount of an injunction bond." *DSE, Inc. v. United States*, 169 F.3d 21, 33 (D.C. Cir. 1999) (construing Rule 65(c)); *District 29, UMW v. New Beckley Mining Corp.*, 895 F.2d 942, 947 (4th Cir. 1990). Indeed, some courts have construed this discretion as allowing the court to dispense with the bond entirely in appropriate cases. *E.g.*, *Temple University v. White*, 941 F.2d 201, 219-20 (3rd Cir. 1991), *cert. denied*, 502 U.S. 1032 (1992) (construing Rule 65(c)); *Crowley v. Local 82, Furniture Movers*, 679 F.2d 978, 999-1001 (1st Cir. 1982), *rev'd on other grounds*, 467 U.S. 526 (1984). Factors that the court should take into account in exercising its discretion are "the possible loss to the enjoined party together with the hardship that a bond requirement would impose on the applicant" and, "in order not to restrict a federal right unduly, that impact that a bond requirement would have on enforcement of the right should also be considered."

---

No temporary restraining order or temporary injunction shall be issued except on condition that complainant shall first file an undertaking with adequate security in an amount to be fixed by the court sufficient to recompense those enjoined for any loss, expense, or damage caused by the improvident or erroneous issuance of such order or injunction, including all reasonable costs (together with a reasonable attorney's fee) and expense of defense against the order or against the granting of any injunctive relief sought in the same proceeding and subsequently denied by the court.

[11/] Rule 65(c), Fed. R. Civ. P., provides that:
Security. No restraining order or preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained.

*Crowley*, 679 F.2d at 1000. Indeed, *Crowley* noted that some courts have held that "no bond is required in suits to enforce important federal rights or 'public interests.'" *Id*.

When these factors are considered here, it is apparent that only a nominal bond, such as a $5,000 bond, should be required here. This is so because this suit is to enforce the commands of the Railway Labor Act, which carriers have long asserted is intended to prevent interruptions to interstate commerce. Thus, in addition to protecting rights of the Gate Gourmet employees who will be unlawfully deprived of their Health Care coverage *unless* Gate Gourmet is restrained, this injunction will also protect the public's interests that the RLA was enacted to guarantee. Those interests are too important to be lost by a requirement that plaintiff post a bond the employees it represents–who earn limited wages–cannot afford.

## CONCLUSION

For the reasons set forth herein, plaintiff respectfully submits that this Court should issue, first, a Temporary Restraining Order, and then a preliminary injunction prohibiting defendants Gate Gourmet, Inc. and its division, Gate Gourmet Division Americas (collectively, "Gate Gourmet") from implementing on July 1, 2005, the carrier's announced intention of discontinuing payment of its portion of the costs for the Health Care coverage which it is obligated by its collective bargaining agreement with the Council to provide for its employees.

Respectfully Submitted,


_____/s/ John O'B. Clarke, Jr._____
John O'B. Clarke, Jr. (Bar No. 044685)
HIGHSAW, MAHONEY & CLARKE, P.C.
1050 17th Street, N.W., Suite 444
Washington, D.C. 20036
(202) 296-8500

-39-

_____/s/ Roland P. Wilder, Jr._____
Roland P. Wilder, Jr. (Bar No. 69069)
Susan Boyle (Bar No. 441102)
BAPTISTE & WILDER, P.C.
1150 Connecticut Ave., N.W., Suite 500
Washington, DC 20036
(202) 223-0723

DATE: June 24, 2005                    Attorneys for Plaintiff Council

## CERTIFICATE OF SERVICE

I hereby certify that I have this 24th day of June, 2005, caused a copy of the foregoing

Memorandum Of Law In Support Of Application For A Temporary Restraining Order and Motion

For A Preliminary Injunction to be served upon counsel for defendants Gate Gourmet Division

Americas and Gate Gourmet, Inc., by causing a copy thereof to be hand delivered to the offices of:

Thomas Jerman
O'Melveny & Myers LLP
1625 Eye Street, N.W.
Washington, D.C. 20036

and by emailing the same to: tjerman@omm.com.

_____/s/ John O'B. Clarke, Jr._____
John O'B. Clarke, Jr.

-40-