## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

IBT/HERE EMPLOYEE REPRESENTATIVES' )
COUNCIL, )
     *Plaintiff,* )
  )
    *v.* )     Civil Action No. 05-01210 (EGS)
  )
GATE GOURMET DIVISION AMERICAS, and )
GATE GOURMET, INC., )
     *Defendants.* )
_____ )

### DECLARATION OF KENNETH C. PAULSEN

**KENNETH C. PAULSEN** hereby declares pursuant to 28 U.S.C. § 1746, under penalty of perjury, that the following is true and correct:

1.     Declarant is an International Vice President of UNITE HERE, a labor organization that represents employees in various industries. Declarant is also the UNITE HERE designee on the IBT/HERE Employee Representatives' Council (Council), which was formed by UNITE HERE's predecessor, the Hotel Employees and Restaurant Employees International Union (HERE), and by the International Brotherhood of Teamsters (IBT) in 2000 to represent employees in the airline catering and commissary industry employed by Gate Gourmet.

2.     The chief executive officer of the Council is the Council Director. This position rotates annually between the HERE designee and the IBT designee. Declarant has been either the Council Director or its Vice Director since the Council was formed in 2000; he is currently, and has been since January 1, 2005, the Council Director.

3.     In July 1999, Gate Gourmet acquired Dobbs International Services, Inc., which operated various flight kitchens throughout the United States. After it was acquired by Gate Gourmet, Dobbs became subject to the Railway Labor Act. At the time Dobbs was acquired by Gate

Gourmet, HERE and IBT, through affiliated local unions, represented the majority of Dobbs' flight kitchen, catering and commissary employees, but did so under the auspices of the National Labor Relations Act, 29 U.S.C. § 151, *et seq*., with separate contracts at each facility. Several other unions represented Dobbs' employees at other facilities, while some Dobbs' employees were unrepresented.

4.      In 2000, HERE and IBT formed the Council, which applied to the National Mediation Board (NMB) to be certified under Section 2 Ninth of the Railway Labor Act, 45 U.S.C. § 152 Ninth, as the representative under the Railway Labor Act for collective bargaining purposes of Gate Gourmet's craft or class employees system wide. On October 11, 2000, the NMB certified the Council as the representative of the craft or class of Kitchen, Commissary, Catering, and Related Employees, employed by Dobbs International services, Inc. d/b/a Gate Gourmet, its successors and assigns. *Dobbs International Services, Inc.*, 28 N.M.B. 7 (2000).

5.      At the time that the Council applied to the NMB to be certified as the craft or class representative, approximately 1,600 of Dobbs employees were represented by four non-Council AFL-CIO labor organizations; namely: The Bakery, Confectionery, Tobacco Workers and Grain Millers International Union; the International Association of Machinists and Aerospace Workers; the Retail, Wholesale and Department Store Union District Council, UFCW; and the Union of Needletrades, Industrial and Textile Employees (UNITE). In July 2004, HERE and UNITE merged to form UNITE HERE. Once it was certified, the Council exercised its prerogative under Section 2 Third of the Railway Labor Act, 45 U.S.C. § 152 Third, and designated those labor organizations as its bargaining agent for the craft or class employees employed by Gate Gourmet at the facilities where, prior to the Council's certification, those unions had represented Dobbs employees.

6.      Prior to the NMB's certification, Gate Gourmet recognized the Council as the

-2-

representative of its employees who had been either represented by the IBT or HERE prior to the formation of the Council, or had been unrepresented. Gate Gourmet also entered into an agreement with the Council, known as the National Master Agreement (NMA), establishing rates of pay, rules, and working conditions to be applied to those facilities where the employees had previously been unrepresented or were subject to agreements negotiated by either HERE or IBT. A true and accurate copy of that agreement, as modified shortly after the Council's certification, is attached hereto as Paulsen Exhibit 1 (PEx. 1). That agreement was intended to be applied in conjunction with various provisions of the collective bargaining agreements in effect at the various facilities where HERE and IBT represented Dobbs employees, which agreements were continued in existence as "local Addendums."

7.    Except for certain provisions of the NMA, such as that provision establishing the System Board of Adjustment (SBA) pursuant to Section 204 of the Railway Labor Act, 45 U.S.C. § 184, which applied to the entire system, the NMA did not apply to those employees who had been represented by AFL-CIO affiliated unions other than HERE or IBT affiliated local unions prior to the NMB's certification, unless those unions adopted the NMA. The Council's designation of the non-Council AFL-CIO unions as its bargaining agent at select Gate Gourmet facilities is reflected in the NMA, which provides (PEx. 1 at 3, Art. 1): "The Company understands that the Council will designate, under Section 2 Third of the Railway Labor Act, IBT and HERE and other AFL-CIO affiliated labor organizations to act as the bargaining representatives for the Council . . . ."

8.    NMA Article 24, Section 1, provides that craft or class employees are "eligible to participate in the Company's Health Care Program" as well as term life and accidental death insurance. PEx. 1 at 17. That provision further provides that: "While administration of the plan

-3-

remains a Company prerogative, bargaining unit Employee's contribution rates for the various health

plans and optional life insurance will be the same each year as the contribution rates for

management/salaried employees."

9.    NMA Article 34 provides in pertinent part that (PEx. 1 at 25):

> It is understood between the Company and the Union that no
> employee in any location will suffer a reduction in any wages, or
> benefits from his present level as a direct result of this Master
> Agreement. Furthermore, if any local Addendums terms and
> conditions exceed the terms and conditions of the Master, then the
> local Addendum shall apply during the term of the Master
> Agreement. . . .

10.    Beginning in December 2003, when Gate Gourmet proposed changes to the NMA,

and both prior to and following the service of proposals by the Council pursuant to Section 6 of the

Railway Labor Act to modify the NMA, Gate Gourmet and the Council conferred and sought to

reach agreement on the changes in rates of pay, rules, and working conditions each proposed. On

May 4, 2005, Gate Gourmet presented the Council with what it stated was its "last best offer,"

which, if accepted, would modify existing rates of pay, rules, and working conditions. Gate

Gourmet's proposal would reduce the average wage by 14%, from $11.10 to $9.72, and would freeze

the reduced wages for ten (10) years. Another modification would affect the monthly premium

employees must pay for health insurance by continuing unchanged Gate Gourmet's obligation to pay

most of the existing Health Care costs, but would have required employees to pay 50% of future

premium increases.

11.    The Council submitted Gate Gourmet's "last best offer" to the HERE and IBT

memberships for their consideration. During the latter part of May, 63% of the affected employees

voted, 94% of whom voted to reject the proposed agreement.

12.    On October 27, 2004, while the parties were negotiating over the various Section 6 proposals, Gate Gourmet announced that, effective January 1, 2005, the current health insurance benefits would be lowered and the employee contribution rate would be increased. Prior to those changes, Gate Gourmet paid about 75% of the Health Care costs, but it intended to reduce that payment to 55% as of January 1, 2005. The monthly premium for individual coverage was to be increased from $31.32 to $119.07, while the monthly premium for family coverage was to be increased from $155.63 to $362.61. The Council informed Gate Gourmet that it considered such increases to be in violation of the Railway Labor Act as impermissible unilateral alterations of the status quo, as well as in violation of the NMA. True and accurate copies of that protest and grievance are attached to the 1st Amended Complaint as Exhibits 1 and 2, respectively. Gate Gourmet implemented the changes in coverage and premium costs on January 1, 2005.

13.    On April 8, 2005, Gate Gourmet responded to the Council's protest and claim; a true and accurate copy of that response is attached the Complaint as Exhibit 3. On April 20, 2005, the Council referred the grievance it filed over the breach of contract caused by that unilateral change, to the System Board of Adjustment established by the NMA. That grievance was scheduled to be heard by the SBA on June 8, 2005, but by mutual agreement, was postponed until August 9, 2005.

14.    By a communication dated May 12, 2005, that was distributed while the employees were voting on Gate Gourmet's contract proposal, Gate Gourmet informed its craft or class employees that because "our Divisional financial performance continues to decline and our labor costs remain uncompetitive under the current labor contract, the company Medical Plan subsidy will end on June 30, 2005 if the new contract is not approved by the union membership." A true and accurate copy of that communique is attached hereto to the 1st Amended Complaint as Exhibit 4.

Gate Gourmet further stated that: "If the new contract is not approved, we will continue to offer the Medical Plan, **but you will be responsible for the full monthly cost beginning in July.**" Ex. 4 (emphasis in original). It announced that employees had to re-enroll if they wished to "continue to participate in the Medical Plan after June 30, 2005" and that they had until June 1, 2005, to re-enroll. *Id.* Employees were further informed that the monthly premium for individual coverage would increase from $119.07 to $390.57; the monthly rate for employee and children coverage would change from $228.66 to $757.25; the monthly rate for employee and spouse would change from $267.90 to $796.49; and family coverage would increase from $362.61 to $1,148.27 per month. *Id.*

15.    On June 3, 2005, as supplemented on June 7, 2005, the Council protested Gate Gourmet's actions as being a violation of the Railway Labor Act as an impermissible change of the status quo and a breach of the NMA. A true and accurate copy of the June 3, 2005 protest and claim is attached to the 1st Amended Complaint as Exhibit 5, while the June 7, 2005 supplement is attached to the Complaint as exhibit 6. Gate Gourmet has refused to rescind its announced discontinuance of its contribution to the Health Care Plan costs. On June 17, 2005, the Council referred its grievance over the July 1, 2005 unilateral changes in the allocation of the Health Care costs to the SBA to be heard on August 9, 2005.

16.    It is expected that on August 9, 2005, the SBA will deadlock on both grievances and the next step will be for the Council to submit the disputes for final resolution under the SBA's arbitration procedures. Declarant estimates that it will take between 60 to 90 days to place the case before an arbitrator and then another 60 to 90 days for the arbitrator to issue a decision.

17.    During the negotiations over the parties' Section 6 notices, Gate Gourmet has refused to negotiate with the HERE and IBT affiliates over the changes Gate Gourmet and the affiliates have

proposed to the health insurance contributions, even though many craft or class employees represented by the Council are covered by local Addendums which require Gate Gourmet to provide health insurance coverage through employee benefit plans established by the affiliates.

18.     As of April 2005, Gate Gourmet employed approximately 7,400 craft or class employees, all of whom were represented by the Council. Approximately 5,400 of those employees (including approximately 492 employees employed at Gate Gourmet facilities where non-Council AFL-CIO unions have been designated as the Council's bargaining agent) are currently covered by Gate Gourmet's Health Care Plan. The remaining Gate Gourmet craft or class employees (approximately 2,200) are covered by employee health and welfare plans provided through the local Addendums, including approximately 377 employees employed at a facility where a non-Council union has been designated as the Council's bargaining agent.

19.     On June 10, 2005, the Council informed Gate Gourmet that, in light of the overwhelming rejection of Gate Gourmet's "last best offer" and Gate Gourmet's refusal to rescind its proposed elimination of its Health Care payments, the Council considered conferences over the pending Section 6 notices to have terminated. A true and accurate copy of that communication is attached to the 1st Amended Complaint as Exhibit 7.

20.     On June 15, 2005, Gate Gourmet invoked the jurisdiction of the NMB under Section 5 First of the Railway Labor Act, 45 U.S.C. § 155 First, to mediate the disputes over the proposed changes to the NMA, including the dispute over the Health Care contributions. The NMB docketed that dispute as NMB Case No. A-13373, adding: "The parties are reminded of the status quo provisions of the Railway Labor Act." A true and accurate copy of the NMB docketing letter is attached to the 1st Amended Complaint as Exhibit 8.

**KENNETH C. PAULSEN** hereby declares pursuant to 28 U.S.C. § 1746, under of perjury,

that the foregoing is true and correct.

Executed this 24th day of June, 2005, in Washington, D.C.

Kenneth C. Paulsen

# EXHIBIT 1
**(National Master Agreement)**



# Gate Gourmet Dobbs International Master Agreement



# INDEX

Page

Article I, Recognition.................................................................3

Article II, Transfer of Company Title or Interest........................4

Article III, Uniforms..................................................................4

Article IV, No Strikes and No Lock Outs...................................4

Article V, Maintenance of Standards........................................5

Article VI, Non-Discrimination..................................................5

Article VII, Discipline & Discharge...........................................6

Article VIII, Holidays................................................................6

Article IX, Grievance Procedure...............................................7

Article X, System Board of Adjustment Procedures..................8

Article XI, Seniority/Loss of Seniority......................................9

Article XII, Job Vacancy.........................................................10

Article XIII, Stewards and Union Officials................................11

Article XIV, Check-Off/Union Security Provision......................12

Article XV, Jury Duty..............................................................13

Article XVI, Military Leave.......................................................13

Article XVII, Sick Leave..........................................................13

Article XVIII, Union Visitation..................................................14

Article XIX, Funeral Leave......................................................14

Article XX, Leave of Absence..................................................14

Article XXI, Vacation..............................................................15

Article XXII, Bulletin Boards....................................................17

Article XXIV, Health and Life Benefit…………………………………………17

Article XXV, Employee Quality Incentive Plan………………………………18

Article XXVI, Hours of Work and Overtime…………………………………18

Article XXVII, Rights of Management………………………………………..19

Article XXVIII, Drug/ Alcohol Testing Policy………………………………...20

Article XXIX, Invalidation Clause…..………………………………………...23

Article XXX, Payroll Period…………………………………………………..23

Article XXXI, Reporting Pay………………………………………………….24

Article XXXII, Safety and Health……………………………………………..24

Article XXXIII, Transition Agreement………………………………………...24

Article XXXIV, Superiority Agreement……………………………………….25

Article XXXV, Wage…..………………………………………………………26

Article XXXVI, Amendment…………………………………………………..27

Attachment A,…………………………………………………………..…28

2

## ARTICLE 1
## RECOGNITION

RECOGNITION, SCOPE, AND EMPLOYEE PROTECTIONS

**Recognition**

Dobbs International Services, Inc. a/k/a Gate Gourmet, Division Americas owned by S Air Group (the "Company") recognizes the IBT/HERE Employee Representatives' Council, (the "Council") as the collective bargaining representatives of all employees working at facilities covered by this Agreement with the authority and obligation to represent them for all purposes of the Railway Labor Act, as amended.

This collective bargaining agreement and any formal letters of agreement between the Company and the Union may be collectively referred to as the "National Master Agreement" (N.M.A.). It is understood by the parties that Local Addendums consistent with the National Master Agreement shall be entered into at the local level between the Company and affiliates of the Union. Supervisory personnel shall not perform work customarily performed by employees in the bargaining unit.

The Company understands that the Council will designate, under Section 2 Third of the Railway Labor Act, IBT and HERE and other AFL-CIO affiliated labor organizations to act as the bargaining representatives for the Council and it is hereby agreed that the term "Union" as used in this Agreement shall refer to the Council. Where the context so indicates, the term "Union" shall also refer to IBT and/or HERE, and, in those instances where the designated labor organization adopts this agreement, to the other labor organization so designated and authorized by the Council.

**Scope**

This Agreement covers all present and future kitchen, commissary and catering work, including all related work, performed at facilities for which the Union has been designated as the bargaining agent for employees in the system wide basis craft or class; provided that this Agreement shall not apply to managers, supervisors, guards, office-clerical employees or employees based outside of the United States, its territories and possessions.

It is understood between the parties that existing patterns of representation as between HERE and IBT at locations where both organizations currently represent employees, or at locations where only IBT or HERE exclusively represent employees, shall be preserved. Future food service operations identified in the system wide basis, craft or class opened or acquired by the Company shall become subject to the terms of this Agreement immediately upon notification by the Council that the Union has been designated as the bargaining agent for such operation or facility. For newly opened or later acquired facilities, the Company shall initially establish hourly wage rates for all classifications; thereafter the negotiated increases of the NMA wage addendum shall apply.

The Company shall not establish any new kitchen, commissary or caterer, or acquire a controlling interest in such a food operation, whether directly or through an affiliate or subsidiary, or by a parent or holding company of which the Company is wholly owned or controlled subsidiary, and operate it as a separate entity outside the provisions of this Agreement.

This Agreement and the supplemental addendums hereto and hereinafter referred to collectively as "Agreement", shall be binding upon the parties hereto, their successors, administrators, executors and assigns.

It is understood by this Section that the parties hereto shall not use any leasing devise to a third party to evade this Agreement. The Employer shall give notice of the existence of this Agreement to any purchaser, transferee, lessee, assignee, etc., of the operation covered by this Agreement or any part thereof. Such notice shall be in writing with a copy to the respective International Union and local union, at the time the seller, transferee or lessor executed a contract or transaction as herein described. The Union shall also be advised of the general nature of the transaction, not including financial details. In the event that the Employer fails to require the purchaser, transferee or lessee to assume the obligation of this Agreement, the Employer, (including partners thereof) shall give the Union sixty (60) days notice in writing, after which the Employer or the Union shall not be liable for any all damages sustained as a result of such failure to require assumption of the terms of this Agreement.

## ARTICLE 3
## UNIFORMS

**Section 1**. New employees shall not be required to purchase required uniforms through payroll deduction effective 6-1-2002.

**Section 2**. The Company will supply uniforms and safety equipment at no cost to the employees effective 6-1-2002. Thereafter, the Company will replace or repair all uniforms that are no longer serviceable through fair wear and tear in accordance with appearance standards at no cost to the employees. Employees are required to maintain their uniforms and general appearance in a fashion that is clean and orderly. The employee will return the uniforms upon termination of employment or the Company will deduct the value of the unreturned uniform from the final paycheck. The Company will deduct the replacement value of a uniform from the employee's paycheck if the uniform is lost, stolen or damaged.

## ARTICLE 4
## NO STRIKES AND NO LOCKOUTS

From the effective date of this Agreement through thirty (30) days following the date, if any, that the parties are released from mediation by the National Mediation Board in connection with negotiations for a successor Agreement (the "Release Date"), the Union and its members or employees it represents, agree that there shall be no strikes, walk outs, stoppages, or slow down of work, including sympathy strikes, boycotts, refusal to handle any merchandise, picketing or any other interference with any of the operations of the employer during the term of this agreement.

The employer agrees that there shall be no lockout during the term of this Agreement.

4

## ARTICLE 5
## MAINTENACE OF STANDARDS

The Employer agrees that all conditions of employment relating to wages, hours of work, overtime differentials and general working conditions, other than those specifically referred to in this Agreement, shall be maintained at not less than the highest standards in effect at the time of the signing of this Agreement, and the conditions of employment shall be changed, upon amendment wherever specific provisions are made elsewhere in this Agreement.  It is agreed that the provisions of this Section shall not apply to inadvertent or bona fide errors made by the Employer or the Union in applying the terms and conditions of this Agreement if such error is corrected within ninety (90) days from discovery of the error.  This provision does not give the employer the right to impose or continue wages, hours and working conditions less than those contained in the Agreement.

## ARTICLE 6
## NON-DISCRIMINATION

No employee shall be unlawfully discriminated against in any manner pertaining to hiring, wages, hours and working conditions because of his race, color, religion, creed, national origin, age, sex, sexual orientation, mental or physical handicap and disabled veterans or veterans of the Vietnam era, or because of his seeking redress through the grievance procedure for alleged grievances or for legitimate Union activities. The Company and the Union further agree not to discriminate against any employee because of age where such discrimination is in violation of applicable Federal statutes. The Company and the Union further agree not to discriminate against any employee under the Family and Medical Leave and American Disabilities Acts.  Whenever in this agreement the masculine gender is used, it shall be deemed to include the feminine gender.

5

## ARTICLE 7
## DISCIPLINE AND DISCHARGE

**Section 1.**  The Company shall not discharge any employee nor impose any disciplinary action against any employee except for just cause.  The Company shall have the right to establish reasonable rules for the conduct of employees not inconsistent with the terms of this Agreement.
**Section 2.**  Employee Corrective Action Notices shall be maintained in the employee's personnel file for ⌐ period of twelve (12) months from the time of issuance.

## ARTICLE 8
## HOLIDAYS

**Section 1.** Employees shall receive nine (9) paid holidays, effective 1/1/2001

| | | | |
|---|---|---|---|
| New Years Day | Martin Luther King, Jr. Day | Easter | Memorial Day |
| Labor Day | July 4 | Thanksgiving Day | Christmas Eve |
| Christmas Day | | | |

**Section 2.** The Union recognizes that the employees may be expected work on said holidays inasmuch as the business of the Company operates seven (7) days a week.

**Section 3.** All employees shall receive eight (8) hours' pay at straight-time rate when the holidays are not worked provided that:

a) The employee has not failed to work when scheduled to work on a holiday unless he is absent with the approval of management.

b) The employee works his scheduled day both immediately preceding and following the holiday unless he is absent with the approval of the Company.

c) The employee has worked during the week of a holiday (excluding vacation periods); and

d) The employee is not on strike or suspension, leave of absence or workers' compensation.

**Section 4.** Part-time employees who work a regular five (5) day week shall after ninety (90) days of employment, receive pro-rated holiday pay for holidays not worked, provided a holiday is worked, contractual holiday pay will be granted for all hours worked the holiday.

# ARTICLE 9
# GRIEVANCE PROCEDURE

**Section 1.**  Should differences arise between the Company and any of its employees as to the meaning and application of this Agreement, or if any other controversy or grievance arises, an earnest effort shall be made as promptly as possible to settle such difference in the following manner:

Step 1.  The employee having such grievance, with or without the Steward, shall present the grievance to his immediate supervisor within five (5) days of the action giving rise to the grievance.  The supervisor will give his answer within seven (7) days of the action giving rise to the grievance.  Should an employee request that a Steward be present to discuss the grievance, the supervisor shall arrange for the Steward to attend the grievance meeting. If the grievance is not thus satisfactorily settled, then the grievance may be appealed to Step 2.

Step 2.  The grievance shall be put into writing and presented by either the Union Representative, Chief Steward, Shop Steward and/or the aggrieved employee to the General Manager or his designated representative, within twelve (12) days of the action giving rise to the grievance.  The Manager will give his answer in writing, with a copy to the Union, within seventeen (17) days of the action giving rise to the grievance.  If the grievance is settled or withdrawn, the Union Representative and Employer will put the withdrawal or settlement in writing on the grievance form.  If the grievance is not satisfactorily settled, then the grievance may be appealed to Step 3.

Step 3.  The aggrieved employee, and/or Union may present the grievance in writing to the Regional Personnel Manager or his designated representative within twenty-two (22) days of the action giving rise to the grievance The Regional Personnel Manager or his designated representative shall meet with the Union and answer the grievance in writing within thirty (30) days of the action giving rise to the grievance.

**Section 2.**  All grievances must be submitted as provided in Step 1 above within five (5) days of the Employer's action giving rise to the grievance; and, if not submitted within the aforementioned time, then the grievance shall be considered to be waived and may not thereafter be submitted for adjustment.  Any grievance that is not appealed from one step of the grievance procedure to the next step within the time limits set forth above (such time limits may be extended by written agreement) shall be considered settled on the basis of the last decision given and shall not be subject to further grievance and arbitration proceedings or collective bargaining.

7

**Section 3**  All grievances not settled in these steps may proceed to the System Board of Adjustment.

# ARTICLE 10
## SYSTEM BOARD OF ADJUSTMENT PROCEDURES

Within fourteen days after the receipt of the written decision of the Company designee, if the decision is not satisfactory to the Union, the Union may appeal such grievance to the System Board of Adjustment by serving a written notice upon the Company directed to the Vice President of Human Resources or his/her designee at the Company's office of its intention to do so.  If the System Board deadlocks, the case may be appealed to arbitration by the Union.

The System Board of Adjustment shall be composed of two members designated by the Union and two members designated by the Company.  The Board shall meet every other month at a location mutually agreed upon by the parties.  In the event there are no grievances to be heard the board may cancel such meeting upon mutual agreement.

The System Board shall only be empowered to make a finding or decision with respect to contract language and any non-probationary employee covered by this agreement who is terminated or disciplined to the extent of loss of pay by the Company, and such finding or decision shall be final and binding upon the employee, and all parties to the dispute.

If the Board deadlocks, the Union may appeal the case to arbitration.  In the event the Union appeals the decision to arbitration the Company and the Union shall attempt to mutually agree to an acceptable impartial Arbitrator.  If the parties are unable to agree on an Arbitrator they shall then request a panel of  seven (7) Arbitrators to be provided for by the Federal Mediation and Conciliation Service.

The parties shall alternately strike names from the panel with the remaining arbitrator selected to hear and resolve the dispute.

The Arbitrator shall have no authority to add to, or subtract from, or modify the terms of this Agreement.

The arbitrator's decision shall be rendered within thirty days from the date of the close of the hearing.

The cost of the Arbitrator shall be borne equally between the Union and the Company.

# ARTICLE 11
## SENIORITY/LOSS OF SENIORITY

**Section 1**.  Seniority shall govern as to layoffs and rehiring. New employees shall be employed on a trial basis for ninety (90) calendar days.  During this period, their retention as employees is entirely at the discretion of the Company. The provisions of this Agreement shall not apply to probationary employees.

**Section 2**.  In the event the Company finds it necessary to lay off employees because of lack of work or reduction in business, such layoffs shall be on the basis of seniority. Seniority shall be defined as the length of service an individual has with the Company. The employee having the shortest period of continuous employment with the Company shall be laid off before any other employee.  The senior employees shall have preference of full-time employment (to wit, forty (40) hours per week) at all times where it is available.  Both seniority and ability shall govern except as provided in this Article, on job or station assignment, hours worked and, where applicable, in other phases of employment.

**Section 3**.  The Company agrees that it will recall all persons who have retained seniority in the inverse order in which they were laid off.  That is, the last one laid off will be the first recalled, provided the employee still has the physical fitness and ability to perform the work required.  Employees, including those that are laid off, have the responsibility to keep on file with the Company the address to which the notice to return to work is to be sent; and the Company agrees to notify such laid off employees not less than three (3) days, exclusive of Sundays, prior to the date called back to work by certified mail or telegram and notify the Union of the same by mail.

**Section 4.** Seniority shall terminate:
a) Upon discharge for just cause;
b) Upon quitting;
c) Overstaying leave of absence without permission;
d) Engaging in gainful employment while on leave of absence, which shall be considered quitting;
e) Laid off from work for a period of one hundred eighty (180) consecutive calendar days;
f) Upon failure to report to work after layoff within three (3) days, exclusive of Sundays, after notification;
g) Being absent from employment for three (3) consecutive days without notifying the Company.

**Section 5**. The seniority of an employee promoted to a supervisory position shall be retained in the classification from which promotion was made for a period of ninety (90)

9

work days unless such employee is discharged for cause within such ninety (90) workday period.

# ARTICLE 12
# JOB VACANCY

**Section 1**. Employees in the same job classification may exercise their seniority for the purpose of selecting shift and off days by filing a bid as outlined in Section 2 below, provided the employee is qualified to perform the work.

Employees may exercise their seniority for the purpose of promotion to a higher rated job classification by filing a bid as outlined in Section 2 below, provided however, that the employee is qualified to do the work.

**Section 2.** Two types of bid forms may be filed. Bid form for shift and off days within employee's current job classification, and bid form for promotion to a higher rated classification. Vacancies will be posted on the employee bulletin board within each kitchen for a period of three (3) days.

Bid forms must be completed accurately and legibly and submitted in a timely fashion.

First: Award the position(s) to the most senior qualified employee(s) in the job classification who have submitted a bid as outlined above for the shift and off days of the vacancy. Then:

Second: Award the resulting position(s) to the most senior qualified employee in a lower rated classification who have submitted a bid as outlined above for the job classification, shift and off days of the vacancy. Then:

Third: Return employees who are currently on layoff, by seniority provided, however, that the employee is qualified to do the work.

Fourth: Fill remaining openings with new hires.

When filling such permanent job vacancies, ability and physical fitness being reasonably equal, seniority shall prevail. It is understood that job vacancies subject to this procedure may, when necessary, be filled at the employer's discretion temporarily to assure continuity of production. Temporary is defined as any period of time thirty (30) days or less except where a job is vacated due to a medical leave of absence, which may extend beyond thirty (30) days.

There will be at least one (1) annual bid within each respective kitchen, to determine shifts and off days. The first bid will be within three (3) months of ratification of the Agreement.

**Section 3**. In the event any employee is promoted to a higher job classification and that employee is judged to be insufficiently effective in that job, the employee will be returned to his previous job classification provided the demotion occurs within ninety (90) days of the promotion. Furthermore, the employee may request to return to his former job classification at any time within the first ninety (90) days following the

10

promotion, however, the employee shall be barred from promotions to that job classification for a period of one (1) year.

# ARTICLE 13
## STEWARDS AND UNION OFFICIALS

The Company recognizes the right of the Local Union to designate Stewards and Alternate Stewards from the Company seniority list. The authority of Stewards and Alternate Stewards so designated by the Local Union shall be limited to, and shall not exceed, the following duties and activities:

The investigation and presentation of grievances with his employer or the Company Representative in accordance with the provisions of the collective bargaining agreement. The transmission of such messages and information, which shall originate with, and are authorized by the Local Union or its Officers, provided such messages and information;

Have been reduced to writing; or
If not reduced to writing, are of a routine nature and do not involve work stoppages, slow downs, refusal to handle goods, or any other interference with the Company's business

Stewards and Alternates have no authority to take strike action, or any other action interrupting the Company business except as authorized by official action of the Local Union. The Company recognizes these limitations upon the authority of Stewards and their Alternates, and shall not hold the Union liable for any unauthorized acts unless condoned, ratified or authorized by the Union. The Company in so recognizing such limitations shall have the authority to impose proper discipline, including discharge. Stewards, upon notification to and approval by a supervisor, shall be permitted reasonable time to investigate, present and process a grievance on the Company property and where mutually agreed to by the Local Union and Company, off the property without loss of time or pay. Such time spent in handling grievances during the Stewards regular working hours shall be considered working hours in computing daily and/or weekly overtime if within the regular schedule of the Steward.
The Steward will be considered the most senior employee for purpose of job bidding, layoff, and recall if currently in practice.
A Steward shall be present at all disciplinary investigations, and presentations. In the event that a Steward or Alternate is not available the employee may select another bargaining unit member to act as witness.

## ARTICLE 14
## CHECK-OFF/UNION SECURITY PROVISION

It shall be a condition of employment that all current employees of the Company covered by this agreement, shall on the effective date of this agreement, become and remain members in good standing of the Union, or in the alternative, render the Union a monthly sum equivalent to the standard monthly dues and any additional fees required of Union members, such sums to be recognized as "Service Fees".

It shall be a condition of continued employment that all employees of the Company performing bargaining unit work shall on or before the sixtieth (60th) day following their hire date, become and remain members in good standing in the Union, or in the alternative, render the Union a monthly sum equivalent to the standard monthly dues and any additional fees required of Union members, such sums to be recognized as "Service Fees".

The Company will deduct from the wages of any employee covered by this Agreement said employees initiation fees, service fees, and/or dues as a member of the Union upon receiving the employee's voluntary and individual written authorization for the Company to make such deductions signed by the employee. Such authorization forms will be provided by the Union. The Company will remit to the Union the wages withheld for such initiations fees, service fees and / or dues on a monthly basis. The amount so withheld shall be deducted from the appropriate paycheck, reported and paid to the Union monthly. The employee's Social Security number, full name, dues rate, rate of pay, and status of employment will be transmitted with the monthly fees/dues. New hires including hire dates, terminations including termination dates, furloughs, including furlough dates, recalls, including recall dates, leaves including leave dates, return to work, including return to work dates, will also be provided to the Union monthly.

The Union shall give the Company at least thirty (30) days written notice before requesting the removal of employees from employment for failure to maintain membership in good standing in accordance with the aforementioned Sections.

The Union will hold harmless, and indemnify the Company and its employees with respect to any and all claims or liabilities arising out of, or in connection with this Article or any action taken under it at the request of the Union, provided that the Union shall have the right to defend itself against all such claims, if any.

12

## ARTICLE 15
## JURY DUTY

**Section 1.**  The Company will pay its employees who are required to serve on jury duty the difference between the amount paid them by the Court for such service and the amount the employee otherwise would have earned at work during the time of jury service, but not to exceed eight (8) hours in any one day, or forty (40) hours in any one week.

**Section 2.**  In order to be eligible for jury duty pay, the employee must verify with certification of the Clerk of Court all times and days of service.  However, no payment shall be made under the provisions of this Article to any employee summoned for jury service unless he has informed the Company of his jury summons at least seven (7) days before the first day on which he is required to serve.

**Section 3.**  Said employee shall make him available for work for all days during said week when not required to serve on jury service. By failure to return to work as herein required, the employee will forfeit all jury duty pay for that term of his jury service.


## ARTICLE 16
## MILITARY LEAVE

The Company agrees to abide by all applicable State and Federal laws as they relate to military leave.


## ARTICLE 17
## SICK LEAVE

All employees with one year or more will receive three (3) sick days each year, effective 1-1-2001.  Effective 1-1-2003 all employees with one year or more shall receive four (4) sick days each year.

13

## ARTICLE 18
## UNION VISITATION

The representatives of the Union, or of any Local Union representing the employees of the Company, shall have the right upon advance notification or upon arrival to visit the establishment or any department thereof at reasonable times in order to investigate matters such as wages, hours, working conditions and grievances; and shall be authorized to post official Union notices pertaining to conditions of employment in a place conspicuous to the employees.

## ARTICLE 19
## FUNERAL LEAVE

A regular, full time employee who has completed the probationary period shall be entitled to a maximum of three (3) days paid leave to attend the funeral of a parent, child, spouse, brother, sister, present parents-in-law and grandparents.
The employee must submit proof of the death if so requested by the Company. Any falsification of proof shall be grounds for discipline up to and including discharge.

## ARTICLE 20
## LEAVE OF ABSENCE

**Section 1**. Leave of Absence for Union Activities
The Company agrees to grant the necessary time off, without loss of seniority rights and without pay, to any employee designated by the Union to attend a labor convention or serve in any capacity on other official Union business, provided forty-eight (48) hours' written notice is given to the Company by the Union, specifying length of time off. The Union agrees that in making its request for time off for Union activities due consideration shall be given to the number of employees affected in order that there shall be no disruption of the Company's operations due to lack of available employees.

**Section 2.** Medical Leave: An employee will upon proper application be granted a medical leave of absence. The employee will furnish the Company, if requested, a written verification and/or prognosis of his condition and his intended date of return from his attending physician using a form provided by the Company. Extension of a medical leave shall be granted when an employee confirms need with physician's documentation. An employee will retain and continue to accrue seniority during disability leaves and extensions. The Company will abide by the Family Medical Leave Act guidelines.

**Section 3.** Personal Leave: An employee may upon proper application be granted a personal leave of absence subject to operational requirements. The maximum leave of absence shall be thirty (30) days. The employee will retain and continue to accrue seniority during this personal leave. The Company shall have the sole discretion in granting such leaves of absence.

**Section 4.** All leaves of absence shall be applied for and granted in writing with copies to the Union, the Company and the employee.

**Section 5.** An employee returning from a leave of absence, after notifying the Company at least seven (7) days in advance, shall be returned to their former job classification.

## ARTICLE 21
## VACATION

**Section 1.** An employee, on reaching his first (1st) anniversary date of employment, shall be eligible for one (1) week vacation with pay provided the employee has worked at least one hundred eighty (180) days in the twelve (12) month period preceding such anniversary date.

**Section 2.** An employee, on reaching his second (2nd) anniversary date of employment, shall be eligible for two (2) weeks vacation with pay provided the employee has worked at least one hundred eighty (180) days in the twelve month period preceding such anniversary date.

**Section 3**. An employee, on reaching his fifth (5th) anniversary date of employment, shall be eligible for three (3) weeks' vacation with pay provided the employee has worked at least one hundred eighty (180) days in the twelve month period preceding such anniversary date.

**Section 4**. An employee, on reaching his fifteenth (15th) anniversary date of employment, shall be eligible for four (4) weeks' vacation with pay provided the employee has worked at least one hundred eighty (180) days in the twelve month period preceding such anniversary date.

**Section 5**. An employee, on reaching his thirtieth (30th) anniversary date of employment, shall be eligible for five (5) weeks' vacation with pay provided the employee has worked at least one hundred eighty (180) days in the twelve month period preceding such anniversary date.

**Section 6.**  Employees cannot waive their vacation and draw double pay for work during the vacation period unless mutually agreed between the employee and the Company.

**Section 7**. Vacations will be taken between January 1st and December 31st of each year and such vacations shall be scheduled and posted not later than December 15th of each vacation year. Vacation bidding will be based on the overall company seniority within job classification, department and shift.  Employees shall be permitted to choose their vacation periods subject to the requirements of the business.  Preference in the choice of available vacation periods shall be granted on the basis of length of service; thereafter, an employee's chosen vacation shall not be changed unless unforeseen circumstances make such action necessary.

**Section 8**. When a holiday(s) occurs in an employee's scheduled vacation period, he shall receive compensation for the extra day(s) vacation in lieu thereof.

**Section 9**. For the purpose of calculating vacation, former United Airlines employees' seniority shall be inclusive.

## ARTICLE 22
## BULLETIN BOARDS

A place shall be provided inside the Company kitchen facilities where Union notices of interest to the employees may be posted.  These notices will be restricted to:
Notices of Union recreational/social affairs.
Notices of Union elections/appointments and results of Union elections.
Notices of Union administrative affairs.
Notices of Union meetings

## ARTICLE 23
## PENSION AND RETIREMENT PLAN/401K

**Section 1.** During the term of this agreement, the Company will administer and make total contributions for all eligible, full-time Employees to the Dobbs Hourly Employee Pension Plan.
Further, the Company agrees that should any general benefits improvement be adopted for the majority of Employees covered by the Pension Plan during the life of this Agreement, bargaining unit Employees covered by this Agreement shall be entitled to any and all such improvements so adopted.

**Section 2.**   All employees who have been employed by the Company for a period of one (1) year will be eligible to participate in the Dobbs International Services, Inc. Bargained Employees' 401(k) Plan.  The Company matching contribution will equal the first 3% of the employees pre-tax contribution to the plan.
Guidelines for the plan will be established by the Company and distributed to eligible employees and the Union prior to the enrollment date.  Administration of the plan remains a Company prerogative.

## ARTICLE 24
## HEALTH AND LIFE BENEFIT

**Section 1.**  Regular, full-time bargaining Employees will be eligible to participate in the Company's Health Care Program and the Basic and Supplemental Group Term Life/AD&D Insurance.  Regular, full-time Employees will become eligible to participate in these plans on the first day of the calendar month following ninety (90) days of continuous employment.  The minimum life insurance provided will be in the amount of $8.000.00.  The provisions of all these plans are contained in the plan descriptions themselves which are incorporated by reference hereto.
While administration of the plan remains a Company prerogative, bargaining unit Employee's contribution rates for the various health plans and optional life insurance will be the same each year as the contribution rates for management /salaried employees.

17

Further, the Company agrees that should there be any change in the benefit level of the Health Care and life Insurance Plans during the term of this Agreement it will apply to the Employees covered under this Collective Bargaining Agreement.

## ARTICLE 25
## EMPLOYEE QUALITY INCENTIVE PLAN

Bargaining unit employees shall participate in the Employee Quality Incentive Plan during the years of 2000 to 2004. This Plan is based upon a combination of Unit quality and profit goals, which are the same for both management and hourly employees. The details of these goals, as well as the payout formulas and eligibility criteria, are described in the Plan Booklet, applicable to bargaining unit employees and are hereby incorporated into this Agreement by this reference. A target payout for each year of this agreement is 10%.

## ARTICLE 26
## HOURS OF WORK AND OVERTIME

**Section 1.** The workweek shall start at 12:01 a.m. Saturday and end at 12:00 midnight the following Friday.

**Section 2.** The Company agrees that the standard workweek shall consist of forty (40) hours per week. However, it is understood and agreed that neither the provisions of this Article or any other Article in the Agreement are to be considered as a guarantee of the availability in a work week of any particular number of days or hours per week for any employee. All hours worked in excess of forty (40) hours in a workweek shall be paid for at the rate of time and one half the employee's regular hourly rate.

**Section 3.** An employee's workweek shall normally consist of five (5) workdays and two (2) days off. In the event of an eight (8) hour shift, the workweek shall consist of five (5) work days and two (2) days off. In the event of a ten (10) hour shift, the workweek shall consist of four (4) days with three (3) days off.

**Section 4.** Overtime may be required when necessary to complete customer service obligations. When overtime is required, the Company agrees to offer such overtime to the employees in the affected classification on that shift in order of seniority (i.e., offer first to most senior employee, offer last to least senior employee). In the event senior employees decline the overtime assignment, the least senior employee in the classification working said shift will be required to work the overtime assignment.

**Section 5.** Any employee, who performs work in a higher classification for one (1) hour or more in a day, shall be paid at the higher classification rate for the time worked in the

18

higher job classification. Any employee, who performs work in a lower job classification during a day, shall be paid at the rate of this regular job classification. Except:
a) Where an employee is temporarily assigned to a lower classification to accommodate medical limitations; or
b) Where an employee is disqualified from a higher rated position; or
c) Where an employee is transferred (bidding) at his own request to another classification paying a lower rate;

**Section 6**. All employees covered by this Agreement will be granted one thirty (30) minute lunch break without pay.
All employees covered by this Agreement will be granted one fifteen (15) minute break with pay before the lunch break and fifteen (15) minute break with pay after the lunch break for the purpose of relaxation

## ARTICLE 27
## RIGHTS OF MANAGEMENT

This Agreement is not intended to interfere with, abridge or limit the Employer in the exercise of its function of management or the control of its business and the direction of its working force. The Union will not interfere directly or indirectly with the employment, transfer, discharge or duties of any of the supervisory employees or other company personnel not included in the bargaining unit.

It is agreed that the extent of its operations and the nature of the work to be performed, to determine when any operation shall function or shall be changed or terminated or when services to the airlines and railroad shall be increased, decreased or changed, to maintain efficiency of employees; to make, publish and enforce rules of conduct, safety and appearance; to determine the number, extent and location of its operations; the kinds to be used, to subcontract work; the schedules and the number of hours an employee shall work per day or per week; to hire, classify; to create new jobs and abolish jobs or combine jobs, are solely and exclusively the responsibility of the Employer. It is the responsibility and right of the Employer to maintain discipline; to transfer, promote, demote, retire, layoff, suspend, discipline or discharge employees for just cause. Such rights shall be subject to the limitation, if any, imposed by other Articles of this Agreement.

# ARTICLE 28
# DRUG/ALCOHOL TESTING POLICY

The parties have agreed that the procedures as set forth herein shall be the methodology for all testing and will be modified only in the event that further Federal legislation or Department of Transportation (DOT) regulations require revised testing methodologies or requirements during the term of this Agreement.

Should other categories or types of testing be required by the government, the Company will notify the Union of its procedure.

Employees Who Must Be Tested

Dobbs employees subject to Department of Transportation mandated drug testing are drivers and loader helpers of vehicles with a vehicle weight rating over 26,000 pounds, requiring a commercial driver license (CDL) or in a safety sensitive position. This includes employees who relieve for vacations or other temporary vacancies.

In addition to testing mandated employees, controlled substance testing will be part of pre-qualification conditions for safety sensitive positions and those persons transferring to a safety sensitive position. Individuals who bid for a safety sensitive position are subject to being tested for controlled substances before being accepted into such a position.

Employees covered by this Collective Bargaining Agreement, who are not subject to DOT mandated drug testing, are subject to reasonable cause/suspicion and post-on-the-job-injury testing as provided herein.

Testing

Because of the consequences that a positive test result has on an employee, the Company will employ a very accurate, two-stage testing program (screening and confirmatory). Urine samples will be analyzed by a highly qualified, independent laboratory, which is certified by the National Institute of Drug Abuse (NIDA). All samples will be tested according to DOT drug testing requirements.

Laboratory Testing

All laboratories selected by the Company for analyzing controlled substances testing specimens will be NIDA certified.

Types of Testing Required

The Company's testing format will include the following:

a) When there is reasonable suspicion,

b) To aid the investigation of serious accidents/all vehicle accidents. (CSRs and CSAs involved or present at the accident.)

c) Prior to assignment in safety-sensitive positions,

d) During an employees probationary period.

e) When an employee is involved with an on-the-job injury, which requires medical attention.

Pre-Qualification Testing For Safety Sensitive Positions

Upon reasonable cause, the Company will require an employee to be tested for the use of controlled substances.

Reasonable cause is defined as an employee's observable action, appearance or conduct that clearly indicates the need for a fitness for duty medical evaluation.

The employee's conduct must be witnessed by at least two (2) Supervisors, if available. When the Supervisor(s) confronts an employee, a Union employee, should be made available.

Non-DOT – Reasonable Cause/Suspicion

In the event an employee (not covered by DOT) is tested, such test will be performed under the same procedures as previously stated. In the event the test result is positive, it shall be considered a dischargeable offense.

Post Accident Testing

Where a driver and loader helper are involved with an accident (vehicle/aircraft), the driver and loader helper will be required to submit to drug/alcohol testing.

Random Testing Random Employee Selection

The procedure used to randomly select employees for drug testing in compliance with the DOT regulations will be a computer program specifically intended for such an application.

The program will utilize an internal computer clock procedure to randomly select general lists of employees mandated for testing by the Department of Transportation/Federal Highway Administration. The computer shall randomly select the required number of employees from the total pool of affected employees.

The Company's Safety/Security Director shall maintain the list or true copies of the lists. The lists will be maintained and made available for review by Local Union representatives.

The parties agree that no effort will be made to cause the system and method of selection to be anything but a true random selection procedure ensuring that all affected employees are treated fairly and equally.

The parties further agree not to amend or change the current method of random selection as described herein without prior agreement with the parties.

Post on-the-Job

When an employee is involved with an on-the-job-injury, which requires medical attention, the employee will submit to a drug/alcohol test. Such test will be performed under the same procedures as previously stated. In the event the test result is positive, it shall be considered a dischargeable offense.

Split Sample Procedure

A split sample will be secured and an employee who tests positive may have the split sample tested at a NIDA certified lab at the employee's expense. The employee must request the split sample test within 72 hours of notification by the MRO.

Paid for Time

Employees shall be paid for all time from the place of employment to the collection site and for all the time at the collection site.

21

Disciplinary Action

Employees may be subject to discipline up to and including discharge as provided below if they test positive for drugs specified elsewhere in the Article.

1. Reasonable Cause/ Suspicion Testing
   a) A positive test is a dischargeable offense.
   b) Refusal to submit to a reasonable cause/suspicion drug test is a dischargeable offense

2. Post Accident Testing
   a) A positive test is a dischargeable offense.
   b) Refusal to submit to a post-accident drug test is a dischargeable offense.

3. Random Testing

   a) A positive test result – employee is subject to successfully complete a rehabilitation program. The employee will enter into a rehabilitation program within fifteen (15) calendar days after test results. Employee will be subject to random testing for twelve (12) months after the completion of the rehabilitation program. (An employee will be permitted a positive test result only once during his tenure with the Company.
   b) Refusal to submit to a random drug test is a dischargeable offense.

4. Pre-Qualification Testing for Safety Sensitive Positions
   a) A positive test is a dischargeable offense.
   b) Refusal to submit to a pre-qualification drug test is a dischargeable offense.

5. Post On-The-Job-Injury
   a) A positive test is a dischargeable offense.
   b) Refusal to submit to a post injury drug test is a dischargeable offense.

The Company further agrees, if an employee(s) recognizes that he/she has an alcohol or drug abuse problem, and voluntarily identifies this problem to the Company, the Company will allow the employee(s) time off to seek professional assistance. The employee will be permitted to utilize any applicable contractual benefit for this absence. It should totally be the responsibility of the employee(s) to recognize the problem and come forward to the Company prior to a disciplinary situation normally resulting in suspension, subject to discharge. The Company agrees to provide the employee(s) with a confidential method to contact professional assistance.

An employee who is subject to a substance abuse screening will be suspended, pending the outcome of the screening. If the results are negative, he will be returned to work and paid for all lost wages. If the results are positive, he will be discharged.

## ARTICLE 29
## INVALIDATION CLAUSE

If any of the terms and conditions of this Agreement is in violation of any State or Federal Law or Court Decision or decree, then to the extent of any violation, this Agreement shall be null and void. If any portion of this Agreement is declared illegal, it shall not in any way affect the remaining provisions of this Agreement.

## ARTICLE 30
## PAYROLL PERIOD

**Section 1**. The work week and pay period shall start at 12:01 a.m. on Saturday and end 12:00 midnight the following Friday.

**Section 2.** All Employees covered by this Agreement shall be paid in full each week. Payroll checks will be made available for Employees on Thursday of each week following the work week and pay period.

**Section 3.** Employees shall be paid in full when laid off or discharged. Payment of wages will be made in a timely manner at the next scheduled pay day.

**Section 4**. Employees shall be provided with an itemized statement of gross earnings and all deductions.

**Section 5**. Employees will have an option to participate in direct deposit program.

**Probation.** Newly hired employees shall be on probation for the first ninety (90) calendar days of employment. During that period, the Discharge, Grievance, Arbitration and Seniority articles of this Agreement shall not apply to the new employee. Neither shall any fringe benefit provisions of this Agreement apply, except named holidays. Upon completion of the probation period, seniority shall date from the most recent hire date.

## ARTICLE 31
## REPORTING PAY

Any employee reporting for work on a regular shift and not permitted to work shall receive four (4) hours pay at the employee's regular rate, and any employee who regularly works a four-day, ten-hour work week and reporting for work on a regular shift and not permitted to work shall receive five (5) hours pay at the employee's regular pay rate. This provision shall not apply in the case of fire, strike, utility failure, acts of God or any other conditions beyond the control of the Company. Any part-time employee who reports to work as scheduled or as requested on a given day, shall be guaranteed four (4) hours work or pay in lieu thereof.

## ARTICLE 32
## SAFETY AND HEALTH

The Employer shall continue to make reasonable provisions for the safety and health of its employees at the plant during the hours of employment, protective devices, on equipment, and /or clothing necessary to properly protect employees from injury shall be provided for and maintained by the employer, when required by the employer.
In the event a work related injury or illness that requires serious immediate medical attention away from the workplace, the employer will provide transportation to the medical facility and back to the workplace.

## ARTICLE 33
## TRANSITION AGREEMENT

Upon the ratification of this Master Agreement, the following guidelines must be adhered to:
All local addendums must be extended to have a common amendment date of May 30, 2004 and substitute the Grievance and System Board of Adjustment procedures/processes for any Grievance and/or Arbitration articles in current local addendums.  All local issues and interpretations will be governed by the superior conditions clause attached hereto.  Local supplement amendments will be for only economic issues relating to the local addendums in place at this time except, that there will be no additional entry or participation by the Company, or its employees, in any multi-employer pension/retirement or Health and Welfare fund/plans.  Local supplements will be

24

amended on the dates identified herein as Attachment A, unless amended or extended by mutual agreement. Non-economic language will be frozen in each respective local addendum until May 30, 2004.

In the event any Local Union cannot reach agreement on their local addendum and economic re-openers, the issues of dispute will be taken to the System Board of Adjustment for review and settlement.

## ARTICLE 34
## SUPERIORITY AGREEMENT

It is understood between the Company and the Union that no employee in any location will suffer a reduction in any wages, or benefits from his present level as a direct result of this Master Agreement. Furthermore, if any local Addendums terms and conditions exceed the terms and conditions of the Master, then the local Addendum shall apply during the term of the Master Agreement. In instances where the Master Agreement language and / or benefits are superior to the local addendum, the Master Agreement will apply at the time the Local Addendum is subject to amendment.

## ARTICLE 35
## WAGES

Contract wage increases for all classifications in accordance with the National Master Agreement shall be effective as follows:

| Effective: | Increase: |
|---|---|
| 6/3/00 | 4% |
| 6/2/01 | 3% |
| 6/1/02 | 3% |
| 5/31/03 | 4% |

## ARTICLE 36
## AMENDMENT

This Agreement shall become effective June 1, 2000 and thereafter remaining in effect until changed in accordance with the provisions of the Railway Labor Act.

Neither party shall, prior to April 1, 2004 serve a notice on the other party, pursuant to section 6 of the Railway Labor Act, to change any term of the Agreement, which change shall not be effective prior to June 1, 2004.

For Gate Gourmet / Dobbs                     For The Employee's Representative
                                             Council

_____                      _____
                                             IBT

_____                      _____
                                             HERE

## ATTACHMENT "A"

TEAMSTERS                                  HERE

ATL  3-7-02                          ORD     3-27-03
JAX  2-4-00                          LAS     5-31-02
LAX  6-30-01                         MIA     12-3-03
MEM 8-28-01                          EWR     EXPIRED
MSY 3-12-03                          OAK
PHL  5-9-01                          AMTK    3-31-02
SFO  2-15-00                         SFO     10-31-01
STL   10-20-01                       PHL     6-3-00
IAD   4-4-00                      SEATTLE
ORD   10-1-01                        AMTK    4-15-02

## LETTER OF UNDERSTANDING

All existing units will maintain their existing holiday schedules in accordance with area standards and practices prior to January 1, 20001.

For Gate Gourmet/Dobbs

For The Employee's Representative Council

IBT

HERE

# GATE GOURMET SYSTEM BOARD OF ADJUSTMENT

## *RULES OF PROCEDURE*

Original Version
July 14, 2000

# GATE GOURMET SYSTEM BOARD OF ADJUSTMENT

## *RULES OF PROCEDURE*

### Rule 1:  Scheduling of Hearings
The Gate Gourmet System Board of Adjustment (the **"System Board"**) shall conduct regular hearings six (6) times per year, every other month, commencing August 2000.  The hearings will commence on the scheduled date at 9:00 am and will conclude at 5:00 pm daily unless otherwise modified by the mutual agreement of the members of the System Board.  The Co-Chairpersons of the Union and Company shall each determine three (3) meeting locations per year.

### Rule 2:  Composition of System Board
The System Board will be comprised of two (2) members of the Union and two (2) representatives of the Employer as set forth in the Master Agreement.  The designated Co-Chairpersons of the Union and Employer will preside over the Hearings of the System Board and will make final rulings on all points of order and of admissibility of proof.

    A.  The IBT/HERE Employee Representatives' Council will designate the Union's Co-Chairperson.

    B.  The Employer will designate the Employer's Co-Chairperson.

    C.  The Co-Chairpersons will designate the Secretary of the System Board.

### Rule 3:  Requests for Hearing
Hearings before the System Board will be scheduled only after a Request for Hearing has been properly and timely filed with the Secretary.  A format Request for Hearing is attached.  Requests for Hearing shall be sent to the Secretary by certified mail, overnight delivery, or telefax.  A copy of the Request for Hearing must also be sent to the opposing party at the same time and in the same manner it is sent to the Secretary.  Upon such proper and timely filing, a hearing will be scheduled and it is mandatory that the Union and Employer be present at the hearing.  Failure to so appear will result in a ruling by the System Board against the absent party.  Requests for hearing may be withdrawn or postponed, but in no event can the Union or Employer be permitted to postpone the same hearing more than one (1) time.

### Rule 4:  Timeliness of Requests for Hearing
Requests for Hearing must be sent to the Secretary within the following time limits:

    A.  For all Grievances, within fourteen (14) days of the receipt by the Union of the Company's written decision of the final step of the Grievance Procedure.

B. For all other disputes, within thirty (30) days of the date the dispute became known to the Union or Employer.

## Rule 5:  Docketing

Cases will be docketed on the Agenda as the Requests for Hearing are received by the Secretary.   The "cut-off" for making the docket for a scheduled hearing date is fifteen (15) days prior to the scheduled hearing date.  Requests for Hearing must be received by the Secretary on or before the "cut-off" date for the cases to be docketed. Only discharge cases and/or cases which involve continuing liability may be added to the Agenda after the cut-off date.  All cases will be heard by the System Board in the order in which the cases are docketed.  However, upon reasonable request, the Co-Chairpersons can agree to hear a case out of its regular order on the docket.

## Rule 6:  Presentation of Cases

The following rules govern the presentation of cases before the System Board:

A. When a case is called for hearing, the Secretary will inquire whether the parties are prepared to proceed and whether all parties affected by the case are present or were notified of the case.  Hearings involving seniority will be heard only after written evidence is presented which establishes that all affected parties have been notified that a hearing is scheduled before the System Board and they have been offered an opportunity to be present

B. The presentation of cases before the System Board is limited to representatives from the Union and the Employer only.  Attorneys are not allowed to present cases before the System Board.  In cases involving grievances, the grievant may also be present during the hearing. Witnesses may be called to testify on behalf of the parties.

C. Written statements may be presented in lieu of live testimony only if the statements are legible, notarized, and have been presented to the opposing party at least ten (10) days prior to the hearing date.  Statements obtained by the opposing party in rebuttal to these written statements must also be legible, notarized and presented to the other party at least three (3) days prior to the hearing date.  In cases involving grievances, written evidence can be used at the System Board hearing only if that same written evidence had been presented to the opposing party at some prior step of the grievance procedure. The party presenting the written evidence must also have five (5) additional copies of the document, four (4) for the System Board members and one (1) for the opposing party.

D. The party filing the Request for Hearing will present its case first, except when the case involves discharge or suspension, in which instance the Employer will present its case first.

E.  Only evidence pertaining to the particular issue before the System Board generally will be permitted, but evidence of progressive discipline may be introduced if relevant to a particular case.

F.  The parties will be given every reasonable opportunity to present their respective cases. However, the Co-Chairpersons have the complete discretion to limit proof in any manner they jointly deem necessary.

G.  The System Board shall have the authority to apply and interpret all provisions of the applicable Agreements to the extent necessary to render its decisions.

H.  The System Board shall not conduct hearings unless both parties comply with all applicable provisions of the Grievance Procedure set forth in the Master Agreement and/or the comparable provision of the local agreement.

I.  After each party has presented its case, the System Board members, in executive session, will cast their votes. The vote will be by secret ballot if so requested by any member of the System Board. During this executive session, all other persons will leave the hearing room. After a decision has been agreed to by a majority of the panel, or if a deadlock is reached, all interested parties shall be called into the hearing room and advised of the outcome.

J.  The Secretary shall prepare written minutes of the System Board hearings. These minutes shall briefly outline the nature of the disputes, the facts as determined by the System Board, and the decisions reached by the System Board. The Secretary shall mail copies of the minutes to the System Board members, all Unions, and the Employer.

**Rule 7:  Binding Decision**
All decisions by the System Board are final and binding on the parties.

**Rule 8:  Financial Charges**
The non-prevailing party will pay the sum of fifty dollars ($50.00) to the System Board. This charge must be paid in full prior the next scheduled System Board hearings. Additionally, there will be a twenty-five dollar ($25.00) charge to the party granted a request for postponement of a docketed case. Finally, the hearings before the System Board, with the exclusion of the executive sessions, will be tape-recorded. Either party may obtain a copy of a tape for a fee of one hundred dollars ($100.00). All monies collected will be placed in an account established by the System Board and will be used to defray the costs of the System Board in conducting the hearings.

**Rule 9:  Modification of Rules**
These Rules of Procedure are subject to the modification or revision by mutual agreement of the members of the System Board.

# GATE GOURMET SYSTEM BOARD OF ADJUSTMENT

## REQUEST FOR HEARING

Gate Gourmet Unit:_____    Local Union: _____

Grievant/Complainant: _____

Union Contact Person: _____    Phone: _____

Gate Gourmet Contact Person: _____    Phone: _____

Nature of Dispute:   _____

_____

_____

_____

_____

_____

Hearing Date Requested:    _____

*I certify that I have complied with the notice requirements of Rule 3 of the Gate Gourmet system Board of Adjustment Rules of Procedure and that I have sent a copy of this Request for Hearing to the opposing party on the same date and by the same manner I sent this to the Secretary.*

_____

Signature

_____

Date

**XXXXXXXXXXXXXX** *DO NOT WRITE BELOW THIS LINE* **XXXXXXXXXXXXXX**

_____

Docket Number: _____

Date Set: _____

Decision of Board: _____

_____