UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

IBT/HERE EMPLOYEE REPRESENTATIVES )
COUNCIL, )
     *Plaintiff,* )
)
v. )
)
GATE GOURMET DIVISION AMERICAS, )
     *Defendant.* )
_____)

## DECLARATION OF STEVEN P. VAIRMA

I, STEVEN P. VAIRMA, hereby declare pursuant to 28 U.S.C. § 1746, under penalty of perjury, that the following is true and correct:

1.    I am the Secretary-Treasurer of Teamsters Local Union No. 435 and an International Representative of the International Brotherhood of Teamsters (IBT). I have served as the Teamster designee on the IBT/HERE Employee Representatives' Council (Council) since the end of 2001. The Council was formed in 2000 by UNITE HERE's predecessor, the Hotel Employees and Restaurant Employees International Union (HERE), and by the International Brotherhood of Teamsters to represent employees in the airline catering and commissary industry employed by Gate Gourmet. The so-called "craft or class" represented by the council is the "Kitchen, Commissary, Catering, and Related Employees." The terms "craft or class" and "bargaining unit" are used synonymously on the property to refer to the employee group represented by the Council.

2. The chief officer position of the Council rotates annually between the HERE designee and the IBT designee. Since January 1, 2005 the position of Council Director has been held by the HERE designee, Ken Paulsen, and I have been the Vice-Director.

3. The Council and Gate Gourmet are parties to a collective bargaining agreement, known as the National Master Agreement (NMA), establishing rates of pay, rules and working conditions at certain Gate Gourmet facilities. The NMA covers approximately 6,270 employees of Gate Gourmet who are represented by the Council. Approximately 2,229 of the employees covered by the NMA are Teamsters who work at ten facilities: Chicago, Portland, Orlando, Indianapolis, Memphis, Atlanta, New Orleans, Jacksonville, Washington, D.C. and Philadelphia. The remaining craft employees belong to UNITE HERE or other AFL-CIO unions, which the Council has designated to represent employees at the local level. Many of the Council's agents maintain local agreements with Gate Gourmet, which are referred to as "Addendums."

4. Employees covered by the NMA perform such jobs as food cook, food preparation, driver and customer service representative. They make between $8.10 per hour and $18.25 per hour with the average wage being approximately $11.10 an hour. Employees who are covered by the NMA have not received a raise in two years.

5. The current NMA became effective on June 1, 2000. On or about December 10, 2003, Gate Gourmet served upon the Council an opening proposal to modify the NMA pursuant to Section 6 of the Railway Labor Act. Exhibit 1. The parties have been

negotiating over proposed modifications to the agreement since that time. I am the Council's chief spokesperson at negotiations and have attended all negotiating sessions.

6.	On or about October 21, 2004, Gate Gourmet proposed deep, across-the-board cuts in wages and benefits. Exhibit 2.

7.	On October 27, 2004, while the parties were negotiating over the various Section 6 proposals, Gate Gourmet announced that, effective January 1, 2005, the health insurance benefits were being lowered and the employee contribution rate was being increased. Exhibit 3. In a letter to Employees, Gate Gourmet stated that employees would have to bear the entire cost of the premium if they chose to continue dental insurance and that the Company was increasing the monthly employee contributions for health insurance as follows:

| | |
|---|---|
| Employee | from $31.32 to $119.07 |
| Employee & spouse | from $94.01 to $267.90 |
| Employee & children | from $75.95 to $228.66 |
| Employee & family | from $155.63 to $362.61. |

Id.

8.	Many employees reduced their coverage by dropping family members effective January 1, 2005 because they could not afford the rate increases.

9.	Not only were the contribution rates for employees at least doubled on January 1, 2005, but deductibles and co-payments also increased. For example, calendar year deductibles were increased from $200 with a family limit of $600 to $250 with a family limit

of $750. The required emergency room co-pay doubled, increasing from $50 to $100, and hospitalization co-pays doubled from $100 to $200 a day. Maximum out of pocket expenses for out-of-network services was raised to $12,000 for family coverage from $6,000 for Plus coverage and $9,000 for Core coverage and to $4,000 for individual coverage from $3,000 for Core coverage and $2,000 for Plus coverage. Prescription drug costs increased ten dollars for brand name drugs, from $20 to $30 and from $40 to $50 for ninety-day orders made through the mail. These increases in co-pays, deductibles and prescription costs alone created a financial hardship for people who gross an average of only approximately $23,000 a year.

10.     Other costs for employees that remained the same beginning in January 2005 included co-payments for doctor's visits in the amount of $20 for a primary care physician and $40 for a specialist. Employees must also pay must pay between 10% and 30% for many physician services depending on the plan and whether the physician is in network. Even those hourly employees that maintained the Gate Gourmet Medical Plan after January 1, 2005 were delaying or skipping medical treatment because they could not afford the co-payments and fees for which they were responsible.

11.     The Council protested the January 1, 2005 alterations to the health plan and filed a grievance on December 2, 2004 informing Gate Gourmet that its increases in premium payments were illegal unilateral alterations of the status quo in violation the Railway Labor

Act and that they also violated the NMA. Despite the Council's protest, Gate Gourmet implemented the changes, reducing coverage and increasing premium costs. The Council's grievance regarding this action is scheduled to be heard at the next meeting of System Board of Adjustment on August 9, 2005.

12. NMA Article 24, Section 1, provides that craft or class employees are "eligible to participate in the Company's Health Care Program" as well as term life and accidental death insurance. Ex. 1 to K. Paulsen Decl. at 17. That section further provides that: "While administration of the plan remains a Company prerogative, bargaining unit Employee's contribution rates for the various health plans and optional life insurance will be the same each year as the contribution rates for management/salaried employees."

13. NMA Article 34 provides in pertinent part that (Ex. 1 to K. Paulsen Decl. at 25):

> It is understood between the Company and the Union that no employee in any location will suffer a reduction in any wages, or benefits from his present level as a direct result of this Master Agreement. Furthermore, if any local Addendums terms and conditions exceed the terms and conditions of the Master, then the local Addendum shall apply during the term of the Master Agreement. . . .

14. On May 4, 2005, Gate Gourmet presented the Council with what it stated was its "last best offer." In this latest offer Gate Gourmet proposes, in part, to reduce the number of paid holidays, reduce the amount of sick leave that may be accrued, eliminate most

premium wage rates, reduce the base wage rate by 9.9%, freeze the reduced wages for four (4) years and to increase it by only 1%, which would be paid in a lump sum, for the next four (4) years thereafter and increase the monthly premium employees must pay for health insurance by requiring the employees to pay 50% of future premium increases. A copy of the summary of this offer that was prepared by Gate Gourmet is attached as Exhibit 4.

15.  The Council submitted Gate Gourmet's "last best offer" to the IBT and HERE memberships for a ratification vote. Each Local conducted a vote during the period from May 11, 2005 until May 31, 2005. Voting was complete on or about May 27. The Company's proposal was overwhelmingly rejected by approximately 94% of the voting members.

16.  In a memorandum dated May 12, 2005, Gate Gourmet informed the bargaining unit employees that it would stop making any contribution for the payment of their health insurance premiums if the Company's proposal was rejected. Gate Gourmet mailed this memorandum to all bargaining unit members covered by the NMA on or about the same day that the voting period began. Gate Gourmet did not provide the Council a copy of the memorandum. I first learned about it on or about May 20, 2005. The memorandum states that because "our Divisional financial performance continues to decline and our labor costs remain uncompetitive under the current labor contract, the company Medical Plan subsidy will end on June 30, 2005 if the new contract is not approved by the union membership."

Gate Gourmet further stated that: "If the new contract is not approved, we will continue to offer the Medical Plan, **but you will be responsible for the full monthly cost beginning in July.**" Ex. 4 to Complaint (emphasis in original). It announced that employees had to re-enroll if they wished to "continue to participate in the Medical Plan after June 30, 2005" and that they had until June 1, 2005, to re-enroll. *Id.* Employees were further informed of the new monthly premium rates. *Id.*

17.   The rate changes to the employees' contribution for health insurance since 2004, are as follows:

|  | 2004 | | 1/1/05 | 7/1/05 |
|---|---|---|---|---|
|  | Core | Plus | | |
| Employee | $31.32 | $61.53 | $119.07 | $390.57 |
| Employee & Spouse | $94.01 | $156.70 | $267.90 | $796.49 |
| Employee & Children | $75.95 | $130.26 | $228.66 | $757.25 |
| Employee & Family | $155.63 | $250.63 | $362.61 | $1,148.27 |

18.   In the October 27, 2004 letter to its employees advising them of the January 1, 2005 unilateral alterations to the health insurance, Gate Gourmet set forth the total amount of the health insurance premium for 2005. It states that the employee and company contributions add up to $270.61 for employee only, $569.28 for employee & spouse, $514.15 for employee & children and $811.82 for employee & family. The announced rates for employees that Gate Gourmet will implement in July are approximately 140% of the total cost for Gate Gourmet's medical insurance.

19. On May 27, 2005 Gate Gourmet posted a memorandum advising the bargaining unit members that they had extended the time for the members to re-enroll until June 8, 2005.

20. On June 3, 2005, the Council protested Gate Gourmet's actions as being a violation of the Railway Labor Act as an impermissible change of the status quo and a breach of the NMA. A true and accurate copy of that protest and claim is attached as Exhibit 5 to the Complaint. The Council requested expedited processing of the grievance.

21. On June 7, 2005 Gate Gourmet agreed to have this and all future grievances filed by the Council proceed directly to the System Board of Adjustment.

22. Gate Gourmet employees who are represented by the Council and who are participating in the Gate Gourmet Inc. Group Benefit Plan are already suffering financial hardship from the reduction in benefits and the increases in costs that were implemented by the Company in January. These changes caused some employees to drop insurance coverage for their family members. Many will completely drop coverage in July if Gate Gourmet fails to pay a portion of the health insurance. As stated above, the average wage of the hourly employees at Gate Gourmet is approximately $11.10 per hour, or less than $2,000 per month gross. Employees with family coverage will be left with little or no money on which to live after paying the health insurance contribution at the increased rate.

23. This critical situation is exacerbated by the fact that many employees do not understand what is going to happen in July. Many of the hourly Gate Gourmet employees are immigrants who speak little or no English and do not comprehend the impending changes. They believe that their health insurance is secure and they do not realize that they will have significant increases as of July 1 or they will lose their insurance. These employees speak Spanish, Vietnamese and other languages. Gate Gourmet has made no attempt to translate their communications to employees into any language.

24. An award by the SBA in several months cannot remedy the lack of medical treatment for employees and their family members who develop medical conditions or whose conditions worsen without medical treatment while awaiting the SBA's decision. Gate Gourmet has already begun denying authorization for necessary medical treatment for employees who did not "re-enroll."

I have read this Declaration, consisting of twenty-four (24) paragraphs, and I declare pursuant to 28 U.S.C. 1746, under penalty of perjury, that it is true and correct to the best of my knowledge, information and belief.

Sworn to this 16th day of June, 2005 in Denver, Colorado.

_____
Steven P. Vairma