# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

IBT/HERE EMPLOYEE
REPRESENTATIVES' COUNCIL,

        Plaintiff,

    v.

GATE GOURMET DIVISION AMERICAS
and GATE GOURMET, INC.,

        Defendants.

Civil Action No. 1:05CV01210

Judge:    The Honorable Ricardo M. Urbina

**GATE GOURMET'S MEMORANDUM OF LAW IN OPPOSITION
TO PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ........................................................................................1

STATEMENT OF FACTS ..............................................................................................4

    A.    The Parties to the Dispute ...........................................................4

        1.    Gate Gourmet, Inc ..............................................................4

        2.    The Union...........................................................................5

        3.    The NMA ...........................................................................6

    B.    Background of Gate Gourmet's Financial Problems .................7

    C.    Gate Gourmet's Difficult Financial Condition..........................8

    D.    Gate Gourmet Has Been Unable to Make Progress on Reductions for Union-Represented Employees ..........................................10

    E.    Gate Gourmet's Contractual Right to Reduce Contribution Rates Unilaterally for Hourly and Salaried/Management Employees...............11

        1.    The Applicable Contractual Provisions .......................11

        2.    The Past Practice of Altering Benefits Unilaterally .....................12

        3.    The Company's Decision to Eliminate Employer Contributions to the Medical Plan................................14

    F.    The Announcement of a Retention Payment for Salaried and Management Employees........................................................16

    G.    The Relative Harm to the Union and the Company .................17

        1.    The Relative Harm to the Union...................................17

        2.    The Relative Harm to the Company. ............................19

ARGUMENT...................................................................................................19

    I.    THE UNION'S MOTION FOR TEMPORARY RESTRAINING ORDER SHOULD BE DENIED BECAUSE THE UNION UNREASONABLY DELAYED IN SEEKING THE RELIEF REQUESTED ...................19

    II.    THE UNION'S MOTION DOES NOT SATISFY THE REQUIREMENTS FOR ISSUANCE OF INTERIM RELIEF IN THIS CIRCUIT ......................................................................................21

    III.    THE UNION'S ARGUMENT THAT THE RLA PROHIBITS AN EMPLOYER FROM ALTERING THE "STATUS QUO" DURING NEGOTIATIONS, EVEN THOUGH THE EMPLOYER'S ACTION ARE ARGUABLY JUSTIFIED BY THE EXISTING COLLECTIVE BARGAINING AGREEMENT, IS CONTRARY TO WELL-ESTABLISHED PRINCIPLES UNDER THE RLA ..........................25

**TABLE OF CONTENTS**
(continued)

Page

A. An Overview of the Distinction Between "Major" and "Minor" Disputes Under the RLA ........................................26

B. The 1964 Southern Railway Decision upon Which the Union Relies Has Been Plainly Overruled by Subsequent Supreme Court and Circuit Court Authority........................................28

IV. THE DISPUTE OVER GATE GOURMET'S RIGHT TO ALTER THE EMPLOYEE CONTRIBUTION RATES FOR HEALTH INSURANCE IS A MINOR DISPUTE SUBJECT TO THE EXCLUSIVE JURISDICTION OF THE SYSTEM BOARD OF ADJUSTMENT..................32

A. The Test for Distinguishing Between a Major and Minor Dispute Is Whether the Carrier's Contractual Defense Is "Frivolous" or "Obviously Insubstantial."........................................32

B. The Company's Contractual Defense Cannot Be Characterized as "Frivolous" or "Obviously Insubstantial." ..............................................33

1. The Plain Language of Article 24 Allows the Company to Change or Eliminate the Employer Contribution So Long as Union and Management Employees Are Treated Similarly ........................................34

2. The Bargaining History of Article 24 Allows the Company to Change or Eliminate the Employer Contribution....................35

3. The Past Practice Under Article 24 Allows the Company to Change or Eliminate the Employer Contribution........................35

4. The Retention Payment Was Implemented to Deal with a Severe Attrition Problem Among Management and Salaried Employees, and Is Unrelated to the Change in Employee Contributions ................................36

V. THE COURT SHOULD REJECT THE UNION'S REQUEST TO ISSUE AN INJUNCTION MAINTAINING THE STATUS PENDING ARBITRATION ........................................37

A. A "Minor Dispute" Injunction Is Inconsistent with the Supreme Court's Holding in Conrail That the Federal Courts Have No Jurisdiction over Minor Disputes, and That the Carrier May Act Unilaterally Pending Arbitration ................................38

B. Even If the Court Had Limited Jurisdiction to "Preserve the Jurisdiction of the Adjustment Board," This Case Does Not Meet That Standard ........................................39

CONCLUSION........................................43

# TABLE OF AUTHORITIES

Page

## CASES

*Air Cargo, Inc. v. Local Union 851*,
733 F.2d 241 (2d Cir. 1984) ....................................................................29

*Air Line Pilots Ass'n, Int'l v. Eastern Air Lines, Inc.*,
863 F.2d 891 (D.C. Cir. 1988) .......................................................25, 29, 30

*Air Line Pilots Ass'n, Int'l v. Eastern Air Lines, Inc.*,
869 F.2d 1518 (D.C. Cir. 1989) .....................26, 27, 32, 33, 38, 39, 42

*Allied Pilots Ass'n v. American Airlines*,
898 F.2d 462 (5th Cir. 1990) ..................................................................40

*Aluminum Workers Local 215 v. Consol. Aluminum Corp.*,
696 F.2d 437 (6th Cir. 1982) ..................................................................24

*Bhd. of Locomotive Eng'rs v. Louisville & N.R.R.*,
373 U.S. 33 (1963) ..................................................................................27

*Bhd. of Locomotive Eng'rs v. Missouri-Kansas-Texas R. Co.*,
363 U.S. 528 (1960) ..........................................................................38, 40

*Bhd. of Locomotive Eng'rs v. Missouri-Kansas-Texas R. Co.*, 363 U.S. 528, 534
(1960) ......................................................................................................42

*CityFed Fin. Corp. v. Office of Thrift Supervision*,
58 F.3d 738 (D.C. Cir. 1995) ............................................................21, 22

*Communications Workers of Am. v. Verizon Communications, Inc.*,
255 F. Supp. 2d 479 (E.D. Pa. 2003) .....................................................24

*Consol. Rail Corp. v. Ry. Labor Executives' Ass'n*,
491 U.S. 299 (1989).................................2, 3, 26, 27, 29, 30, 31, 32, 38

*CSX Transp., Inc. v. Williams*,
406 F.3d 667 (D.C. Cir. 2005) ................................................................22

*Detroit & Toledo Shore Line R.R. v. United Transp. Union*,
396 U.S. 142 (1969).........................................................................27, 31

*Dobbs Int'l Servs., Inc.*,
27 N.M.B. 537 (2000)..........................................................................5, 6

*Elgin, J. & E. Ry. v. Burley*,
325 U.S. 711 (1945).................................................................................26

*Enercons Va., Inc. v. Am. Sec. Bank, N.A.*,
720 F.2d 28 (D.C. Cir. 1983) ..................................................................19

# TABLE OF AUTHORITIES
### (continued)

Page

*FTC v. Exxon Corp.*,
   636 F.2d 1336 (D.C. Cir. 1980) .......................................................................................19

*Fund for Animals v. Frizzell*,
   530 F.2d 982 (D.C. Cir. 1975) ........................................................................................21

*IBEW, AFL-CIO, Local Union No. 245 v. FirstEnergy Corp.*,
   233 F. Supp. 2d 913 (D. Ohio 2002) ..............................................................................24

*Int'l Ass'n of Machinists & Aerospace Workers v. Northeast Airlines, Inc.*,
   473 F.2d 549 (1st Cir. 1972)............................................................................................40

*Int'l Ass'n of Machinists & Aerospace Workers, Dist. Lodge No. 100 v. Eastern
   Air Lines, Inc.*,
   826 F.2d 1141 (1st Cir. 1987)..........................................................................................38

*Int'l Ass'n of Machinists v. NMB*,
   2005 U.S. Dist. LEXIS 11881 (D.D.C. June 20, 2005) ..............................................21, 41

*Int'l Bhd. of Elec. Workers v. Washington Terminal Co.*,
   473 F.2d 1156 (D.C. Cir. 1972) ......................................................................................39

*Local 553 Transport Workers v. Eastern Air Lines, Inc.*,
   695 F.2d 668 (2d Cir. 1982) ...........................................................................................39

*Local Lodge 2144, BRAC v. Ry. Express Agency, Inc.*,
   409 F.2d 312 (2d Cir. 1969) ...........................................................................................38

*Local Union 15, Int'l Bhd. of Elec. Workers v. Exelon Corp.*,
   191 F. Supp. 2d 987 (N.D. Ill. 2001) ..............................................................................24

*Mazurek v. Armstrong*,
   520 U.S. 968 (1997).........................................................................................................19

*Mova Pharm. Corp. v. Shalala*,
   140 F.3d 1060 (D.C. Cir. 1998) ......................................................................................21

*Pittsburgh & Lake Erie R.R. v. Ry. Labor Executives' Ass'n*,
   491 U.S. 490 (1989)...................................................................................2, 26, 30, 31

*Risteen v. Youth for Understanding USA, Inc.*, 245 F. Supp. 2d 1 (D.D.C. 2002) .......................23

*Rubber Workers Local 884 v. Bridgestone/Firestone, Inc.*,
   61 F.3d 1347 (8th Cir. 1995) ..........................................................................................23

*Rutland Railway v. Brotherhood of Locomotive Engineers*,
   307 F.2d 21 (2d Cir. 1962), *cert. denied*, 372 U.S. 954 (1963).........................................29, 30

*S. Ry. v. Bhd. of Locomotive Firemen*,

## TABLE OF AUTHORITIES
### (continued)

**Page**

337 F.2d 127 (D.C. Cir. 1964) ........................................................25, 26, 28, 29, 32

*Sheet Metal Workers v. Burlington R.R.*,
  893 F.2d 199 (8th Cir. 1989) ..................................................................40

*Teamsters v. Southwest Airlines Co.*,
  875 F.2d 1129 (5th Cir. 1989) ................................................................40

*United Transp. Union v. Penn Cent. Transp. Co.*,
  505 F.2d 542 (3d Cir. 1974) ...................................................................40

*Westchester Lodge 2186 v. Ry. Express Agency, Inc.*,
  329 F.2d 748 (2d Cir. 1964) ...................................................................39

## STATUTES AND RULES

29 U.S.C. § 107 ...............................................................................................22

29 U.S.C. § 151 *et seq.* ......................................................................................4

45 U.S.C. § 151 *et seq.* ......................................................................................1

45 U.S.C. § 153 ...............................................................................................27

45 U.S.C. § 156 ...............................................................................................25

45 U.S.C. § 184 ...............................................................................................27

Norris La-Guardia Act, 29 U.S.C. § 107 .............................................................2

## OTHER AUTHORITIES

*Elkouri & Elkouri*, How Arbitration Works ..........................................................40

## PRELIMINARY STATEMENT

IBT/HERE Employee Representatives' Council (the "Union"), the collective bargaining representative for all kitchen, commissary, and catering work personnel employed by Gate Gourmet, Inc. ("Gate Gourmet" or the "Company"), seeks a five-day temporary restraining order ("TRO") prohibiting Gate Gourmet from exercising its existing rights under the parties' collective bargaining agreement (the "National Master Agreement," or "NMA") pending hearing on a motion for preliminary injunction. As explained in more detail below, the NMA provides that for bargaining unit employees, the employee contribution rate for health coverage "will be the same each year as the contribution rates for management/salaried employees." Because of Gate Gourmet's difficult financial condition, which the Union's motion completely ignores, the Company was forced to eliminate the employer subsidy for all employees covered by the Company Health Care Plan, which applies to both Union-represented and management and salaried employees, effective July 1, 2005.

Even though the NMA plainly permits the Company to modify the employee contribution rates so long as the rates are the same for union and nonunion employees, the Union seeks to enjoin the change, arguing: (1) that the change violates the status quo obligations under Section 6 of the Railway Labor Act, 45 U.S.C. §§ 151 *et seq.* (the "RLA"), because the parties are currently in negotiations for a new agreement; and (2) that even if the Company's right to implement this change is a minor dispute, the Court should issue a "minor dispute injunction" barring the Company from implementing the change pending arbitration over the Company's rights. As demonstrated below, the Union is wrong on both points, and its request for a TRO should accordingly be denied.

*First*, the Union has unreasonably delayed in bringing this motion for a TRO, creating an "emergency" of its own making. The Union, by its own admission, knew of the planned changes

by May 31, 2005 (and probably much earlier).  As reflected by the dates on the declarations, the

Union began drafting its papers in early June 2005, but waited nearly a month before seeking this

TRO.  Moreover, despite informing the Company that it would file this motion on Tuesday of

last week, it waited to file this supposedly emergency motion until after 7 P.M. last Friday.

Neither Gate Gourmet, nor the Court, should be required to deal with a TRO application under

these circumstances.

   ***Second***, the Union cannot satisfy the requirements for interim injunctive relief under the

law of this Circuit.  As explained below, the Union has no reasonable likelihood of success on

the merits, and any injury to employees represented by the Union can be remedied through

arbitration before the Gate Gourmet System Board of Adjustment.  Gate Gourmet has offered to

arbitrate this dispute on an expedited basis, and the arbitrator will have authority to issue full,

make-whole relief.  Moreover, under the Norris-La Guardia Act, 29 U.S.C. § 107, any TRO

would be limited to five days, and the likelihood of any harm during that five-day period is

highly speculative.

   ***Third***, both Supreme Court and D.C. Circuit authority make clear that where a collective

bargaining agreement gives the employer an "arguable" right to change the existing terms of

employment, the employer is entitled to act on that right unilaterally even during negotiations for

a new agreement.  *Consol. Rail Corp. v. Ry. Labor Executives' Ass'n*, 491 U.S. 299 (1989)

("*Conrail*"); *Pittsburgh & Lake Erie R.R. v. Ry. Labor Executives' Ass'n*, 491 U.S. 490 (1989)

("*P&LE*").  Any dispute over the company's rights is a "minor dispute" subject to arbitration

before an adjustment board created pursuant to the RLA to resolve such disputes.  *Id.*  While the

Union relies on a 1964 decision of the D.C. Circuit which it claims requires Gate Gourmet to

maintain the status quo while in bargaining, that case has been plainly overruled by subsequent

case law.

In fact, the Union itself recognized that this is a minor dispute by filing a grievance before the System Board of Adjustment (the "System Board"), and the Company has agreed to arbitrate this grievance on an expedited basis.  The Company believes it will prevail in this arbitration because the NMA provides that "Employee's contribution rates for the various health plans and optional life insurance *will be the same each year as the contribution rates for management/salaried employees,*" and, thus, unequivocally authorizes Gate Gourmet to make changes to the health plan contribution rates for Union-represented employees when it makes the same changes for management and salaried employees.  Indeed, the Union's only complaint is that the Company has implemented a retention payment for management and salaried employees which, the Union contends, is a disguised subsidy for health insurance.  The evidence recounted below, however, demonstrates that the retention payment was implemented because of high attrition among such employees, and is unrelated to whether the employee elected to participate in the Company's medical plan.

*Fourth,* the Union's request that the Court nonetheless enjoin Gate Gourmet from implementing the changes pending arbitration ignores the holding of *Conrail* that the federal courts have no jurisdiction in minor disputes.  *Conrail*, 491 U.S. at 304.  Enjoining the carrier from acting pending arbitration would be wholly inconsistent with the Supreme Court's holding in *Conrail* that the employer may act unilaterally pending arbitration.  Even if this Court had limited jurisdiction to issue an injunction to "preserve the jurisdiction" of the System Board, however, this case does not present the type of irreparable injury that would render the adjustment board's ruling an "empty victory."  If the System Board concludes that the Union's interpretation of the NMA is correct, it can award full monetary relief to any employee adversely

affected, and prospective relief directing Gate Gourmet to continue its employer contribution to the health plan.  Indeed, if the loss of medical benefits were a sufficient basis to obtain a minor dispute injunction, then injunctions would be available in every discharge case because, in that circumstance, an employee loses both income *and* health insurance.

## STATEMENT OF FACTS

**A.**      **The Parties to the Dispute.**

**1.**      **Gate Gourmet, Inc.**

Gate Gourmet, Inc. is a company within "Gate Gourmet Division Americas," and is an indirect subsidiary of Gate Gourmet Holding S.C.A., which, together with other direct and direct subsidiaries, comprises the "Gate Gourmet Group," an international caterer that provides food and beverages primarily to airlines for in-flight service.  The Company employs approximately 8,500 employees within the United States.  (Declaration of Douglas Goeke ("Goeke Decl.") ¶ 3.)

The Company currently provides catering services to over 20 domestic and 24 foreign air carriers at 34 airports within the United States.  Gate Gourmet has long-term contracts with these carriers to provide catering services as specified by the airline.  Based on the specifications provided by its airline customers, Gate Gourmet purchases the necessary provisions, prepares the food and beverages in its own kitchens, packs the prepared food, beverages and service items into moveable bins provided by the airline, places the bins into a high-loader truck, and delivers the bins to the proper aircraft shortly before its scheduled departure.  (Goeke Decl. ¶ 4.)

Until 2000, Gate Gourmet – then known as Dobbs International Services, Inc. ("Dobbs") – was subject to the National Labor Relations Act, 29 U.S.C. §§ 151 *et seq*. (the "NLRA").  Each of the geographical sites/cities were considered a separate bargaining unit, and Dobbs had approximately 25 collective bargaining agreements with several different unions.  (Declaration of Keith Warren ("Warren Decl.") ¶ 4.)  In 1999, SAirGroup, the parent of SwissAir, purchased

Dobbs, and thereafter, the National Mediation Board ("NMB") determined that the Company was a "carrier" subject to the RLA. *Dobbs Int'l Servs., Inc.*, 27 N.M.B. 537, 545 (2000). In that decision, the NMB certified the IBT/HERE Employee Representatives' Council as the representative of the entire, system-wide craft or class of kitchen, catering and commissary employees. *Id* at 5.

        **2.    The Union.**

The IBT/HERE Employee Representatives' Council (the "Union") was formed in 2000 by the International Brotherhood of Teamsters ("IBT") and the Hotel Employees and Restaurant Employees International Union ("HERE") following the purchase of Dobbs by SAir Group. (Warren Decl. ¶ 6.)

IBT and HERE formed the Union in recognition that Dobbs was covered by the RLA, and that under the RLA there had to be a single collective bargaining representative for the entire system. At the time, IBT represented about 31 percent of the employees system-wide, and HERE represented about 32 percent. Rather than have a runoff election in which one of the unions would have lost representation rights entirely, they agreed to form the Union since, in the aggregate, these two represented a majority of employees in the system-wide craft or class. As part of this arrangement, the Union informed its own IBT and HERE affiliated local unions, as well as other AFL-CIO affiliated unions who represented smaller groups of employees, that the Union would delegate Local Addendum bargaining authority to them at only the kitchens and sites where they previously had representation rights under the NLRA. (Warren Decl. ¶ 7.)

After IBT and HERE formed the Union, Dobbs agreed to allow the NMB to certify the Union based on a "card check" rather than its normal election procedures. (Warren Decl. ¶ 8.) *See Dobbs*, 27 N.M.B. at 545.

5

3.    **The NMA.**

Concurrent with the proceedings before the NMB, the Company and the Union entered into negotiations for a single collective bargaining agreement covering the entire system.  In approximately April, 2000, the parties executed the IBT/HERE Employee Representatives' Council – Gate Gourmet Dobbs International National Master Agreement (the "National Master Agreement," or "NMA").  The NMA became effective on June 1, 2000, and became amendable pursuant to the RLA on June 1, 2004.  (Warren Decl. ¶ 9.)

At the time that the NMA was executed, the parties agreed that 25 existing local agreements would continue in force as "Local Addendums" to the NMA.  The parties further agreed, in Article 34 of the NMA, that if the Local Addenda provided greater wages or benefits than the NMA, the Local Addenda would control.  (Warren Decl. ¶ 10.)  Article 34 provides:

> It is understood between the Company and the Union that no employee in any location will suffer a reduction in any wages, or benefits from his present level as a direct result of this Master Agreement.  Furthermore, if any local Addendums terms and conditions exceed the terms and conditions of the Master, then the local Addendum shall apply during the term of the Master Agreement.  In instances where the Master Agreement language and/or benefits are superior to the local addendum, the Master Agreement will apply at the time the Local Addendum is subject to amendment.

The plain language of Article 33, the Transition Agreement, also provides that the NMA applies to locations with a Local Addendum.

The Company's negotiators would testify that the sentence providing, "no employee in any location will suffer a reduction in any wages, or benefits from his present level as a direct result of this Master Agreement," was intended by the parties to mean that the execution of the NMA itself would not result in any immediate reduction of wages or benefits, but that all of the parties understood that future events could result in a reduction.  (Warren Decl. ¶ 10.)

### B.    Background of Gate Gourmet's Financial Problems.

Although the dispute between Gate Gourmet and the Union ultimately turns on a question of contract interpretation – a question committed to the exclusive jurisdiction of the System Board of Adjustment – the Union's allegation that Gate Gourmet invoked its contractual rights in bad faith requires an explanation of the difficult financial circumstances facing Gate Gourmet – circumstances that the Union knows full well, but failed even to acknowledge in its motion.

The enormous financial losses affecting the airline industry since September 11 have had an equivalent impact on companies such as Gate Gourmet whose business is to service the airlines. As explained below, these losses, and the airlines' attempts to deal with them create a "triple whammy" for Gate Gourmet: (1) a direct loss of business as its airline customers cut capacity; (2) a direct loss of business as the airlines have cut food service; and (3) an ongoing effort by the financially troubled carriers to force caterers to offer lower prices. At the same time, an increase in low-cost competitors has further eroded Gate Gourmet's business.

First, the number of flights catered by Gate Gourmet dropped substantially following September 11. In 2000, Gate Gourmet catered 2,227,617 flights in the United States. Since 2000, that number has dropped to 1,689,956 flights as of 2004—a reduction of 24 percent. As a result, the Company has been forced to close or consolidate 18 facilities since September 11. (Goeke Decl. ¶ 6.)

Second, to deal with their own financial problems, the so-called "legacy airlines" have dramatically reduced in-flight food services. A majority of Gate Gourmet's business comes from three of the largest U.S. carriers – United Airlines, Inc., Delta Airlines, Inc., and American Airlines, Inc. In the face of continuing losses, those carriers have either eliminated meals in most domestic coach class flights or begun charging coach passengers. Even relatively profitable carriers such as America West Airlines have greatly reduced food service; for

example, America West dramatically reduced its food costs from 1.7 cents per "revenue passenger mile" to 0.5 cents between 2000 to 2004.  (Goeke Decl. ¶ 7.)

Third, again because of their own financial problems, the legacy carriers have demanded and secured significant ongoing discounts in lieu of cutting service further.  Indeed, United Airlines, renegotiated its long-term catering contracts in bankruptcy, forcing the Company to cut prices in order to retain the business.  (Goeke Decl. ¶ 8.)

Finally, the emergence of low-cost competition in the airline catering industry has made the market much more competitive.  The competitors, which generally have lower labor costs than Gate Gourmet, have a pricing advantage.  This has resulted in both a direct loss of business to low-cost competitors, and a need to reduce prices to retain business.  (Goeke Decl. ¶ 9.)

C.    **Gate Gourmet's Difficult Financial Condition.**

As a result of the foregoing circumstances, the Gate Gourmet Group experienced a 35 percent drop in total revenue between 2000 and 2003.[1]  Since 2003, total revenue has been relatively stable but unit revenue – the revenue generated from each meal and service – has continued to drop.  The Gate Gourmet Group's profit, likewise, has declined from CHF 26 million in 2000 to approximately a loss of CHF 109 million in 2004, excluding impairment charges.  This year, the Gate Gourmet Group's net margin is projected to be negative 4.9 percent, producing a net loss of CHF 116 million.  (Goeke Decl. ¶ 10.)

These continuing losses have created a cash flow crisis for the Gate Gourmet Group. The Gate Gourmet Group currently has approximately $400 million in senior secured debt and $225 in mezzanine debt.  In order to alleviate a projected liquidity crisis in the second and third quarter of 2005, the Gate Gourmet Group defaulted on its debt and embarked on a series of cost-

---

[1]    The financial results reported here are for Gate Gourmet Group because Gate Gourmet, Inc. does not report its financial results separately from Gate Gourmet Group.

containment and cash-conservation initiatives to avert a Chapter 11 bankruptcy filing. All available lines of credit are drawn and no additional sources of liquidity are available. The Gate Gourmet Group is currently unable to make the principal payments on the senior debt and the interest on the mezzanine debt and has spent nearly all of 2005 in default with its lenders. (Goeke Decl. ¶ 11.)

Management is continuing to work with debt and equity stakeholders; however, the lenders could force a Chapter 11 bankruptcy filing at any time. EBITDA margins are below the level needed to sustain the business. An operational and financial restructuring is required to create a viable entity. Negotiations for the financial restructuring are at an advanced stage and will reduce overall debt by over $140 million, but a satisfactory conclusion to labor renegotiations is a pre-condition of the new financing. (Goeke Decl. ¶ 12.)

As part of its restructuring efforts, Gate Gourmet has aggressively pursued non-labor cost reductions, initiating business process changes through a variety of continuous improvement initiatives. Gate Gourmet has few non-labor options that it has not already pursued to reduce its operating costs. Thus, labor costs – which represent Gate Gourmet's single largest expense, totaling approximately 50 percent of Gate Gourmet's total costs – are the only realistic place where the Company can still cut costs. (Goeke Decl. ¶ 13.)

For management and salaried employees, the Company can reduce wages and benefits unilaterally. Since September 11, there have been no general pay increases for management employees, and neither management nor salaried employees have been paid performance-based bonuses for the past several years. The Company has also frozen the defined benefit pension plan, eliminating future accruals, for management/salaried employees effective June 30, 2004. (Goeke Decl. ¶ 14.)

9

In contrast to management and salaried employees, Gate Gourmet cannot reduce the wages of Union-represented employees unilaterally. Gate Gourmet executed long-term labor agreements in 2000 – a time when financial conditions were much rosier – which have resulted in pay raises of 18 percent under the NMA since 1999 and pay increases averaging 16 percent under the Local Agreements. (Declaration of Anthony Bralich, Jr. ("Bralich Decl.") ¶ 4.)

### D.    Gate Gourmet Has Been Unable to Make Progress on Reductions for Union-Represented Employees.

In December 2003, the Company entered into negotiations with the Union in anticipation of the NMA's amendable date of June 1, 2004. In these negotiations, the Company sought to reduce both wages and benefits in light of the financial condition discussed above. Although the Union said that it recognized the Company's tough financial situation, and offered certain concessions, the parties have been unable to reach agreement despite negotiations for more than a year. Accordingly, in May 2005 the Union agreed to submit the Company's "final offer" to its membership for a vote; this proposal, if approved, would have saved Gate Gourmet $42 million annually. (Bralich Decl. ¶ 5.)

While the Union had promised the Company it would remain neutral on approval of the agreement, it staff representatives actively and openly campaigned against the proposed contract, and as a result, it was defeated by more than 90 percent. Shortly thereafter, the Union "terminated conferences" pursuant to the RLA, and the Company applied for mediation before the National Mediation Board ("NMB"). The parties are currently in mediation before the NMB but have not made further progress. (Bralich Decl. ¶ 6.)

By rejecting the Company's final offer, the Union itself rejected the Company's offer to create minimum and maximum contribution rates for health benefits. Indeed, the Union had agreed to the Company-proposed contribution rates as part of their counterproposal to the

Company (and had also agreed to *no* health or other benefits for part-time employees), but differed with the Company as to the percentage of future increases to be paid by the employee. (Bralich Decl. ¶ 7.)

      **E.**    **Gate Gourmet's Contractual Right to Reduce Contribution Rates Unilaterally for Hourly and Salaried/Management Employees.**

      **1.**    **The Applicable Contractual Provisions.**

The NMA does not require the Company to provide employer-paid health insurance, nor does it fix contribution rates. Rather, Article 24 of the NMA provides only that covered employees will be "eligible to participate" in the Company health plan. Article 24 provides that "[w]hile the administration of the plan remains a Company prerogative, bargaining unit Employee's contribution rates for the various health plans and optional life insurance will be the same each year as the contribution rates for management/salaried employees." It also provides that "Further, the Company agrees that should there be any change in the benefit level of the Health Care and Life Insurance Plans during the term of this Agreement it will apply to the Employees covered under this Collective Bargaining Agreement." (Bralich Decl. ¶ 10.)

Under some of the Local Addenda, the Company is obligated to provide health insurance pursuant to a separate and distinct union or multi-employer plan; these agreements are not at issue here because the Company continues to make those contributions. In addition, the Local Addenda confirm the Company's right to link its union and nonunion employees' medical benefits and contributions. For example, Article XXV of the New Orleans Local Addendum provides: "While administration of the plan remains a company prerogative, bargaining unit employees' contribution rates for the various health plans and optional life insurance will be the same each year as the contribution rates for management/salaried employees in New Orleans." (Bralich Decl. ¶ 11.)

## 2.     The Past Practice of Altering Benefits Unilaterally.

Since the NMA was executed, the Company has exercised its authority to alter the plan, including contribution rates, on a number of occasions.  Not until the changes proposed for 2005, however, did the Union object to those changes.

- In January 2001, Gate Gourmet made significant changes to the then existing health care plan by splitting it into two programs, one of which resulted in increased employee contributions and the other of which resulted in significantly reduced employee benefits.

- On January 1, 2003, the Company increased the employee contributions while reducing the benefit coverage.

- On January 1, 2004, the Company increased the employee contributions while reducing the benefit coverage.

The Union did not grieve or otherwise challenge any of these actions.  (Bralich Decl. ¶ 12.)

On October 21, 2004, as a result of continuing financial problems, Gate Gourmet announced that it was forced to substantially reduce the amount it could contribute to its employees' healthcare costs.  Effective January 1, 2005, the Company increased the employee's cost to 45 percent of total cost of the plan.  Thus, employee contributions for the Core health plan increased from $31.32 to $119.07 per month for single employee coverage, $94.01 to $267.90 per month for employee plus spouse coverage; $75.95 to $228.66 per month for employee plus children coverage; and $155.63 to $362.61 per month for family coverage.  (Bralich Decl. ¶ 13.)

This is the first time that the Union objected to Gate Gourmet's unilateral change to healthcare contribution rates since the inception of the NMA in 2000.  On December 2, 2004 and

December 10, 2004, the Union sent letters to the Gate Gourmet Group's Chairman and CEO, David Siegel, purporting to be grievances over the Company's proposed actions. Nonetheless, the challenged rates went into effect on January 1, 2005. (Bralich Decl. ¶ 14.)

On April 8, 2005, Anthony Bralich, the Company's Vice President of Labor Relations, sent a letter to the Union informing them that the challenge to the increased rates was without merit and that the change was consistent with Article 24 of the NMA. In that letter, Mr. Bralich further explained that Article 24 does not set any particular requirements for the benefit plan, nor does it contain a fixed formula for employer contributions. Rather, Mr. Bralich explained, the NMA links the type and cost of the benefits received by Union-represented employees to those received by management/salaried employees. (Bralich Decl. ¶ 15.)

On April 20, 2005, the Union replied, by requesting that its grievance be submitted for a hearing before the System Board of Adjustment. The Union's grievance over the January 1 increases, as well as over the proposed July 1 increases and their supposed connection to Company's payment of management and salaried retention payments, is currently scheduled to be heard by a four-person arbitration board, the contractual step prior to a System Board arbitration, on August 9, 2005. (Bralich Decl. ¶ 16.)

### 3. The Company's Decision to Eliminate Employer Contributions to the Medical Plan.

As noted above, the proposal submitted to the Union membership in May 2005 would have saved Gate Gourmet approximately $42 million annually. The Company recognized that there was no assurance that the proposal would be approved by the membership, however, and it therefore looked for other ways to conserve cash.

After considering its available options to reduce labor costs, Gate Gourmet concluded that the only step it could take unilaterally was to eliminate the employer contribution to the

Company's Health Care Plan for all employees.  This step, the Company concluded, would save

approximately $11 million annually – savings it drastically needed if the Union membership

failed to ratify the Company's concessionary proposal.  On May 12, 2005, therefore, the

Company announced to all employees that if the Union membership did not approve the

Company's proposal, the Company would be forced to require all employees covered by the

Company Health Care Plan to pay the full cost of their medical coverage effective July 1, 2005.

(Bralich Decl. ¶ 18.)

Following this announcement, the Company required all employees to elect whether or

not they wanted coverage under the plan, and the level of coverage.  As the table below

demonstrates, similar percentages of *union* and *nonunion* employees elected to waive coverage

rather than pay the full costs.  (Bralich Decl. ¶ 19.)

**Union**

|  | Prior coverage | July election |
|---|---|---|
| Single | 1,545 | 341 |
| Couple | 431 | 55 |
| Parent + Children | 358 | 61 |
| Family | 372 | 35 |
| Waived | 1,824 | 4,027 |
| Total Eligible | 4,530 | 4,519 |

**Nonunion**

|  | Prior coverage | July election |
|---|---|---|
| Single | 394 | 155 |
| Couple | 140 | 62 |
| Parent + Children | 130 | 21 |
| Family | 174 | 50 |
| Waived | 527 | 1,183 |
| Total Eligible | 1,365 | 1,471 |

**F.    The Announcement of a Retention Payment for Salaried and Management
Employees.**

In this lawsuit, the Union does not seriously challenge the Company's right under the

NMA to eliminate the employer contribution for all employees.  Instead, the Union contends that

14

a retention payment announced for all management and salaried employees in May 2005 was a *sub silentio* subsidy of the Company Health Plan for management and salaried employees.

As a legal matter, the Company submits that the question of whether the retention payments are equivalent to employer contributions under Article 24 of the NMA is a question for the System Board. As a factual matter, however, the retention payments were unrelated to elimination of the Company contribution to the Health Plan, but were instead intended to deal with a serious attrition problem among management and salaried employees in light of the Company's financial condition and the lack of a general salary increase for management employees since before September 11, 2001.

Because of these issues, the Company's attrition among management and salaried employees has risen to unacceptable levels. At present, the Company has an annualized 25 percent attrition rate among salaried and management employees. In the past four months alone, Gate Gourmet has lost 44 exempt management and salaried employees. Because management employees are not tied to the Company by any seniority system, and have skills that are easily transferable to other industries, it is critical that the Company provide market compensation to those employees. Therefore, in order to prevent additional departures, requiring the Company to recruit and hire replacements during a period of operational and economic uncertainty, the Company decided in May 2005 to institute a broad-based retention program for management and salaried employees. (Bralich Decl. ¶ 21.)

On May 26, 2005, Pete Pappas, President of Gate Gourmet Division Americas, notified *all* management and salaried employees that it would implement a $500 per month retention payment to encourage employees to remain with the Company. The retention program is scheduled to begin on July 1, 2005, and will be reviewed every quarter. (Bralich Decl. ¶ 22.)

15

The facts do not bear out the Union's contention that this payment is a disguised subsidy of the Company's health care plan contribution for management employees.

- The retention program applies regardless of whether the management/salaried employee participated in the Company's Health Plan prior to July 1, 2005, or whether they waived such coverage.

- Almost 40 percent of management and salaried employees had not elected to participate in the plan prior to the July 1, 2005, enrollment period.

- Following the Company's decision to eliminate the employer contribution, 80 percent of the management and salaried employees elected not to participate in the plan – a percentage roughly equal to Union-represented employees.  Thus, 80 percent of the employees receiving the retention payment will not participate in the Company Health Plan.  (Bralich Decl. ¶ 23.)

### G.      The Relative Harm to the Union and the Company

#### 1.      The Relative Harm to the Union.

With its motion for a TRO, the Union has filed declarations from ten employees regarding the harm that termination of medical insurance will have on them and their families.

First, it should be obvious to the Court, as it is to the Company, that the Union scoured the workforce of almost 4,500 Union-represented employees eligible for coverage to obtain the ten "best" examples it could find.  Such anecdotal declarations, by definition, do not represent the effect on the average employee.  Indeed, almost 2,000 employees out of 4,500 had waived health coverage prior to the most recent changes in the program.

Second, as set forth in the Expert Report of Cathryn Sreckovich,[2] the Union's declarations wholly ignore the numerous alternatives for employees to obtain insurance coverage, or health care in the absence of such coverage.

- For some employees, individual policies, or policies secured through other group plans (such as a spouse's plan) can provide coverage at a lower cost than the

---

[2] Ms. Sreckovich, a consultant with Navigant Consulting, has more than 25 years of experience in the field of health care financing and delivery issues in both the public and private sector.  (Sreckovich Decl. ¶ 2.)

Company's current plan.

- Children of working parents in certain income categories (and in some cases, the parents themselves) can obtain low- or no-cost coverage through public "SCHIP" (State Children's Health Insurance Program) funds.

- Some individuals meeting specified need-based criteria (particularly pregnant women) can be eligible for Medicaid coverage.

- Short-term "gap" policies can often provide protection against medical expenses at relatively low cost.

- Discounted or no-cost arrangements are available through community clinics, individual providers, or (in the case of prescription drugs) from pharmaceutical companies.

- In addition, the federal EMTALA statute, 42 U.S.C. § 1395dd, requires all emergency rooms in Medicare-participating hospitals to provide initial screening and stabilization of emergent medical conditions.  Although obviously not a substitute for health insurance, EMTALA provides a minimum baseline for the treatment of true health emergencies.

In sum, although the Company does not wish to discount the significant concerns attendant upon a lack of employer-subsidized health care – a concern that is hardly unique to the Company or its employees – it is simply manipulative for the Union to suggest that the essentially financial issues in this litigation threaten human health.

### 2.    The Relative Harm to the Company.

In its motion, the Union implies that issuance of a TRO will have no adverse effect on the Company.  In fact, it would for the following reasons:

- The Company's lenders have insisted upon revised labor agreements as a condition to any refinancing, and are closely watching the pending proceedings as an indication of the Company's ability to cut its labor costs.  An injunction, therefore, could seriously undermine the Company's restructuring efforts.  (Goeke Decl. ¶ 15.)

- The Company is currently in default on its loans, and its lenders could force Gate Gourmet into bankruptcy at any time.  (Goeke Decl. ¶ 16.)

- The annualized cost of employee contributions under the prior contribution schedule was roughly $11 million a year.  (Goeke Decl. ¶ 17.)  While the cost of providing coverage for five days is obviously a fraction of that, so is the relative harm to the Union's members.

17

- Issuance of injunctive relief requiring the Company to maintain the status quo deprives it of its right to a hearing before the System Board, and essentially decides the case against the Company for whatever period of time the injunctive relief remains in place.

## ARGUMENT

## I.    THE UNION'S MOTION FOR TEMPORARY RESTRAINING ORDER SHOULD BE DENIED BECAUSE THE UNION UNREASONABLY DELAYED IN SEEKING THE RELIEF REQUESTED.

The purpose of a temporary restraining order is to maintain the status quo pending hearing on a motion for preliminary injunction. *See Enercons Va., Inc. v. Am. Sec. Bank, N.A.*, 720 F.2d 28, 29 (D.C. Cir. 1983).  It is an "extraordinary and drastic remedy" that should be issued only when emergency truly requires it. *See Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (stating that provisional injunctive relief "is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion."); *see also FTC v. Exxon Corp.*, 636 F.2d 1336, 1343 (D.C. Cir. 1980) (noting how "stringent" the traditional criteria for seeking injunctive relief are).  In this case, the only emergency is one of the Union's own making, and the motion should be denied on that basis alone.

The Union's motion for TRO challenges a decision announced by Gate Gourmet on May 12, 2005, to eliminate the employer subsidy for health care benefits effective July 1, 2005. While the changes were contingent on membership rejection of a bargaining proposal by Gate Gourmet, the voting on that proposal was completed on May 27, 2005.  Thus, the Council could have filed its lawsuit for declaratory and injunctive relief at any point following May 27, 2005, if not earlier.  (Declaration of Tom A. Jerman ("Jerman Decl.") ¶ 4.)

Following the announcement of May 12, 2005, Gate Gourmet conducted open enrollment for health insurance under the new conditions.  Open enrollment was open through June 8, 2005. Thus, the Union could have challenged Gate Gourmet's actions prior to the end of open

enrollment. Because it did not, Gate Gourmet (and the Court) have no basis for determining whether employees who did not elect health insurance would have elected it under a different contribution schedule. (Jerman Decl. ¶ 5.)

The Union clearly made its decision to file this lawsuit, and seek a TRO, no later than early June, because the declarations filed in support of this motion are dated as early as June 6, 2005. For example, the declaration of Dora Dominguez was executed on June 6, 2005, and the declarations of Maria G. Avlarado, Shirley Lewis, Annie Rolack, and Mildred Washington were executed on June 8, 2005. (Jerman Decl. ¶ 7.)

On Monday, June 20, 2005, defense counsel received a telephone call from John O'B. Clarke, counsel to the Union, informing him that it intended to file a motion for TRO and preliminary injunction, and that he would seek to serve the papers on Tuesday, June 21, 2005. Between June 21, 2005, and June 24, 2005, defense counsel inquired in a number of conversations, voicemails and e-mails as to the status of the motion. The Union did not serve the motion, however, until 7 p.m. EDT on Friday, June 24, 2005. These papers are an inch-and-a-half thick, including a 39-page memorandum of law, and some 13 declarations. (Jerman Decl. ¶ 7.)

The Union's delay in filing its papers until one week before the alleged deadline for a court ruling, when it could have filed more than six weeks ago (and has been working on its papers for a month), makes clear that the only emergency here is one the Union created. *See Fund for Animals v. Frizzell*, 530 F.2d 982, 987-88 (D.C. Cir. 1975) (upholding denial of injunction when movants delayed 44 days in seeking injunction against the known impending issuance of a government regulation, a delay which the court found was "inexcusable"). Moreover, if the Court were to conclude on a motion for preliminary injunction that Gate

Gourmet should be ordered to reinstate health coverage, it can make that order retroactive to

July 1, 2005, ensuring that any medical expenses incurred in the interim would be covered by

insurance.

## II.    THE UNION'S MOTION DOES NOT SATISFY THE REQUIREMENTS FOR ISSUANCE OF INTERIM RELIEF IN THIS CIRCUIT.

Only days ago, in *International Ass'n of Machinists v. NMB*, 2005 U.S. Dist. LEXIS

11881 (D.D.C. June 20, 2005), this Court set forth the requirements for issuance of interim

injunctive relief in this Circuit.  In order to obtain such relief, the plaintiff must show:

> (1) a substantial likelihood of success on the merits, (2) that it would suffer
> irreparable injury if the injunction is not granted, (3) that an injunction would not
> substantially injure other interested parties, and (4) that the public interest would
> be furthered by the injunction.

*Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060, 1066 (D.C. Cir. 1998) (*quoting CityFed Fin.*

*Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 746 (D.C. Cir. 1995)).  As the Court state

elsewhere, "[t]he four factors should be balanced on a sliding scale, and a party can compensate

for a lesser showing on one factor by making a very strong showing on another factor."  *CSX*

*Transp., Inc. v. Williams*, 406 F.3d 667 (D.C. Cir. 2005) (citing *CityFed*, 58 F.3d at 747).

In the present case, application of these factors requires denial of the Union's motion for

a TRO.  First, the Union has no reasonable likelihood of success on the merits.  As demonstrated

below, Supreme Court and D.C. Circuit case law under the RLA is absolutely clear that a carrier

may act upon its own interpretation of the parties' collective bargaining agreement, even where

the parties are in negotiations for a new agreement, and that the Union's exclusive remedy is

arbitration before the appropriate adjustment board.  In such cases, the federal courts are without

jurisdiction to issue relief unless the carrier's position is "frivolous or obviously insubstantial,"

and the Union does not even attempt to make that showing.

Second, any injury to employees represented by the Union can be remedied through

arbitration before the Gate Gourmet System Board of Adjustment.  Gate Gourmet has offered to arbitrate this dispute on an expedited basis, and the arbitrator will have authority to issue full, make-whole relief.  Moreover, under the Norris-La Guardia Act, 29 U.S.C. § 107, any TRO would be limited to five days, and the likelihood of any irreparable harm to employees during that five-day period is highly speculative.

Third, issuance of a TRO would force Gate Gourmet to incur expenses that it is not legally obligated to incur, without any realistic chance of recovering that money, and would effectively deprive Gate Gourmet of its right to have this issue decided by the System Board of Adjustment rather than the federal courts.  While the TRO would be limited to a five-day period, the Court must balance the *relative* harm to both parties during that period.

Finally, issuance of a TRO would harm the public interest, as expressed in the RLA, of having collective bargaining disputes decided by arbitrators, not by the federal courts.  If the loss of health benefits were sufficient to justify federal court jurisdiction to maintain the status quo pending arbitration, then every case involving discharge or furlough of an employee would likewise end up in federal court.  This would not only burden the federal courts, it would totally undermine the established procedures for arbitrating those disputes under the RLA.

Moreover, while the Union cites various cases holding that *terminating* employee health benefits may constitute "irreparable harm," those cases involve the elimination of health benefits, not an increase in the *cost* of such benefits.  The Union's citation to *Risteen v. Youth for Understanding USA, Inc.*, 245 F. Supp. 2d 1 (D.D.C. 2002), is particularly disingenuous.  *Risteen* was not a labor relations case but, rather, involved an employee who sought relief under federal health insurance continuation legislation (COBRA) to *purchase* health insurance – *without an employer subsidy* – through his former employer's group health plan.  It is not disputed here that,

despite the increase in employee premiums, Union-represented employees of the Company retain the right to *purchase* health coverage.

Moreover, while analogies to labor-relations cases outside the context of the Railway Labor Act must not "casually" be drawn, *Air Line Pilots Ass'n, Int'l v. Eastern Air Lines, Inc.*, 863 F.2d 891, 909 (D.C. Cir. 1988) ("*Eastern I*"), the federal courts have frequently rejected efforts by unions "unilateral" changes to employee health benefits. For example, in *Rubber Workers Local 884 v. Bridgestone/Firestone, Inc.*, 61 F.3d 1347 (8th Cir. 1995), the court reversed a district court's injunction barring increases in health care premiums and deductibles pending arbitration. The court cogently explained why an injunction was not necessary to protect the arbitral process:

> [The employer] next argues that [the union] failed to establish that the preliminary injunction was necessary to avoid frustration of the arbitration process. "The union may obtain a status quo injunction against an employer when the employer's action has the effect of frustrating the arbitral process, or rendering it a 'hollow formality.'" Stated another way, the injunction must be necessary to "prevent arbitration from being rendered a meaningless ritual."
>
> The arbitration process is rendered meaningless only if any arbitral award in favor of the union would substantially fail to undo the harm occasioned by the lack of a status quo injunction. ***The fact that the arbitration decision will not be able to restore perfectly the status quo ante is not enough; the injury must be irreparable and must "threaten the integrity of the arbitration process itself."***
>
> We conclude that [the union] has failed to demonstrate that a decision favorable to it in arbitration would not be able to remedy the harms about which [the union] complains. If the arbitrator agrees with [the union] that the health benefits . . . remained in effect . . ., then the arbitrator can order [the employer] to repay all monthly premium payments and deductibles that the employees were wrongly deprived of and require reinstatement of the levels of medical and dental coverages . . . .

61 F.3d at 1354 (emphasis added) (citations omitted).

Numerous other cases are in accord. *See Communications Workers of Am. v. Verizon Communications, Inc.*, 255 F. Supp. 2d 479, 484-86 (E.D. Pa. 2003) (refusing to enjoin

termination of health benefits for 249 laid-off employees, notwithstanding likely hardship to employees, because an adequate arbitral remedy was available); *IBEW, AFL-CIO, Local Union No. 245 v. FirstEnergy Corp.*, 233 F. Supp. 2d 913 (D. Ohio, 2002) (refusing to enjoin elimination of two employee-provided health plans and replacement with plan requiring payment of deductibles, increased co-payments, and increased prescription payments, because arbitral remedies, if obtained, would be far more than an "empty victory" for the union); *Local Union 15, Int'l Bhd. of Elec. Workers v. Exelon Corp.*, 191 F. Supp. 2d 987, 993 (N.D. Ill. 2001) (holding that loss of health benefits due to layoffs was not "an injury so irreparable that a favorable decision by an arbitrator would be an empty victory for the Union."); *see also Aluminum Workers Local 215 v. Consol. Aluminum Corp.*, 696 F.2d 437 (6th Cir. 1982) (holding that potential "repossessions, foreclosures, and injury to credit status" occasioned by elimination of jobs did not warrant injunction pending arbitration; allowing courts to prejudge the outcome of arbitrations in such a fashion would have a "corrosive effect upon the arbitral process"). Accordingly, even cases outside the RLA context counsel against the issuance of an injunction in this case.

**III.    THE UNION'S ARGUMENT THAT THE RLA PROHIBITS AN EMPLOYER FROM ALTERING THE "STATUS QUO" DURING NEGOTIATIONS, EVEN THOUGH THE EMPLOYER'S ACTION ARE ARGUABLY JUSTIFIED BY THE EXISTING COLLECTIVE BARGAINING AGREEMENT, IS CONTRARY TO WELL-ESTABLISHED PRINCIPLES UNDER THE RLA.**

In its motion for TRO, the Union argues that Section 6 of the RLA, 45 U.S.C. § 156, requires an employer during negotiations for a new collective bargaining agreement to maintain the precise terms and conditions of employment that were in effect when negotiations began, and that this obligation applies even where the employer has the arguable right to *change* those terms under the existing collective bargaining agreement.  In support of this contention, the Union relies principally on a 1964 D.C. Circuit decision, *S. Ry. v. Bhd. of Locomotive Firemen*, 337

F.2d 127 (D.C. Cir. 1964), which enjoined a carrier from changing the terms of employment that were subject to a "Section 6 notice" though the parties had scheduled an arbitration over whether the carrier had the existing right to make the change.

This argument is completely groundless. As explained in more detail below, the *Southern Railway* decision has been plainly overruled by four decades of case law, including the Supreme Court's decisions in *Conrail*, 491 U.S. at 304, and *P&LE*, 491 U.S. 490 (1989), and the D.C. Circuit's decision in *Air Line Pilots Ass'n, Int'l v. Eastern Air Lines, Inc.*, 863 F.2d 891 (D.C. Cir. 1988) ("*Eastern I*"). Under this case law, there is no question whatsoever that an employer maintains its right to act based on its own interpretation of the existing agreement even during negotiations for a new collective bargaining agreement under Section 6 of the RLA, and any dispute over the employer's rights can only be decided by the RLA-mandated adjustment board that has jurisdiction over the parties. *See P&LE*, 491 U.S. at 509 ("the unions' [Section 6] notices to change the agreements could not trump the [employer's rights under the] terms of the agreements"); *Conrail*, 491 U.S. at 304 (the Supreme Court "never has recognized a general statutory obligation on the part of an employer to maintain the status quo pending the [Adjustment] Board's decision" on a minor dispute); *Air Line Pilots Ass'n, Int'l v. Eastern Air Lines, Inc.*, 869 F.2d 1518, 1520 (D.C. Cir. 1989) ("*Eastern II*") (in a minor dispute, "the parties must take their grievances to binding arbitration, and each is free to act under its interpretation of the collective bargaining agreement until the arbitrator rules otherwise"). The Union's contention that *Southern Railway* somehow survived this case law – and dozens of similar decisions out of other circuits – is not credible.

### A. An Overview of the Distinction Between "Major" and "Minor" Disputes Under the RLA.

By way of background, the issue in this case arises because Section 6 of the RLA

requires that a party seeking to change the terms of an existing collective bargaining agreement must give 30 days in writing of the proposed change, and that following such notice, the "rates of pay, rules, or working conditions shall not be altered by the carrier" until the parties have exhausted the RLA's lengthy dispute resolution procedures. Disputes over a proposed change to agreements under Section 6 are called "major disputes" under the RLA. *See Elgin, J. & E. Ry. v. Burley*, 325 U.S. 711, 723 (1945) (major disputes are "disputes over the formation of collective agreements or efforts to secure them. . . . They look to the acquisition of rights for the future, not to the assertion of rights claimed to have vested in the past"). In a major dispute, the Supreme Court has held, the carrier must maintain "those actual, objective working conditions and practices, broadly conceived, which were in effect prior to the time the pending dispute arose and which are involved in or related to that dispute." *Detroit & Toledo Shore Line R.R. v. United Transp. Union*, 396 U.S. 142, 153 (1969). Moreover, the federal courts have jurisdiction to require compliance with the status quo obligation under Section 6. *See id.* at 155.

The RLA also provides, however, that disputes over the "interpretation or application" of agreements must be submitted to an administrative tribunal known as an "adjustment board." 45 U.S.C. §§ 153, 184; *Bhd. of Locomotive Eng'rs v. Louisville & N.R.R.*, 373 U.S. 33, 38 (1963). These are called "minor disputes" under the RLA. They "contemplate[] the existence of a collective agreement already concluded or, at any rate, a situation in which no effort is made to bring about a formal change in terms or to create a new one. The dispute relates . . . to the meaning or proper application of a particular provision with reference to a specific situation . . . [T]he claim is to rights accrued, not merely to have new ones created for the future." *Elgin*, 325 U.S. at 723. In a minor dispute, the jurisdiction of the adjustment board to interpret or apply the existing agreement is "mandatory, exclusive and comprehensive." *Louisville*, 373 U.S. at 38.

25

Unlike a major dispute, however, there is no status quo obligation in a minor dispute.  Rather, the carrier is free to act on its own interpretation of the agreement pending a decision by the adjustment board.  *Conrail*, 491 U.S. at 304; *Eastern II*, 869 F.2d at 1520.

This seemingly straightforward distinction has spawned hundreds of lawsuits over the last five decades.  In these cases, the union has typically argued that the carrier changed the agreement in violation of Section 6, and the federal court can enjoin that change, whereas the carrier has typically argued that its action is permissible under the existing agreement, and that any challenge to that change creates a minor dispute subject to the exclusive jurisdiction of the adjustment board.  *See generally Conrail*, 491 U.S. at 302-07.  In one category of cases, the union argues that the carrier has violated Section 2, Seventh of the RLA by changing the terms of employment without serving a Section 6 notice; in the other category, the union argues that the carrier has violated Section 6 by failing to maintain the status quo after one party, or the other, has served a Section 6 notice.  *Id.* at 302-04.

B.    **The 1964 *Southern Railway* Decision upon Which the Union Relies Has Been Plainly Overruled by Subsequent Supreme Court and Circuit Court Authority.**

The case upon which the Union principally relies, *Southern Railway v. Brotherhood of Locomotive Firemen*, 337 F.2d 127 (D.C. Cir. 1964), was one of the earliest appellate court decisions to grapple with the distinction between major and minor disputes.  In that case, the parties had a preexisting dispute over a railroad's decision not to hire additional firemen, and to staff the fireman's position with other employees.  While the carrier contended that it had such a right under the existing agreement, it nonetheless served a Section 6 notice in which it sought to modify the existing agreement.  At the same time, it agreed to submit the dispute over whether it had violated the agreement by failing to hire firemen to the National Railway Adjustment Board ("NRAB").

On appeal, the D.C. Circuit affirmed an injunction barring the railway from refusing to hire additional firemen even though its right to do so was pending before the NRAB. The D.C. Circuit concluded that because the railroad had served a Section 6 notice on the precise subject of its obligation to staff the railroad with firemen, it was prohibited from altering the status quo even though it arguably had the disputed right already.[3] In reaching this decision, the court of appeals distinguished a Second Circuit decision, *Rutland Railway v. Brotherhood of Locomotive Engineers*, 307 F.2d 21 (2d Cir. 1962), *cert. denied*, 372 U.S. 954 (1963), which held that service of a Section 6 notice did not, per se, create an obligation to maintain the status quo, and that to distinguish between major and minor disputes the court "must not place undue emphasis on the contentions or maneuvers of the parties," but should examine the provisions of the existing agreement to determine whether the carrier's actions were in clear violation or, alternatively, were arguably permitted under agreement. *Rutland*, 307 F.2d at 33.

During the next three decades, virtually every circuit – including the D.C. Circuit – adopted, in one form or another, the analysis set forth in *Rutland* and thus rejected the analysis of *Southern Railway. See Conrail*, 491 U.S. at 306-07 & 306 n.6 (collecting decisions). In *Eastern I*, 863 F.2d 891 (D.C. Cir. 1988) – a case that the Union inexplicably fails to cite in its motion – the D.C. Circuit held that after the service of a Section 6 notice, a carrier may act upon its own view of its contractual rights, whether express or implied, and that the exclusive forum in which the union may challenge the carrier's actions is the applicable board of adjustment.[4] In

---

[3]    The *Southern Railway* court itself emphasized the narrowness of it holding: "We conclude with a caution that our decision upholding the injunction as framed here is based on the precise situation and facts before us in this case. *It is not to be read as necessarily authoritative in a different factual setting, or in a case involving disputed claims of another sort.*" 337 F.2d at 133 (emphasis added).

[4]    The Union also relies on *Air Cargo, Inc. v. Local Union 851*, 733 F.2d 241 (2d Cir. 1984), a decision that the D.C. Circuit expressly rejected in *Eastern I*, holding that the Second Circuit's analysis – like the Union's position before this Court – is "unwise and contrary to the two-track procedure of the RLA [for major and minor disputes]." 863 F.2d at 900.

that case, three unions filed suit challenging an airline's proposed elimination of more than 2500 union-represented jobs in connection with a reduction in its schedule, claiming that the furloughs violated the airline's contractual obligations, and its obligation to maintain the status quo under Section 6 of the RLA because the parties were in negotiations at the time.

In *Eastern I*, the D.C. Circuit explicitly rejected the "suggestion that the expiration of collective bargaining agreements between Eastern and ALPA and IAM, plus the filing of § 6 notices, requires us to classify the dispute between Eastern and the unions as major under the Railway Labor Act." *Id*. at 913. Rather, the court held, "the terms of the various collective bargaining agreements and the parties' settled past practice compel the conclusion that the dispute over the September furlough is a minor one. Accordingly, the district court was without jurisdiction to enter a preliminary status quo injunction under § 6 of the Act." *Id*. The *Eastern I* decision thus squarely rebuts the Union's contention that "a carrier's disputed claim of a contractual right to alter the status quo cannot be viewed as 'trumping' the Act's requirement that the status quo be preserved during the admittedly major dispute." (Union Brief at p. 24.)

Less than a year later, the Supreme Court upheld the rationale of the *Eastern I* in *Conrail*, 491 U.S. at 304, and *P&LE*, 491 U.S. 490 (1989). In *Conrail*, the Supreme Court reviewed the development of the law within the courts of appeals, finding that virtually every circuit had adopted some variation of the test set forth in *Rutland*. Concluding that this was the appropriate analysis, the Court adopted the following test for distinguishing between major and minor disputes: "Where an employer asserts a contractual right to take the contested action, the ensuing dispute is minor if the action is arguably justified by the terms of the parties' collective bargaining agreement." 491 U.S. at 307.

While the Union contends that *Conrail* is distinguishable because it did not involve

service of a Section 6 notice, it cannot make that argument about *P&LE*.  In that case, the

Supreme Court held that service of a Section 6 notice seeking to bargain over the carrier's

proposed sale of a portion of its operations did not supersede the carrier's existing contractual

rights.  In *P&LE,* in response to a railroad's decision to sell all of its assets, a number of unions

served Section 6 notices seeking to address various consequences of the contemplated

transaction.  The unions argued, based on the service of their Section 6 notices and the Supreme

Court's *Shore Line* decision, that the railroad could not complete the asset sale until exhaustion

of the Railway Labor Act's bargaining procedures.  491 U.S. at 504-05.  The Court rejected the

unions' argument, and held that the status quo did *not* prevent the railroad from taking action

before the statutory bargaining procedures had been exhausted.  After noting that *Shore Line*, on

which the Council principally relies in this proceeding, had "extended the relevant language of

§ 156 to its outer limits," *id*. at 506, the Court explained:

> Absent statutory direction to the contrary, the decision of a railroad employer to
> go out of business and consequently to reduce to zero the number of available
> jobs is not a change in the conditions of employment forbidden by the status quo
> provision of § 156. . . .  [The labor organization] *concedes that had the collective-*
> *bargaining agreements expressly waived bargaining concerning sale of P&LE's*
> *assets, the unions' § 156 notices to change the agreements could not trump the*
> *terms of the agreements and could not delay the sale.*  [citation omitted]  We think
> the same result follows where the agreement is silent on the matter . . . .  *Id*. at 509
> (emphasis added).

Thus, the Supreme Court has rejected the Union's position, and clearly acknowledged that a

carrier may continue to exercise its contractual rights under a collective bargaining agreement

even after a union has served a Section 6 notice.  While the Union attempts to distinguish *P&LE*

on the theory that the instant case raises the question whether "a carrier's *disputed* claim of a

contractual justification 'trump[s]' the Act's status quo requirement," there is no basis in fact or

logic to distinguish between "disputed" and "undisputed" claims of contractual justification.  In

*P&LE*, the Court held that the carrier could have taken the challenged actions even if the

collective bargaining agreement had been silent on the subject of asset sales – a situation that surely would have resulted in at least a "disputed" claim of contractual justification. Moreover, the *Conrail* decision makes clear that the only way to resolve a disputed claim of contractual justification under the RLA is before the appropriate adjustment board, and that the carrier may act upon its own interpretation pending arbitration. That principle completely undermines the Union's argument.

In sum, the obligation to maintain the status quo under the RLA permits a carrier to make changes to the terms and conditions of employment where, as here, those changes are arguably permitted under the terms of a pre-existing collective bargaining agreement, even though the parties are in Section 6 negotiations for a new agreement. To the extent that *Southern Railway* held otherwise, that holding has clearly and repeatedly been overruled.

## IV.   THE DISPUTE OVER GATE GOURMET'S RIGHT TO ALTER THE EMPLOYEE CONTRIBUTION RATES FOR HEALTH INSURANCE IS A MINOR DISPUTE SUBJECT TO THE EXCLUSIVE JURISDICTION OF THE SYSTEM BOARD OF ADJUSTMENT.

### A.   The Test for Distinguishing Between a Major and Minor Dispute Is Whether the Carrier's Contractual Defense Is "Frivolous" or "Obviously Insubstantial."

Under the *Conrail* decision, as explained above, where the carrier asserts a contractual justification for its action, and the carrier's position is not "frivolous" or "obviously insubstantial," the carrier has the right to take the action pending arbitration, and the federal courts have no jurisdiction—the same standard adopted by the D.C. Circuit in *Eastern II*, where the court held that if a "dispute is arguably resolved by reference to the collective bargaining agreement, it is a minor dispute over which the courts have no jurisdiction." 869 F.2d at 1521.

In the present case, the Union does not expressly contend that Gate Gourmet's position is "frivolous" or "obviously insubstantial." Indeed, by grieving the Company's action, the Union

acknowledges that the Company has a colorable contractual defense.  Instead, the Union argues that the Company's decision was made in "bad faith" – a test that the Union appears to believe is independent from whether the Company's claim is "frivolous" or "obviously insubstantial."  The basis for the Union's claim of bad faith is that the Company has announced a retention payment for salaried and management employees, and the Union appears to believe that this payment is, *sub silentio,* a reimbursement for the increased cost of medical insurance under the Company's newly announced policy.

Gate Gourmet submits that if there is any meaningful distinction between a "frivolous" claim and a "bad faith" claim, it is the former standard, articulated by the Supreme Court in *Conrail*, that would control.  In reality, however, there is no meaningful difference.  If a contractual defense is frivolous or obviously insubstantial, then asserting that defense would constitute "bad faith."  If, on the other hand, the carrier's contractual defense is sufficiently colorable to require a hearing before the board of adjustment, then the Company has the right to assert that defense, and its motivation is immaterial.  *See Eastern II*, 869 F.2d at 1519 (major dispute would exist only if interpretation of agreement that is "so inherently unreasonable" that it amounts to "bad faith").

In the present case, the Union will have the right to argue to the board of adjustment that the retention payment is a disguised subsidy of the medical insurance expenses for management and salaried employees.  As discussed below, Gate Gourmet believes that the evidence will show otherwise, but if the Union is successful in convincing an arbitrator of that fact, the arbitrator would presumably conclude that the Company has not treated union and management employees equally, as required by Article 24 of the Master Agreement.  This is, however, an issue for the arbitrator – not a federal court.

**B.    The Company's Contractual Defense Cannot Be Characterized as "Frivolous" or "Obviously Insubstantial."**

In the present case, the Company submits that its decision to eliminate the employer subsidy to health insurance benefits for all employees easily satisfies the "arguably justified" standard, and, as a result, the current controversy is a "minor" dispute subject to the exclusive arbitral jurisdiction of the System Board of Adjustment.  As shown below, this conclusion is compelled by (1) the plain language of the agreement; (2) the bargaining history of the agreement; (3) past practice under the agreement; and (4) evidence demonstrating that the retention payment was implemented to deal with a severe attrition problem among management and salaried employees, and is unrelated to the Company's elimination of the employer subsidy for medical insurance.

**1.    The Plain Language of Article 24 Allows the Company to Change or Eliminate the Employer Contribution So Long as Union and Management Employees Are Treated Similarly.**

The Company seeks only to exercise its express contractual rights under the National Master Agreement, which plainly permits the Company to change employee medical contributions so long as union and management/salaried employees have the same contribution rate.  To reach this conclusion, the Court need look no further than the face of the NMA, which states:

> Regular, full-time bargaining Employees will be eligible to participate in the Company's Heath Care Program [and optional life insurance program.] . . . bargaining unit Employee's contribution rates for the various health plans and optional life insurance *will be the same each year as the contribution rates for management/salaried employees*."

(See Bralich Decl ¶¶ 3,10, Art. 24 (emphasis added).)

Article 24 thus guarantees Union-represented employees two things:  (1) eligibility to participate in the Company's health care program; and (2) contribution rates which are the same

as those for management/salaried employees.  The contract provision clearly contemplates the

Company's right to change the contribution rate and the Company has strictly complied with the

NMA.  All Union-represented employees remain eligible to participate in the health plan; the

only change is to the rate of contribution and, as required by the NMA, that rate of contribution

remains in lockstep with that for management/salaried employees.

> **2.  The Bargaining History of Article 24 Allows the Company to Change or Eliminate the Employer Contribution.**

The bargaining history of Article 24 confirms the Company's right to make changes or

eliminate the Company contribution to the health plan.  Under the rules of contract interpretation,

failure to successfully add language is a good indicator of the fact that the right sought by the

additional language is not included.

During negotiations for the National Master Agreement, the Union proposed a

qualification to the Company's right to match bargaining unit employee contribution rates to that

of management and salaried employees.  Specifically, the Union unsuccessfully sought to add

language to Article 24 which would have limited employee contributions to $40 per month

during the life of the agreement.  The Company rejected this proposal, and the Union agreed to

Article 24 without any protection against raising the contribution rates.  Thus, the Union now

seeks to use the federal courts to obtain a right that it did not obtain through negotiations.  *See*

Alan Miles Ruben, ed., *Elkouri & Elkouri: How Arbitration Works* 454 (6th ed. 2003) (quoting

*U.S. Postal Serv. v. Postal Workers*, 204 F.3d 523, 530 (4th Cir. 2000)) (noting maxim that a

party "may not obtain 'through [litigation] what it could not acquire through negotiation").

> **3.  The Past Practice Under Article 24 Allows the Company to Change or Eliminate the Employer Contribution.**

As explained above, the Company has regularly altered both the benefits and the

contribution rates under the Company Health Plan.  Until this year, the Union never challenged

the Company's right to make such changes.

Under well-established rules of contract interpretation, where the employer has consistently interpreted and applied a contract provision in a particular manner, and the union has not objected to that interpretation, this "past practice" becomes a part of the contract. *See id.* at 606-07 (noting importance of "custom and past practice" to the interpretation of the parties' rights under a collective bargaining agreement). The Union's failure to challenge any of the prior changes clearly indicates its acknowledgement of the Company's rights under Article 24 of the NMA.

> **4.      The Retention Payment Was Implemented to Deal with a Severe Attrition Problem Among Management and Salaried Employees, and Is Unrelated to the Change in Employee Contributions.**

In apparent recognition that it has no contractual basis upon which to argue this is a major dispute, the Union argues that the monthly retention payment is essentially a subsidy for healthcare premiums made in bad faith and thus changes the character of this dispute from minor to major. The Union's simplistic linkage ignores both the necessity and practical effect of what are, in reality, two independent changes.

First, the Union's argument wholly ignores the reasons the Company implemented the retention payments. As explained above, the program was implemented to stem the continuing loss of management and salaried employees, in light of the Company's economic uncertainty. Thus, these payments are simply an attempt to mitigate a variety of financial constraints that have directly impacted management/salaried employees over the past several years.

Second, these payments are wages – not benefits. While the Union claims that they are a substitute for health benefits, the logic of the Union's position would mean that the Company never provide general salary increases or other economic incentives

because these incentives could arguably be construed as creating a disparity in medical contributions.

Third, the Union's contention that these payments are equivalent to health insurance benefits is not borne out by the fact that, as noted above, a strikingly similar percentage of management and salaried employees chose not to enroll in the health plan as of July 1, 2005 as did bargaining unit employees despite the May 26, 2005 announcement that a retention payment would begin on July 1, 2005. Moreover, the retention program applies regardless of whether the management and salaried employee participated in the Company's insurance plan or had waived such insurance. Indeed, nearly 40 percent of management and salaried employees were not even enrolled in the Company medical plan before July 1, 2005. Thus, the Union's argument that the retention program was intended, in bad faith, by the Company to be a healthcare subsidy is flatly wrong where 40 percent of the subject population was not even paying for, Company medical coverage. Moreover, *after* July 1, 2005, 80 percent of management/salaried employees will not be covered under, and thus will not be making contributions for Company medical coverage. Thus, it is clear that there is no nexus between the retention payments and one's medical coverage decisions.

Finally, the Company both decided and announced its retention program well before receiving notice of the failed ratification vote by the Union. The Union's linking of these two events simply is not supported by the facts.

## V.    THE COURT SHOULD REJECT THE UNION'S REQUEST TO ISSUE AN INJUNCTION MAINTAINING THE STATUS PENDING ARBITRATION.

As an alternative to its specious "major dispute" argument, the Union urges this Court to grant its requested injunction nonetheless, supposedly to preserve the "status quo" pending resolution of this minor dispute by the System Board. This argument fails for two independent

but equally compelling reasons.  First, the Company submits that under existing case law, "status quo" injunctions are unavailable to labor unions bringing suit over minor disputes.  Second, even if such injunctions were theoretically available, the standard for granting them is so high that the Union cannot – as a matter of law – establish its entitlement to such an injunction.

> **A.    A "Minor Dispute" Injunction Is Inconsistent with the Supreme Court's Holding in *Conrail* That the Federal Courts Have No Jurisdiction over Minor Disputes, and That the Carrier May Act Unilaterally Pending Arbitration.**

Although the Union correctly asserts that there are decisions stating that the federal courts have at least a theoretical right to issue injunctive relief in a minor dispute to "protect the jurisdiction of the adjustment board," *e.g.*, *Eastern II*, 869 F.2d at 1520 n.2, the Company submits that those decisions are no longer viable following the Supreme Court's *Conrail* decision.  While the *Conrail* court declined to decide directly whether a so-called "minor dispute injunction" was available under the RLA, *Conrail*, 491 U.S. at 304, the Court's holding that the federal courts have no jurisdiction over minor disputes cannot be squared with issuance of an injunction in a minor dispute.  *Id*. at 304 (the Supreme Court has "never . . . recognized a general statutory obligation on the part of an employer to maintain the status quo pending the  Board's decision," leading the Court to question whether status quo injunctions may ever be granted "during the pendency of a minor dispute at the union's independent behest.").[5]

While there are a small number of cases, cited in the Union's motion, that suggest the possibility of a minor dispute injunction – and exactly one case from 1969, *Local Lodge 2144, BRAC v. Ry. Express Agency, Inc.*, 409 F.2d 312, 316 (2d Cir. 1969), which actually issued such an injunction – the vast weight of case law has consistently held that a carrier may act

---

[5]    A federal court may condition a strike injunction requested by the carrier on maintaining the status quo for so long as the strike is enjoined.  *Bhd. of Locomotive Eng'rs v. Missouri-Kansas-Texas R. Co.*, 363 U.S. 528, 536 (1960).  In *Conrail*, however, the Court held that such "status quo" conditions issued as part of strike injunctions are not equivalent to a "general" rule making such injunctions available to

unilaterally in a minor dispute, and the federal courts are without jurisdiction to issue a status

quo injunction.  *See Int'l Ass'n of Machinists & Aerospace Workers, Dist. Lodge No. 100 v.*

*Eastern Air Lines, Inc.*, 826 F.2d 1141, 1151 (1st Cir. 1987) (collecting cases from numerous

circuits rejecting view that status quo injunctions are available in union-initiated lawsuits

challenging alleged violations of labor agreements).  Indeed, the D.C. Circuit reached this

conclusion in *International Brotherhood of Electrical Workers v. Washington Terminal Co.*, 473

F.2d 1156, 1175 (D.C. Cir. 1972) – a case that was not cited or discussed in the subsequent

*Eastern II* dictum.

In summary, the Company submits that no jurisdiction means no jurisdiction.  The

Union's request for a status quo injunction pending arbitration should therefore be denied on this

basis alone.

> **B.    Even If the Court Had Limited Jurisdiction to "Preserve the Jurisdiction of the Adjustment Board," This Case Does Not Meet That Standard.**

Even if the Court had limited jurisdiction to issue an injunction to preserve the

jurisdiction of the adjustment board, this is not an appropriate case for issuing such relief.  As the

D.C. Circuit observed in *Eastern II*, such injunctions would be available – if at all – only where

necessary to "preserve the arbitrator's ability to decide the case."  *Eastern II*, 869 F.2d at 1520

n.2 (dicta).  The irreparable injury alleged by the Union in the present case falls far short of

meeting that standard.

Those courts that have allowed for the possibility of minor dispute "status quo"

injunctions have limited them to cases where they are necessary "to preserve the jurisdiction of

the Adjustment [System] Board," *Westchester Lodge 2186 v. Ry. Express Agency, Inc.*, 329 F.2d

748, 753 (2d Cir. 1964), that is, when the "absence [of an injunction] would prevent the

---

unions "where no strike injunction has been sought by the employer."  *Conrail*, 491 U.S. at 304.

Adjustment Board from giving a significant remedy to the side that prevails before the board,"
*Local 553 Transport Workers v. Eastern Air Lines, Inc.*, 695 F.2d 668, 675 (2d Cir. 1982).

(Tellingly, *Westchester Lodge*, the Second Circuit case that announced this potential exception
for "status quo" injunctions, did not grant *any* injunctive relief, and in the 1982 *Eastern Air Lines*
case, an injunction was granted only after the district court determined that the dispute was
major, not minor. ) *Accord Int'l Ass'n of Machinists & Aerospace Workers v. Northeast
Airlines, Inc.*, 473 F.2d 549, 555 n.7 (1st Cir. 1972) (noting possibility of a status quo injunction
"if it would be **impossible** otherwise later to make the workers whole") (emphasis added); *see
also Missouri-Kansas-Texas*, 363 U.S. at 534 (allowing for status-quo conditions to be attached
to carrier-requested strike injunctions only where the potential injury to the union is "so
irreparable that a decision of the Board in the unions' favor would be but an empty victory").

    The standard is a tough row to hoe.  In case after case, courts have refused to grant
"status quo" injunctions, even when the carrier's allegedly "unilateral" change resulted in a job
loss or the threat of job loss.  *See Sheet Metal Workers v. Burlington R.R.*, 893 F.2d 199, 205 (8th
Cir. 1989) (affirming denial of injunction against subcontracting of bargaining unit work);
*United Transp. Union v. Penn Cent. Transp. Co.*, 505 F.2d 542, 545 (3d Cir. 1974) (affirming
denial of injunction against abolition of work assignments, resulting in job loss and increased
overtime for remaining employees); *see also Allied Pilots Ass'n v. American Airlines*, 898 F.2d
462, 465-66 (5th Cir. 1990) (holding that district court abused its discretion in enjoining carrier
from implementing drug and alcohol testing program; risk of discipline or discharge of
employees was neither "irreparable harm" nor a threat to "the jurisdiction of the grievance
procedure"); *Teamsters v. Southwest Airlines Co.*, 875 F.2d 1129, 1133-34 (5th Cir. 1989) (en
banc) (same).  If, as these cases have held, real or threatened *job loss* – which automatically

entails loss of health benefits – is not a threat to the arbitrator's jurisdiction, then it is certainly true that changes in the *cost* of health insurance will not justify the issuance of a "status quo" injunction.

In the present case, as noted above, the Company has offered to arbitrate this dispute on an expedited basis. While it is impossible to predict exactly how long that will take, it is reasonable to assume that the parties would have a final decision within 30 to 60 days. If the arbitrator upholds the Union's position, he or she can order the Company to reinstitute medical coverage retroactively to July 1, 2005, and cover all medical bills incurred in the interim in accordance with the health insurance plan. That is not an "empty victory": it is a make-whole remedy that fully compensates any employees for financial loss incurred as a result of the Company's decision. *See IAM*, 2005 U.S. Dist. LEXIS 11881 at *17 ("money damages can adequately compensate monetary loss").

In response to this point, the Union contends that an arbitrator could never restore the "medical health" of its represented employees. As an initial matter, the Company recognizes the hardship that requiring employees to pay 100 percent of their medical insurance costs will cause, and wishes it were not necessary to take this action. The cause of this hardship, however, is not heartless management but economic conditions, affecting the entire airline industry, which are beyond its control. If the Company does not reduce its costs then it will need to take far more serious steps. Indeed, there are tens of thousands of employees in the airline and related industries who have lost not only their health insurance, but their income as well.

Moreover, while the Company does not lightly dismiss the effects of losing one's health insurance, the ten declarations offered by the Union – undoubtedly selected because they were the most dramatic stories it could find – do not fairly represent the effect of this action on the

employees affected by this action.  As explained in the Expert Report of Cathryn Sreckovich, it is unlikely that anyone would go without essential health care while the case is being arbitrated, and it is certain that no one with a life-threatening condition would fail to receive care.

More importantly, even if there were hardship that could not be fully remedied through monetary relief, that does not rise to the high standard suggested by the *Eastern II* case for issuance of a minor dispute injunction, which is to permit an injunction only where the injunction is necessary to "preserve the arbitrator's ability to decide the case."  *Eastern II*, 869 F.2d at 1520 n.2 (dicta); *see also Bhd. of Locomotive Eng'rs v. Missouri-Kansas-Texas R. Co.*, 363 U.S. 528, 534 (1960) (allowing for status quo conditions to be attached to carrier-requested strike injunctions only where the potential injury to the union is "*so* irreparable that a decision of the Board in the unions' favor would be but an *empty victory*.") (emphases added).

Finally, if the loss of medical insurance justified a minor dispute injunction, then every discharge case would justify a minor dispute injunction because those employees would lose both their benefits *and* their employment.  It is clear, however, that termination of employment is not sufficient to justify a minor dispute injunction; indeed, the *Eastern* case involved the furlough of 2,400 employees, and the D.C. Circuit did not deem that situation to meet the standard for a minor dispute injunction.  Any contrary holding would completely undermine the system established under the RLA for resolution of minor dispute because every discharged employee could seek an injunction requiring that he or she be reinstated pending arbitration of the discharge or furlough decision.

## CONCLUSION

For the foregoing reasons, the Company respectfully requests that the Court deny the

Union's request for a temporary restraining order and preliminary injunction.

DATED:  June 29, 2005.                      Respectfully submitted,

                                            GATE GOURMET, INC.


                                            By:___/S/_____
                                                 TOM A. JERMAN (DC Bar No. 454960)
                                                 KAREN WAHLE (DC Bar No. 440517)
                                                 O'MELVENY & MYERS LLP
                                                 1625 Eye Street, N.W.
                                                 Washington, D.C. 20006
                                                 (202) 383-5300

                                                 ROBERT A. SIEGEL
                                                 O'MELVENY & MYERS LLP
                                                 400 South Hope Street, Suite 1500
                                                 Los Angeles, California 90071-2899
                                                 (213) 430-6000

SF1:592700.1