IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IBT/HERE EMPLOYEE REPRESENTATIVES' COUNCIL,<br><br>Plaintiff,<br><br>v.<br><br>GATE GOURMET DIVISION AMERICAS and GATE GOURMET, INC.,<br><br>Defendants. | Civil Action No. 1:05CV01210<br><br>Judge Ricardo Urbina |

## DECLARATION OF ANTHONY J. BRALICH, JR. IN SUPPORT OF GATE GOURMET'S OPPOSITION TO PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER

I, Anthony J. Bralich, Jr., declare and state as follows:

1. I submit this Declaration in support of the Opposition of Gate Gourmet, Inc. ("Gate Gourmet") to the IBT/HERE Employee Representatives' Council (the "Union") Motion for Temporary Restraining Order. If called to testify in the above-captioned matter, I could and would testify competently to the following facts that are within my personal knowledge.

2. I am the Vice President for Labor Relations for Gate Gourmet. I have held this position since November 15, 2004. In this position, I am responsible for, among other things, overseeing labor relations at Gate Gourmet, including overseeing the administration of the national collective bargaining agreement between Gate Gourmet and the Union.

### Background

3.  The Union is the certified collective bargaining representative under the RLA of Gate Gourmet's kitchen, commissary and catering work personnel. Gate Gourmet and the Union are parties to a national collective bargaining agreement (the "National Master Agreement" or "NMA") as well as numerous local addenda specific to particular locations. (A true and correct copy of the NMA is attached hereto as Exhibit A.)

4.  Union employee pay scales have continued to increase since 1999 with pay scales under the NMA rising 18 percent since 1999 and the pay scales under the Local Addenda rising an average of 16 percent.

### 2004-2005 Contract Negotiations

5.  In December 2003, the Company entered into negotiations with the Union in anticipation of the NMA's amendable date of June 2004. In these negotiations, the Company sought to reduce both wages and benefits in light of the financial condition discussed above. Although the Union said that it recognized the Company's tough financial situation, and offered certain concessions, the parties have been unable to reach agreement despite negotiations for more than a year. Accordingly, in May 2004 the Union agreed to submit the Company's "final offer" to its membership for a vote; this proposal, if approved, would have saved Gate Gourmet $42 million annually. (A true and correct copy of the Company's Final Offer and Valuation is attached hereto as Exhibit B.)

6.  While the Union had promised the Company it would remain neutral on approval of the final offer, its staff representatives actively and openly campaigned against the proposed

contract, and as a result it was defeated by more than 90 percent. Shortly thereafter, the Union "terminated conferences" pursuant to the RLA, and the Company applied for mediation before the National Mediation Board ("NMB"). The parties are currently in mediation before the NMB but have not made further progress.

7. By rejecting the Company's final offer, the Union itself rejected the Company's offer to create for the first time minimum and maximum contribution rates for health benefits. Indeed, the Union had agreed to the Company-proposed contribution rates as part of their counterproposal to the Company (and had also agreed to *no* health or other benefits for part-time employees), but differed with the Company as to the percentage of future increases to be paid by the employee. (A true and correct copy of the Union's counterproposal is attached hereto as Exhibit C.)

8. Despite the promise of neutrality, however, I have been made aware that its staff representatives actively encouraged and in some situations, directed its members to reject the proposed contract. As a result, more than ninety percent of the employees rejected the contract.

9. The Union then also sent a letter dated June 10, 2005 to Gate Gourmet asserting that it was terminating Section 6 conferences as of June 10, 2005, indicating that it would not meet again under Section 6 discussions. The Company then applied to the NMB for its mediation services. Thus, the Company and the Union will now continue in negotiations under the auspices of the NMB to try to reach a consensual agreement for a new collective bargaining agreement that will provide the cost savings necessary for Gate Gourmet to survive as a profitable enterprise.

## History of Healthcare Contribution Changes

10. The NMA does not require the Company to provide employer-paid health insurance, nor does it fix contribution rates. Rather, Article 24 of the NMA provides only that covered employees will be "eligible to participate" in the Company health plan. Article 24 provides that "[w]hile the administration of the plan remains a Company prerogative, bargaining unit Employee's contribution rates for the various health plans and optional life insurance will be the same each year as the contribution rates for management/salaried employees." It also provides that "Further, the Company agrees that should there be any change in the benefit level of the Health Care and life Insurance Plans during the terms of this Agreement it will apply to the Employees covered under this Collective Bargaining Agreement."

11. Under some of the Local Addenda, the Company is obligated to provide health insurance pursuant to a separate and distinct union or multi-employer plan; these agreements are not at issue here because the Company continues to make those contributions. In addition, the Local Agreements confirm the Company's right to link its union and non-union employees medical benefits and contributions. For example, Article XXV of the New Orleans Local Agreement provides: "While administration of the plan remains a company prerogative, bargaining unit employees' contribution rates for the various health plans and optional life insurance will be the same each year as the contribution rates for management/salaried employees in New Orleans."

12. Employee contributions for management and bargaining unit employees alike have risen consistently since 2000 without any challenge by the Union. In fact, at the start of 2001, Gate Gourmet made significant changes to the then existing health care plan by splitting the health plan into two plans, one of which resulted in increased employee contributions and the

other of which resulted in significantly reduced employee benefits. Furthermore, on January 1, 2003 and January 1, 2004, the Company raised the employee contributions while reducing the benefit coverage. Specifically, the Union did not grieve or otherwise challenge any of these actions.

### 2005 Healthcare Contribution Changes

13.  On October 21, 2004, as a result of continuing financial problems, Gate Gourmet announced that it was forced to substantially reduce the amount it could contribute to its employees' healthcare costs. Effective January 1, 2005, the Company increased the employee's cost to 45 percent of total cost of the plan. Thus, employee contributions for the Core health plan increased from $31.32 to $119.07 per month for single employee coverage, $94.01 to $267.90 per month for employee plus spouse coverage; $75.95 to $228.66 per month for employee plus children coverage; and $155.63 to $362.61 per month for family coverage.

14.  This is the first time that the Union objected to Gate Gourmet's unilateral change of to healthcare contribution rates since the inception of the NMA in 2000. The Union also threatened to terminate the ongoing Section 6 negotiations for a new collective bargaining agreement. On December 2, 2004 and December 10, 2005, the Union sent letters to Gate Gourmet Group's Chairman and CEO, David Siegel, asserting that the letters served as a grievance submission over the Company's proposed actions. Nonetheless, the challenged rates went into effect on January 1, 2005. (True and correct copies of the Union's December 2, 2004 and December 10, 2004 letters seeking to invoke the grievance procedure are attached hereto as Exhibits D and E.)

15.  On April 8, 2005, I sent a letter to the Union informing them that the challenge to the increased rates was without merit and that the change was consistent with Article 24 of the

NMA. In that letter, I further explained that Article 24 does not set any particular requirements for the benefit plan, nor does it contain a fixed formula for employer or employee contributions. Rather, I explained, the NMA links the type and cost of the benefits received by Union-represented employees and the contribution rates to be paid by such employees to those received by management/salaried employees. (A true and correct copy of the April 8, 2005 letter is attached hereto as Exhibit F.)

16.     On April 20, 2005, the Union replied, by requesting that its grievance be advanced to the next step in the grievance process for a hearing before the System Board of Adjustment. The Union's grievance over the January 1 increases and the Company's payment of management and salaried retention payments, as well as the grievance over the proposed July 1 increases is scheduled to be heard by a four-person arbitration board, the contractual step prior to a final and binding arbitration, on August 9, 2005. (A true and correct copy of the Union's letter dated April 20, 2005 is attached hereto as Exhibit G.)

17.     I sent the Union a letter on Friday, June 24 requesting that the August 9 board hearing be converted to a final and binding arbitration hearing on the Union's grievances. The Union's counsel represented to the Court on June 27, 2005 that the Union had agreed to my request, however, as of the evening of June 28, 2005, the Union had not contacted me to inform me of its decision. Accordingly, I sent an email on June 28, 2005 requesting that the Union confirm its agreement to convert the August 9 hearing to an arbitration, but have not yet received a response to the e-mail request.

18.     On May 12, 2005, the Company announced to all employees that if the Union membership did not approve the Company's proposal, the Company would be forced to require all employees covered by the Company Health Care Plan to pay the full cost of their medical

coverage effective July 1, 2005. (A true and correct copy of the May 12 announcement is attached hereto as Exhibit H.)

19. As the table below demonstrates, similar percentages of *union* and *non-union* employees elected to waive coverage rather than pay the full costs.

**Union**

|  | Prior coverage | July election |
|---|---|---|
| Single | 1,545 | 341 |
| Couple | 431 | 55 |
| Parent + Children | 358 | 61 |
| Family | 372 | 35 |
| Waived | 1,824 | 4,027 |
| Total Eligible | 4,530 | 4,519 |

**Non-Union**

|  | Prior coverage | July election |
|---|---|---|
| Single | 394 | 155 |
| Couple | 140 | 62 |
| Parent + Children | 130 | 21 |
| Family | 174 | 50 |
| Waived | 527 | 1,183 |
| Total Eligible | 1,365 | 1,471 |

**The Union's Grievances**

20. On June 3, 2005, the Union sent a letter intending it to be a grievance filing regarding Gate Gourmet's unilateral action and requested that this grievance be expedited. (A true and correct copy of the Union's June 3, 2005 letter is attached hereto as Exhibit I.) The Union sent a follow-up letter to its June 3, 2005 letter on June 7, 2005. (A true and correct copy of the Union's June 7, 2005 letter is attached hereto as Exhibit J.)

**The Management and Salaried Retention Program**

21.    At present, the Company has an annualized 25 percent attrition rate among management and salaried employees. In the past four months alone, Gate Gourmet has lost 44 exempt management and salaried employees. Because management employees are not tied to the Company by any seniority system, and have skills that are easily transferable to other industries, it is critical that the Company provide market compensation to those employees. Therefore, in order to help prevent additional departures, requiring the Company to recruit and hire replacements during a period of operational and economic uncertainty, the Company decided in May 2005 to institute a broad-based retention program for management and salaried employees.

22.    On May 26, 2005, Pete Pappas, President of Gate Gourmet Division Americas, notified *all* management and salaried employees that it would implement a $500 per month retention payment to encourage employees to remain with the Company. The retention program is scheduled to begin on July 1, 2005, and will be reviewed every quarter. (A true and correct copy of the May 26 letter is attached hereto as Exhibit K.)

23.    The retention program applies regardless of whether the management/salaried employee participated in the Company's Health Plan prior to July 1, 2005, or whether they waived such coverage during the open enrollment period for the July rate changes. Almost 40 percent of management and salaried employees were not even participating in the plan prior to the July 1, 2005, enrollment period. Following the Company's decision to eliminate the employer contribution, 80 percent of the management and salaried employees elected not to participate in the plan – a percentage roughly equal to Union-represented employees. Thus, 80 percent of the employees receiving the retention payment will not participate in the Company Health Plan.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

EXECUTED this 29th day of June 2005, at Reston, Va.

*Anthony J. Bralich, Jr.*
Anthony J. Bralich, Jr.