# EXHIBIT A



# Gate Gourmet
# Dobbs International
# Master Agreement



# INDEX

Page

Article I, Recognition..................................................................3

Article II, Transfer of Company Title or Interest.......................4

Article III, Uniforms....................................................................4

Article IV, No Strikes and No Lock Outs...................................4

Article V, Maintenance of Standards..........................................5

Article VI, Non-Discrimination...................................................5

Article VII, Discipline & Discharge............................................6

Article VIII, Holidays..................................................................6

Article IX, Grievance Procedure.................................................7

Article X, System Board of Adjustment Procedures....................8

Article XI, Seniority/Loss of Seniority.......................................9

Article XII, Job Vacancy.............................................................10

Article XIII, Stewards and Union Officials.................................11

Article XIV, Check-Off/Union Security Provision......................12

Article XV, Jury Duty..................................................................13

Article XVI, Military Leave.........................................................13

Article XVII, Sick Leave.............................................................13

Article XVIII, Union Visitation...................................................14

Article XIX, Funeral Leave..........................................................14

Article XX, Leave of Absence.....................................................14

Article XXI, Vacation..................................................................15

Article XXII, Bulletin Boards......................................................17

Article XXIII, Pension and Retirement Plan/401K.................................17

Article XXIV, Health and Life Benefit.........................................17

Article XXV, Employee Quality Incentive Plan..................................18

Article XXVI, Hours of Work and Overtime.....................................18

Article XXVII, Rights of Management............................................19

Article XXVIII, Drug/ Alcohol Testing Policy...................................20

Article XXIX, Invalidation Clause..............................................23

Article XXX, Payroll Period....................................................23

Article XXXI, Reporting Pay....................................................24

Article XXXII, Safety and Health...............................................24

Article XXXIII, Transition Agreement...........................................24

Article XXXIV, Superiority Agreement...........................................25

Article XXXV, Wage.............................................................26

Article XXXVI, Amendment.......................................................27

Attachment A,.................................................................28

## ARTICLE 1
## RECOGNITION

RECOGNITION, SCOPE, AND EMPLOYEE PROTECTIONS

### Recognition

Dobbs International Services, Inc. a/k/a Gate Gourmet, Division Americas owned by S~~
Air Group~~ (the "Company") recognizes the IBT/HERE Employee Representatives'
Council, (the "Council") as the collective bargaining representatives of all employees
working at facilities covered by this Agreement with the authority and obligation to
represent them for all purposes of the Railway Labor Act, as amended.
This collective bargaining agreement and any formal letters of agreement between the
Company and the Union may be collectively referred to as the "National Master
Agreement" (N.M.A.). It is understood by the parties that Local Addendums consistent
with the National Master Agreement shall be entered into at the local level between the
Company and affiliates of the Union. Supervisory personnel shall not perform work
customarily performed by employees in the bargaining unit.

The Company understands that the Council will designate, under Section 2 Third of the
Railway Labor Act, IBT and HERE and other AFL-CIO affiliated labor organizations to
act as the bargaining representatives for the Council and it is hereby agreed that the term
"Union" as used in this Agreement shall refer to the Council. Where the context so
indicates, the term "Union" shall also refer to IBT and/or HERE, and, in those instances
where the designated labor organization adopts this agreement, to the other labor
organization so designated and authorized by the Council.

### Scope

This Agreement covers all present and future kitchen, commissary and catering work,
including all related work, performed at facilities for which the Union has been
designated as the bargaining agent for employees in the system wide basis craft or class;
provided that this Agreement shall not apply to managers, supervisors, guards, office-
clerical employees or employees based outside of the United States, its territories and
possessions.
It is understood between the parties that existing patterns of representation as between
HERE and IBT at locations where both organizations currently represent employees, or at
locations where only IBT or HERE exclusively represent employees, shall be preserved.
Future food service operations identified in the system wide basis, craft or class opened
or acquired by the Company shall become subject to the terms of this Agreement·
immediately upon notification by the Council that the Union has been designated as the
bargaining agent for such operation or facility. For newly opened or later acquired
facilities, the Company shall initially establish hourly wage rates for all classifications;
thereafter the negotiated increases of the NMA wage addendum shall apply.
The Company shall not establish any new kitchen, commissary or caterer, or acquire a
controlling interest in such a food operation, whether directly or through an affiliate or
subsidiary, or by a parent or holding company of which the Company is wholly owned or
controlled subsidiary, and operate it as a separate entity outside the provisions of this
Agreement.

## ARTICLE 2
## TRANSFER OF COMPANY TITLE OR INTEREST

This Agreement and the supplemental addendums hereto and hereinafter referred to collectively as "Agreement", shall be binding upon the parties hereto, their successors, administrators, executors and assigns.

It is understood by this Section that the parties hereto shall not use any leasing devise to a third party to evade this Agreement. The Employer shall give notice of the existence of this Agreement to any purchaser, transferee, lessee, assignee, etc., of the operation covered by this Agreement or any part thereof. Such notice shall be in writing with a copy to the respective International Union and local union, at the time the seller, transferee or lessor executed a contract or transaction as herein described. The Union shall also be advised of the general nature of the transaction, not including financial details. In the event that the Employer fails to require the purchaser, transferee or lessee to assume the obligation of this Agreement, the Employer, (including partners thereof) shall give the Union sixty (60) days notice in writing, after which the Employer or the Union shall not be liable for any all damages sustained as a result of such failure to require assumption of the terms of this Agreement.

## ARTICLE 3
## UNIFORMS

**Section 1.** New employees shall not be required to purchase required uniforms through payroll deduction effective 6-1-2002.

**Section 2.** The Company will supply uniforms and safety equipment at no cost to the employees effective 6-1-2002. Thereafter, the Company will replace or repair all uniforms that are no longer serviceable through fair wear and tear in accordance with appearance standards at no cost to the employees. Employees are required to maintain their uniforms and general appearance in a fashion that is clean and orderly. The employee will return the uniforms upon termination of employment or the Company will deduct the value of the unreturned uniform from the final paycheck. The Company will deduct the replacement value of a uniform from the employee's paycheck if the uniform is lost, stolen or damaged.

## ARTICLE 4
## NO STRIKES AND NO LOCKOUTS

From the effective date of this Agreement through thirty (30) days following the date, if any, that the parties are released from mediation by the National Mediation Board in connection with negotiations for a successor Agreement (the "Release Date"), the Union and its members or employees it represents, agree that there shall be no strikes, walk outs, stoppages, or slow down of work, including sympathy strikes, boycotts, refusal to handle any merchandise, picketing or any other interference with any of the operations of the employer during the term of this agreement.

The employer agrees that there shall be no lockout during the term of this Agreement.

4

## ARTICLE 5
## MAINTENACE OF STANDARDS

The Employer agrees that all conditions of employment relating to wages, hours of work, overtime differentials and general working conditions, other than those specifically referred to in this Agreement, shall be maintained at not less than the highest standards in effect at the time of the signing of this Agreement, and the conditions of employment shall be changed, upon amendment wherever specific provisions are made elsewhere in this Agreement.  It is agreed that the provisions of this Section shall not apply to inadvertent or bona fide errors made by the Employer or the Union in applying the terms and conditions of this Agreement if such error is corrected within ninety (90) days from discovery of the error.  This provision does not give the employer the right to impose or continue wages, hours and working conditions less than those contained in the Agreement.

## ARTICLE 6
## NON-DISCRIMINATION

No employee shall be unlawfully discriminated against in any manner pertaining to hiring, wages, hours and working conditions because of his race, color, religion, creed, national origin, age, sex, sexual orientation, mental or physical handicap and disabled veterans or veterans of the Vietnam era, or because of his seeking redress through the grievance procedure for alleged grievances or for legitimate Union activities. The Company and the Union further agree not to discriminate against any employee because of age where such discrimination is in violation of applicable Federal statutes. The Company and the Union further agree not to discriminate against any employee under the Family and Medical Leave and American Disabilities Acts.  Whenever in this agreement the masculine gender is used, it shall be deemed to include the feminine gender.

## ARTICLE 7
## DISCIPLINE AND DISCHARGE

**Section 1.**  The Company shall not discharge any employee nor impose any disciplinary action against any employee except for just cause.  The Company shall have the right to establish reasonable rules for the conduct of employees not inconsistent with the terms of this Agreement.
**Section 2.**  Employee Corrective Action Notices shall be maintained in the employee's personnel file for a period of twelve (12) months from the time of issuance.

## ARTICLE 8
## HOLIDAYS

**Section 1.**Employees shall receive nine (9) paid holidays, effective 1/1/2001

| | | | |
|---|---|---|---|
| New Years Day | Martin Luther King, Jr. Day | Easter | Memorial Day |
| Labor Day | July 4 | Thanksgiving Day | Christmas Eve |
| Christmas Day | | | |

**Section 2.** The Union recognizes that the employees may be expected work on said holidays inasmuch as the business of the Company operates seven (7) days a week.

**Section 3.** All employees shall receive eight (8) hours' pay at straight-time rate when the holidays are not worked provided that:

a)The employee has not failed to work when scheduled to work on a holiday unless he is absent with the approval of management.

b)The employee works his scheduled day both immediately preceding and following the holiday unless he is absent with the approval of the Company.

c)The employee has worked during the week of a holiday (excluding vacation periods); and

d)The employee is not on strike or suspension, leave of absence or workers' compensation.

**Section 4.** Part-time employees who work a regular five (5) day week shall after ninety (90) days of employment, receive pro-rated holiday pay for holidays not worked, provided a holiday is worked, contractual holiday pay will be granted for all hours worked the holiday.

## ARTICLE 9
## GRIEVANCE PROCEDURE

**Section 1.**  Should differences arise between the Company and any of its employees as to the meaning and application of this Agreement, or if any other controversy or grievance arises, an earnest effort shall be made as promptly as possible to settle such difference in the following manner:

Step 1.  The employee having such grievance, with or without the Steward, shall present the grievance to his immediate supervisor within five (5) days of the action giving rise to the grievance.  The supervisor will give his answer within seven (7) days of the action giving rise to the grievance.  Should an employee request that a Steward be present to discuss the grievance, the supervisor shall arrange for the Steward to attend the grievance meeting. If the grievance is not thus satisfactorily settled, then the grievance may be appealed to Step 2.

Step 2.  The grievance shall be put into writing and presented by either the Union Representative, Chief Steward, Shop Steward and/or the aggrieved employee to the General Manager or his designated representative, within twelve (12) days of the action giving rise to the grievance.  The Manager will give his answer in writing, with a copy to the Union, within seventeen (17) days of the action giving rise to the grievance.  If the grievance is settled or withdrawn, the Union Representative and Employer will put the withdrawal or settlement in writing on the grievance form.  If the grievance is not satisfactorily settled, then the grievance may be appealed to Step 3.

Step 3.  The aggrieved employee, and/or Union may present the grievance in writing to the Regional Personnel Manager or his designated representative within twenty-two (22) days of the action giving rise to the grievance The Regional Personnel Manager or his designated representative shall meet with the Union and answer the grievance in writing within thirty (30) days of the action giving rise to the grievance.

**Section 2.**  All grievances must be submitted as provided in Step 1 above within five (5) days of the Employer's action giving rise to the grievance; and, if not submitted within the aforementioned time, then the grievance shall be considered to be waived and may not thereafter be submitted for adjustment.  Any grievance that is not appealed from one step of the grievance procedure to the next step within the time limits set forth above (such time limits may be extended by written agreement) shall be considered settled on the basis of the last decision given and shall not be subject to further grievance and arbitration proceedings or collective bargaining.

7

**Section 3**  All grievances not settled in these steps may proceed to the System Board of Adjustment.

## ARTICLE 10
## SYSTEM BOARD OF ADJUSTMENT PROCEDURES

Within fourteen days after the receipt of the written decision of the Company designee, if the decision is not satisfactory to the Union, the Union may appeal such grievance to the System Board of Adjustment by serving a written notice upon the Company directed to the Vice President of Human Resources or his/her designee at the Company's office of its intention to do so.  If the System Board deadlocks, the case may be appealed to arbitration by the Union.

The System Board of Adjustment shall be composed of two members designated by the Union and two members designated by the Company.  The Board shall meet every other month at a location mutually agreed upon by the parties.  In the event there are no grievances to be heard the board may cancel such meeting upon mutual agreement.

The System Board shall only be empowered to make a finding or decision with respect to contract language and any non-probationary employee covered by this agreement who is terminated or disciplined to the extent of loss of pay by the Company, and such finding or decision shall be final and binding upon the employee, and all parties to the dispute.

If the Board deadlocks, the Union may appeal the case to arbitration.  In the event the Union appeals the decision to arbitration the Company and the Union shall attempt to mutually agree to an acceptable impartial Arbitrator.  If the parties are unable to agree on an Arbitrator they shall then request a panel of seven (7) Arbitrators to be provided for by the Federal Mediation and Conciliation Service.

The parties shall alternately strike names from the panel with the remaining arbitrator selected to hear and resolve the dispute.

The Arbitrator shall have no authority to add to, or subtract from, or modify the terms of this Agreement.

The arbitrator's decision shall be rendered within thirty days from the date of the close of the hearing.

The cost of the Arbitrator shall be borne equally between the Union and the Company.

## ARTICLE 11
### SENIORITY/LOSS OF SENIORITY

**Section 1**. Seniority shall govern as to layoffs and rehiring. New employees shall be employed on a trial basis for ninety (90) calendar days. During this period, their retention as employees is entirely at the discretion of the Company. The provisions of this Agreement shall not apply to probationary employees.

**Section 2**. In the event the Company finds it necessary to lay off employees because of lack of work or reduction in business, such layoffs shall be on the basis of seniority. Seniority shall be defined as the length of service an individual has with the Company. The employee having the shortest period of continuous employment with the Company shall be laid off before any other employee. The senior employees shall have preference of full-time employment (to wit, forty (40) hours per week) at all times where it is available. Both seniority and ability shall govern except as provided in this Article, on job or station assignment, hours worked and, where applicable, in other phases of employment.

**Section 3**. The Company agrees that it will recall all persons who have retained seniority in the inverse order in which they were laid off. That is, the last one laid off will be the first recalled, provided the employee still has the physical fitness and ability to perform the work required. Employees, including those that are laid off, have the responsibility to keep on file with the Company the address to which the notice to return to work is to be sent; and the Company agrees to notify such laid off employees not less than three (3) days, exclusive of Sundays, prior to the date called back to work by certified mail or telegram and notify the Union of the same by mail.

**Section 4.** Seniority shall terminate:
a) Upon discharge for just cause;
b) Upon quitting;
c) Overstaying leave of absence without permission;
d) Engaging in gainful employment while on leave of absence, which shall be considered quitting;
e) Laid off from work for a period of one hundred eighty (180) consecutive calendar days;
f) Upon failure to report to work after layoff within three (3) days, exclusive of Sundays, after notification;
g) Being absent from employment for three (3) consecutive days without notifying the Company.

**Section 5**. The seniority of an employee promoted to a supervisory position shall be retained in the classification from which promotion was made for a period of ninety (90)

work days unless such employee is discharged for cause within such ninety (90) workday period.

**ARTICLE 12**
**JOB VACANCY**

**Section 1**. Employees in the same job classification may exercise their seniority for the purpose of selecting shift and off days by filing a bid as outlined in Section 2 below, provided the employee is qualified to perform the work.
Employees may exercise their seniority for the purpose of promotion to a higher rated job classification by filing a bid as outlined in Section 2 below, provided however, that the employee is qualified to do the work.

**Section 2**. Two types of bid forms may be filed. Bid form for shift and off days within employee's current job classification, and bid form for promotion to a higher rated classification. Vacancies will be posted on the employee bulletin board within each kitchen for a period of three (3) days.
Bid forms must be completed accurately and legibly and submitted in a timely fashion.
  First: Award the position(s) to the most senior qualified employee(s) in the job classification who have submitted a bid as outlined above for the shift and off days of the vacancy. Then:
  Second: Award the resulting position(s) to the most senior qualified employee in a lower rated classification who have submitted a bid as outlined above for the job classification, shift and off days of the vacancy. Then:
  Third: Return employees who are currently on layoff, by seniority provided, however, that the employee is qualified to do the work.
  Fourth: Fill remaining openings with new hires.

When filling such permanent job vacancies, ability and physical fitness being reasonably equal, seniority shall prevail. It is understood that job vacancies subject to this procedure may, when necessary, be filled at the employer's discretion temporarily to assure continuity of production. Temporary is defined as any period of time thirty (30) days or less except where a job is vacated due to a medical leave of absence, which may extend beyond thirty (30) days.
There will be at least one (1) annual bid within each respective kitchen, to determine shifts and off days. The first bid will be within three (3) months of ratification of the Agreement.

**Section 3**. In the event any employee is promoted to a higher job classification and that employee is judged to be insufficiently effective in that job, the employee will be returned to his previous job classification provided the demotion occurs within ninety (90) days of the promotion. Furthermore, the employee may request to return to his former job classification at any time within the first ninety (90) days following the

promotion, however, the employee shall be barred from promotions to that job classification for a period of one (1) year.

## ARTICLE 13
## STEWARDS AND UNION OFFICIALS

The Company recognizes the right of the Local Union to designate Stewards and Alternate Stewards from the Company seniority list. The authority of Stewards and Alternate Stewards so designated by the Local Union shall be limited to, and shall not exceed, the following duties and activities:

The investigation and presentation of grievances with his employer or the Company Representative in accordance with the provisions of the collective bargaining agreement. The transmission of such messages and information, which shall originate with, and are authorized by the Local Union or its Officers, provided such messages and information;

Have been reduced to writing; or
If not reduced to writing, are of a routine nature and do not involve work stoppages, slow downs, refusal to handle goods, or any other interference with the Company's business

Stewards and Alternates have no authority to take strike action, or any other action interrupting the Company business except as authorized by official action of the Local Union. The Company recognizes these limitations upon the authority of Stewards and their Alternates, and shall not hold the Union liable for any unauthorized acts unless condoned, ratified or authorized by the Union. The Company in so recognizing such limitations shall have the authority to impose proper discipline, including discharge. Stewards, upon notification to and approval by a supervisor, shall be permitted reasonable time to investigate, present and process a grievance on the Company property and where mutually agreed to by the Local Union and Company, off the property without loss of time or pay. Such time spent in handling grievances during the Stewards regular working hours shall be considered working hours in computing daily and/or weekly overtime if within the regular schedule of the Steward.
The Steward will be considered the most senior employee for purpose of job bidding, layoff, and recall if currently in practice.
A Steward shall be present at all disciplinary investigations, and presentations. In the event that a Steward or Alternate is not available the employee may select another bargaining unit member to act as witness.

11

## ARTICLE 14
## CHECK-OFF/UNION SECURITY PROVISION

It shall be a condition of employment that all current employees of the Company covered by this agreement, shall on the effective date of this agreement, become and remain members in good standing of the Union, or in the alternative, render the Union a monthly sum equivalent to the standard monthly dues and any additional fees required of Union members, such sums to be recognized as "Service Fees".

It shall be a condition of continued employment that all employees of the Company performing bargaining unit work shall on or before the sixtieth (60th) day following their hire date, become and remain members in good standing in the Union, or in the alternative, render the Union a monthly sum equivalent to the standard monthly dues and any additional fees required of Union members, such sums to be recognized as "Service Fees".

The Company will deduct from the wages of any employee covered by this Agreement said employees initiation fees, service fees, and/or dues as a member of the Union upon receiving the employee's voluntary and individual written authorization for the Company to make such deductions signed by the employee. Such authorization forms will be provided by the Union. The Company will remit to the Union the wages withheld for such initiations fees, service fees and / or dues on a monthly basis. The amount so withheld shall be deducted from the appropriate paycheck, reported and paid to the Union monthly. The employee's Social Security number, full name, dues rate, rate of pay, and status of employment will be transmitted with the monthly fees/dues. New hires including hire dates, terminations including termination dates, furloughs, including furlough dates, recalls, including recall dates, leaves including leave dates, return to work, including return to work dates, will also be provided to the Union monthly.

The Union shall give the Company at least thirty (30) days written notice before requesting the removal of employees from employment for failure to maintain membership in good standing in accordance with the aforementioned Sections.

The Union will hold harmless, and indemnify the Company and its employees with respect to any and all claims or liabilities arising out of, or in connection with this Article or any action taken under it at the request of the Union, provided that the Union shall have the right to defend itself against all such claims, if any.

12

## ARTICLE 15
## JURY DUTY

**Section 1.** The Company will pay its employees who are required to serve on jury duty the difference between the amount paid them by the Court for such service and the amount the employee otherwise would have earned at work during the time of jury service, but not to exceed eight (8) hours in any one day, or forty (40) hours in any one week.

**Section 2.** In order to be eligible for jury duty pay, the employee must verify with certification of the Clerk of Court all times and days of service. However, no payment shall be made under the provisions of this Article to any employee summoned for jury service unless he has informed the Company of his jury summons at least seven (7) days before the first day on which he is required to serve.

**Section 3.** Said employee shall make him available for work for all days during said week when not required to serve on jury service. By failure to return to work as herein required, the employee will forfeit all jury duty pay for that term of his jury service.

## ARTICLE 16
## MILITARY LEAVE

The Company agrees to abide by all applicable State and Federal laws as they relate to military leave.

## ARTICLE 17
## SICK LEAVE

All employees with one year or more will receive three (3) sick days each year, effective 1-1-2001. Effective 1-1-2003 all employees with one year or more shall receive four (4) sick days each year.

13

## ARTICLE 18
## UNION VISITATION

The representatives of the Union, or of any Local Union representing the employees of the Company, shall have the right upon advance notification or upon arrival to visit the establishment or any department thereof at reasonable times in order to investigate matters such as wages, hours, working conditions and grievances; and shall be authorized to post official Union notices pertaining to conditions of employment in a place conspicuous to the employees.

## ARTICLE 19
## FUNERAL LEAVE

A regular, full time employee who has completed the probationary period shall be entitled to a maximum of three (3) days paid leave to attend the funeral of a parent, child, spouse, brother, sister, present parents-in-law and grandparents.
The employee must submit proof of the death if so requested by the Company. Any falsification of proof shall be grounds for discipline up to and including discharge.

## ARTICLE 20
## LEAVE OF ABSENCE

**Section 1**. Leave of Absence for Union Activities
The Company agrees to grant the necessary time off, without loss of seniority rights and without pay, to any employee designated by the Union to attend a labor convention or serve in any capacity on other official Union business, provided forty-eight (48) hours' written notice is given to the Company by the Union, specifying length of time off. The Union agrees that in making its request for time off for Union activities due consideration shall be given to the number of employees affected in order that there shall be no disruption of the Company's operations due to lack of available employees.

**Section 2.** Medical Leave: An employee will upon proper application be granted a medical leave of absence. The employee will furnish the Company, if requested, a written verification and/or prognosis of his condition and his intended date of return from his attending physician using a form provided by the Company. Extension of a medical leave shall be granted when an employee confirms need with physician's documentation. An employee will retain and continue to accrue seniority during disability leaves and extensions. The Company will abide by the Family Medical Leave Act guidelines.

**Section 3.** Personal Leave: An employee may upon proper application be granted a personal leave of absence subject to operational requirements. The maximum leave of absence shall be thirty (30) days. The employee will retain and continue to accrue seniority during this personal leave. The Company shall have the sole discretion in granting such leaves of absence.

**Section 4.** All leaves of absence shall be applied for and granted in writing with copies to the Union, the Company and the employee.

**Section 5.** An employee returning from a leave of absence, after notifying the Company at least seven (7) days in advance, shall be returned to their former job classification.

## ARTICLE 21
## VACATION

**Section 1.** An employee, on reaching his first (1st) anniversary date of employment, shall be eligible for one (1) week vacation with pay provided the employee has worked at least one hundred eighty (180) days in the twelve (12) month period preceding such anniversary date.

**Section 2.** An employee, on reaching his second (2nd) anniversary date of employment, shall be eligible for two (2) weeks vacation with pay provided the employee has worked at least one hundred eighty (180) days in the twelve month period preceding such anniversary date.

**Section 3**. An employee, on reaching his fifth (5th) anniversary date of employment, shall be eligible for three (3) weeks' vacation with pay provided the employee has worked at least one hundred eighty (180) days in the twelve month period preceding such anniversary date.

**Section 4.** An employee, on reaching his fifteenth (15th) anniversary date of employment, shall be eligible for four (4) weeks' vacation with pay provided the employee has worked at least one hundred eighty (180) days in the twelve month period preceding such anniversary date.

**Section 5**. An employee, on reaching his thirtieth (30th) anniversary date of employment, shall be eligible for five (5) weeks' vacation with pay provided the employee has worked at least one hundred eighty (180) days in the twelve month period preceding such anniversary date.

**Section 6**.  Employees cannot waive their vacation and draw double pay for work during the vacation period unless mutually agreed between the employee and the Company.

**Section 7.** Vacations will be taken between January 1st and December 31st of each year and such vacations shall be scheduled and posted not later than December 15th of each vacation year. Vacation bidding will be based on the overall company seniority within job classification, department and shift.  Employees shall be permitted to choose their vacation periods subject to the requirements of the business.  Preference in the choice of available vacation periods shall be granted on the basis of length of service; thereafter, an employee's chosen vacation shall not be changed unless unforeseen circumstances make such action necessary.

**Section 8.** When a holiday(s) occurs in an employee's scheduled vacation period, he shall receive compensation for the extra day(s) vacation in lieu thereof.

**Section 9.** For the purpose of calculating vacation, former United Airlines employees' seniority shall be inclusive.

## ARTICLE 22
## BULLETIN BOARDS

A place shall be provided inside the Company kitchen facilities where Union notices of interest to the employees may be posted. These notices will be restricted to:
Notices of Union recreational/social affairs.
Notices of Union elections/appointments and results of Union elections.
Notices of Union administrative affairs.
Notices of Union meetings


## ARTICLE 23
## PENSION AND RETIREMENT PLAN/401K

**Section 1.** During the term of this agreement, the Company will administer and make total contributions for all eligible, full-time Employees to the Dobbs Hourly Employee Pension Plan.
Further, the Company agrees that should any general benefits improvement be adopted for the majority of Employees covered by the Pension Plan during the life of this Agreement, bargaining unit Employees covered by this Agreement shall be entitled to any and all such improvements so adopted.

**Section 2.**  All employees who have been employed by the Company for a period of one (1) year will be eligible to participate in the Dobbs International Services, Inc. Bargained Employees' 401(k) Plan. The Company matching contribution will equal the first 3% of the employees pre-tax contribution to the plan.
Guidelines for the plan will be established by the Company and distributed to eligible employees and the Union prior to the enrollment date. Administration of the plan remains a Company prerogative.


## ARTICLE 24
## HEALTH AND LIFE BENEFIT

**Section 1.**  Regular, full-time bargaining Employees will be eligible to participate in the Company's Health Care Program and the Basic and Supplemental Group Term Life/AD&D Insurance. Regular, full-time Employees will become eligible to participate in these plans on the first day of the calendar month following ninety (90) days of continuous employment. The minimum life insurance provided will be in the amount of $8.000.00. The provisions of all these plans are contained in the plan descriptions themselves which are incorporated by reference hereto.
While administration of the plan remains a Company prerogative, bargaining unit Employee's contribution rates for the various health plans and optional life insurance will be the same each year as the contribution rates for management /salaried employees.

17

Further, the Company agrees that should there be any change in the benefit level of the Health Care and life Insurance Plans during the term of this Agreement it will apply to the Employees covered under this Collective Bargaining Agreement.

## ARTICLE 25
## EMPLOYEE QUALITY INCENTIVE PLAN

Bargaining unit employees shall participate in the Employee Quality Incentive Plan during the years of 2000 to 2004. This Plan is based upon a combination of Unit quality and profit goals, which are the same for both management and hourly employees. The details of these goals, as well as the payout formulas and eligibility criteria, are described in the Plan Booklet, applicable to bargaining unit employees and are hereby incorporated into this Agreement by this reference. A target payout for each year of this agreement is 10%.

## ARTICLE 26
## HOURS OF WORK AND OVERTIME

**Section 1.** The workweek shall start at 12:01 a.m. Saturday and end at 12:00 midnight the following Friday.

**Section 2.** The Company agrees that the standard workweek shall consist of forty (40) hours per week. However, it is understood and agreed that neither the provisions of this Article or any other Article in the Agreement are to be considered as a guarantee of the availability in a work week of any particular number of days or hours per week for any employee. All hours worked in excess of forty (40) hours in a workweek shall be paid for at the rate of time and one half the employee's regular hourly rate.

**Section 3.** An employee's workweek shall normally consist of five (5) workdays and two (2) days off. In the event of an eight (8) hour shift, the workweek shall consist of five (5) work days and two (2) days off. In the event of a ten (10) hour shift, the workweek shall consist of four (4) days with three (3) days off.

**Section 4.** Overtime may be required when necessary to complete customer service obligations. When overtime is required, the Company agrees to offer such overtime to the employees in the affected classification on that shift in order of seniority (i.e., offer first to most senior employee, offer last to least senior employee). In the event senior employees decline the overtime assignment, the least senior employee in the classification working said shift will be required to work the overtime assignment.

**Section 5.** Any employee, who performs work in a higher classification for one (1) hour or more in a day, shall be paid at the higher classification rate for the time worked in the

higher job classification. Any employee, who performs work in a lower job classification during a day, shall be paid at the rate of this regular job classification. Except:

a) Where an employee is temporarily assigned to a lower classification to accommodate medical limitations; or

b) Where an employee is disqualified from a higher rated position; or

c) Where an employee is transferred (bidding) at his own request to another classification paying a lower rate;

**Section 6.** All employees covered by this Agreement will be granted one thirty (30) minute lunch break without pay.

All employees covered by this Agreement will be granted one fifteen (15) minute break with pay before the lunch break and fifteen (15) minute break with pay after the lunch break for the purpose of relaxation

## ARTICLE 27
## RIGHTS OF MANAGEMENT

This Agreement is not intended to interfere with, abridge or limit the Employer in the exercise of its function of management or the control of its business and the direction of its working force. The Union will not interfere directly or indirectly with the employment, transfer, discharge or duties of any of the supervisory employees or other company personnel not included in the bargaining unit.

It is agreed that the extent of its operations and the nature of the work to be performed, to determine when any operation shall function or shall be changed or terminated or when services to the airlines and railroad shall be increased, decreased or changed, to maintain efficiency of employees; to make, publish and enforce rules of conduct, safety and appearance; to determine the number, extent and location of its operations; the kinds to be used, to subcontract work; the schedules and the number of hours an employee shall work per day or per week; to hire, classify; to create new jobs and abolish jobs or combine jobs, are solely and exclusively the responsibility of the Employer. It is the responsibility and right of the Employer to maintain discipline; to transfer, promote, demote, retire, layoff, suspend, discipline or discharge employees for just cause. Such rights shall be subject to the limitation, if any, imposed by other Articles of this Agreement.

19

## ARTICLE 28
## DRUG/ALCOHOL TESTING POLICY

The parties have agreed that the procedures as set forth herein shall be the methodology for all testing and will be modified only in the event that further Federal legislation or Department of Transportation (DOT) regulations require revised testing methodologies or requirements during the term of this Agreement.

Should other categories or types of testing be required by the government, the Company will notify the Union of its procedure.

Employees Who Must Be Tested
Dobbs employees subject to Department of Transportation mandated drug testing are drivers and loader helpers of vehicles with a vehicle weight rating over 26,000 pounds, requiring a commercial driver license (CDL) or in a safety sensitive position. This includes employees who relieve for vacations or other temporary vacancies.

In addition to testing mandated employees, controlled substance testing will be part of pre-qualification conditions for safety sensitive positions and those persons transferring to a safety sensitive position. Individuals who bid for a safety sensitive position are subject to being tested for controlled substances before being accepted into such a position.

Employees covered by this Collective Bargaining Agreement, who are not subject to DOT mandated drug testing, are subject to reasonable cause/suspicion and post-on-the-job-injury testing as provided herein.

Testing
Because of the consequences that a positive test result has on an employee, the Company will employ a very accurate, two-stage testing program (screening and confirmatory). Urine samples will be analyzed by a highly qualified, independent laboratory, which is certified by the National Institute of Drug Abuse (NIDA). All samples will be tested according to DOT drug testing requirements.

Laboratory Testing
All laboratories selected by the Company for analyzing controlled substances testing specimens will be NIDA certified.

Types of Testing Required
The Company's testing format will include the following:
a) When there is reasonable suspicion,
b) To aid the investigation of serious accidents/all vehicle accidents.
 (CSRs and CSAs involved or present at the accident.)
c) Prior to assignment in safety-sensitive positions,
d) During an employees probationary period.
e) When an employee is involved with an on-the-job injury, which requires medical attention.

<u>Pre-Qualification Testing For Safety Sensitive Positions</u>
Upon reasonable cause, the Company will require an employee to be tested for the use of
controlled substances.
Reasonable cause is defined as an employee's observable action, appearance or conduct
that clearly indicates the need for a fitness for duty medical evaluation.
The employee's conduct must be witnessed by at least two (2) Supervisors, <u>if available</u>.
When the Supervisor(s) confronts an employee, a Union employee, should be made
available.

<u>Non-DOT -- Reasonable Cause/Suspicion</u>
In the event an employee (not covered by DOT) is tested, such test will be performed
under the same procedures as previously stated. In the event the test result is positive, it
shall be considered a dischargeable offense.
Post Accident Testing
Where a driver and loader helper are involved with an accident (vehicle/aircraft), the
driver and loader helper will be required to submit to drug/alcohol testing.

<u>Random Testing</u> Random Employee Selection
The procedure used to randomly select employees for drug testing in compliance with the
DOT regulations will be a computer program specifically intended for such an
application.
The program will utilize an internal computer clock procedure to randomly select general
lists of employees mandated for testing by the Department of Transportation/Federal
Highway Administration. The computer shall randomly select the required number of
employees from the total pool of affected employees.
The Company's Safety/Security Director shall maintain the list or true copies of the lists.
The lists will be maintained and made available for review by Local Union
representatives.
The parties agree that no effort will be made to cause the system and method of selection
to be anything but a true random selection procedure ensuring that all affected employees
are treated fairly and equally.
The parties further agree not to amend or change the current method of random selection
as described herein without prior agreement with the parties.
Post on-the-Job
When an employee is involved with an on-the-job-injury, which requires medical
attention, the employee will submit to a drug/alcohol test. Such test will be performed
under the same procedures as previously stated. In the event the test result is positive, it
shall be considered a dischargeable offense.
Split Sample Procedure
A split sample will be secured and an employee who tests positive may have the split
sample tested at a NIDA certified lab at the employee's expense. The employee must
request the split sample test within 72 hours of notification by the MRO.
Paid for Time
Employees shall be paid for all time from the place of employment to the collection site
and for all the time at the collection site.

21

Disciplinary Action

Employees may be subject to discipline up to and including discharge as provided below if they test positive for drugs specified elsewhere in the Article.

1. Reasonable Cause/ Suspicion Testing
   a) A positive test is a dischargeable offense.
   b) Refusal to submit to a reasonable cause/suspicion drug test is a dischargeable offense

2. Post Accident Testing
   a) A positive test is a dischargeable offense.
   b) Refusal to submit to a post-accident drug test is a dischargeable offense.

3. Random Testing

   a) A positive test result – employee is subject to successfully complete a rehabilitation program. The employee will enter into a rehabilitation program within fifteen (15) calendar days after test results. Employee will be subject to random testing for twelve (12) months after the completion of the rehabilitation program. (An employee will be permitted a positive test result only once during his tenure with the Company.)
   b) Refusal to submit to a random drug test is a dischargeable offense.

4. Pre-Qualification Testing for Safety Sensitive Positions
   a) A positive test is a dischargeable offense.
   b) Refusal to submit to a pre-qualification drug test is a dischargeable offense.

5. Post On-The-Job-Injury
   a) A positive test is a dischargeable offense.
   b) Refusal to submit to a post injury drug test is a dischargeable offense.

The Company further agrees, if an employee(s) recognizes that he/she has an alcohol or drug abuse problem, and voluntarily identifies this problem to the Company, the Company will allow the employee(s) time off to seek professional assistance. The employee will be permitted to utilize any applicable contractual benefit for this absence. It should totally be the responsibility of the employee(s) to recognize the problem and come forward to the Company prior to a disciplinary situation normally resulting in suspension, subject to discharge. The Company agrees to provide the employee(s) with a confidential method to contact professional assistance.

An employee who is subject to a substance abuse screening will be suspended, pending the outcome of the screening. If the results are negative, he will be returned to work and paid for all lost wages. If the results are positive, he will be discharged.

22

## ARTICLE 29
### INVALIDATION CLAUSE

If any of the terms and conditions of this Agreement is in violation of any State or Federal Law or Court Decision or decree, then to the extent of any violation, this Agreement shall be null and void. If any portion of this Agreement is declared illegal, it shall not in any way affect the remaining provisions of this Agreement.

## ARTICLE 30
### PAYROLL PERIOD

**Section 1**. The work week and pay period shall start at 12:01 a.m. on Saturday and end 12:00 midnight the following Friday.

**Section 2**. All Employees covered by this Agreement shall be paid in full each week. Payroll checks will be made available for Employees on Thursday of each week following the work week and pay period.

**Section 3.** Employees shall be paid in full when laid off or discharged. Payment of wages will be made in a timely manner at the next scheduled pay day.

**Section 4**. Employees shall be provided with an itemized statement of gross earnings and all deductions.

**Section 5**. Employees will have an option to participate in direct deposit program.

**Probation.** Newly hired employees shall be on probation for the first ninety (90) calendar days of employment. During that period, the Discharge, Grievance, Arbitration and Seniority articles of this Agreement shall not apply to the new employee. Neither shall any fringe benefit provisions of this Agreement apply, except named holidays. Upon completion of the probation period, seniority shall date from the most recent hire date.

23

## ARTICLE 31
## REPORTING PAY

Any employee reporting for work on a regular shift and not permitted to work shall receive four (4) hours pay at the employee's regular rate, and any employee who regularly works a four-day, ten-hour work week and reporting for work on a regular shift and not permitted to work shall receive five (5) hours pay at the employee's regular pay rate. This provision shall not apply in the case of fire, strike, utility failure, acts of God or any other conditions beyond the control of the Company. Any part-time employee who reports to work as scheduled or as requested on a given day, shall be guaranteed four (4) hours work or pay in lieu thereof.

## ARTICLE 32
## SAFETY AND HEALTH

The Employer shall continue to make reasonable provisions for the safety and health of its employees at the plant during the hours of employment, protective devices, on equipment, and /or clothing necessary to properly protect employees from injury shall be provided for and maintained by the employer, when required by the employer.
In the event a work related injury or illness that requires serious immediate medical attention away from the workplace, the employer will provide transportation to the medical facility and back to the workplace.

## ARTICLE 33
## TRANSITION AGREEMENT

Upon the ratification of this Master Agreement, the following guidelines must be adhered to:
All local addendums must be extended to have a common amendment date of May 30, 2004 and substitute the Grievance and System Board of Adjustment procedures/processes for any Grievance and/or Arbitration articles in current local addendums. All local issues and interpretations will be governed by the superior conditions clause attached hereto. Local supplement amendments will be for only economic issues relating to the local addendums in place at this time except, that there will be no additional entry or participation by the Company, or its employees, in any multi-employer pension/retirement or Health and Welfare fund/plans. Local supplements will be

24

amended on the dates identified herein as Attachment A, unless amended or extended by mutual agreement. Non-economic language will be frozen in each respective local addendum until May 30, 2004.

In the event any Local Union cannot reach agreement on their local addendum and economic re-openers, the issues of dispute will be taken to the System Board of Adjustment for review and settlement.

## ARTICLE 34
### SUPERIORITY AGREEMENT

It is understood between the Company and the Union that no employee in any location will suffer a reduction in any wages, or benefits from his present level as a direct result of this Master Agreement. Furthermore, if any local Addendums terms and conditions exceed the terms and conditions of the Master, then the local Addendum shall apply during the term of the Master Agreement. In instances where the Master Agreement language and / or benefits are superior to the local addendum, the Master Agreement will apply at the time the Local Addendum is subject to amendment.

## ARTICLE 35
## WAGES

Contract wage increases for all classifications in accordance with the National Master Agreement shall be effective as follows:

| Effective: | Increase: |
| --- | --- |
| 6/3/00 | 4% |
| 6/2/01 | 3% |
| 6/1/02 | 3% |
| 5/31/03 | 4% |

26

## ARTICLE 36
## AMENDMENT

This Agreement shall become effective June 1, 2000 and thereafter remaining in effect until changed in accordance with the provisions of the Railway Labor Act.
Neither party shall, prior to April 1, 2004 serve a notice on the other party, pursuant to section 6 of the Railway Labor Act, to change any term of the Agreement, which change shall not be effective prior to June 1, 2004.

For Gate Gourmet / Dobbs

For The Employee's Representative Council

_____

_____
IBT

_____

_____
HERE

## ATTACHMENT "A"

TEAMSTERS                                    HERE

| | | | |
|---|---|---|---|
| ATL | 3-7-02 | ORD | 3-27-03 |
| JAX | 2-4-00 | LAS | 5-31-02 |
| LAX | 6-30-01 | MIA | 12-3-03 |
| MEM | 8-28-01 | EWR | EXPIRED |
| MSY | 3-12-03 | OAK | |
| PHL | 5-9-01 | AMTK | 3-31-02 |
| SFO | 2-15-00 | SFO | 10-31-01 |
| STL | 10-20-01 | PHL | 6-3-00 |
| IAD | 4-4-00 | SEATTLE | |
| ORD | 10-1-01 | AMTK | 4-15-02 |

28

## LETTER OF UNDERSTANDING

All existing units will maintain their existing holiday schedules in accordance with area standards and practices prior to  January 1, 20001.

For Gate Gourmet/Dobbs

For The Employee's Representative
Council

IBT

HERE

*Unit 239 Wage Supplement to Master Agreement*

## NEW PAY RATES - EFF: JANUARY 14, 2003
## AMERICAN UNIT-239 START RATE

| CLASSIFICATION | START | 90-DAY (LSG only) | 1-YEAR | | | |
|---|---|---|---|---|---|---|
| CSR (Driver) | $12.00 | $12.60 | $12.90 | | | |
| Flight Checkers | $9.00 | $9.50 | $11.00 | | | |
| First Cook | $11.40 | $11.75 | $12.05 | | | |
| Cook | $9.65 | $10.05 | $10.31 | | | |
| Store Room Int'l Liquor Packer | $9.25 | $9.65 | $9.95 | | | |
| Cook's Helper Domestic Liquor Special Meals Meat Slicer | $8.85 | $9.20 | $9.50 | | | |
| General Kitchen Dock Worker | $8.25 | $8.85 | $9.00 | | | |
| | | | | | | |
| | | | | | | |

*Fax  901-766-3947*
*Linda*

DEC 04 2003 12:34

# EXHIBIT B

# Gategourmet

May 5, 2005

Gate Gourmet
11710 Plaza America Drive
Suite 800
Reston, VA 20190

Mr. Steven P. Vairma, Council Director
IBT/HERE Employee Representatives' Council
10 Lakeside Lane, Suite 3-A
Denver, CO 80212

Mr. Kenneth C. Paulsen, Vice Director
IBT/HERE Employee Representatives' Council
1125 17th St NW Suite 504
Washington DC 20036

## RE:  Final Offer

Dear Mr. Vairma and Mr. Paulsen:

Please find attached the Company's final contract offer that if ratified will achieve labor cost savings critical to the successful restructuring of Gate Gourmet.  From an employee perspective, voting **"YES"** for this proposal will keep the loss of jobs to the lowest level possible, make the smallest possible contractual base pay cuts, allow the Company to continue its level of premium contributions to both the Company and Union-sponsored medical plans and add an industry-leading profit sharing program designed to distribute future profits on an annual basis to our employees.

You will see in the attached proposal  that the total dollar amount of concessions is much smaller than originally sought  (from $58 million down to approximately $42 million annually)   Much of the reduction comes from smaller pay cuts than were originally proposed.  While this new proposal will now require the Company to cut costs through other sources, it responds to your focus to minimize the impact on the employees to the greatest extent possible.

Although the need for concessions is an unfortunate and unavoidable result of the serious financial crisis facing our Company and the airline industry, the level of concessions in the Company's final offer, particularly in the area of pay cuts, are below those already taken by the employees of our major customers -- the same customers who have told us that they are no longer able to spend as much money with us as they have in the past.

Given our serious financial crisis, I must emphasize that if the attached offer is not ratified, it will be necessary to take other steps immediately to conserve cash. These steps include, but would not be limited to, the elimination of Company contributions to the Company-sponsored medical plan, the shut-down of certain facilities and significant job losses.

Our senior management team and financial advisors have been working hard the past several months persuading our creditors, lenders, customers and suppliers to remain patient while we tried to reach a labor deal that would bring our costs in line with the competition.

We are rapidly running out of time. However, the good news is that a ratified labor agreement will give our creditors and lenders the renewed confidence and the basis to work with us on new financing and debt restructuring. It also will demonstrate to our customers and our suppliers that our labor issues our behind us and give us the opportunity to rebuild our business and to secure our future.

On the other hand, a "no" vote will most certainly create negative reactions from our creditors, lenders and suppliers and could force the Company into bankruptcy court. If that happened, we would lose control of our business as the creditors, lenders and the court get involved in our operations and decision making. A "no" vote would also put our future and contracts with our biggest customers, at risk. Clearly, this proposal represents the best chance for our employees to determine the shape of their future as an employee of Gate Gourmet.

Finally, if the proposal is ratified and the Company still cannot avoid a Chapter 11 bankruptcy filing, the Company commits as part of its proposal that it will not seek to change any of the terms of the new labor agreement, with the possible exception of the employees' pension plans, while reorganizing in court. This commitment is a significant and important protection for the employees, as they would be shielded from further concessions even though a court filing would most likely require deeper cost reductions to successfully emerge from bankruptcy. This same provision was extended to employees at US Airways during its bankruptcy filing and employees who had ratified their labor agreements avoided court-imposed pay reductions, while employees without ratified agreements had 21% wage reductions imposed by the bankruptcy judge as an immediate means to conserve cash.

We are at a critical crossroads and time is running out. We ask that the attached proposal be read carefully and that serious consideration be given to how the voting outcome will affect our employees, their families and the future of Gate Gourmet.

Sincerely,

*Anthony J. Bralich Jr.*

Anthony J. Bralich Jr.
Vice President Labor Relations


Cc: Peter Pappas

# SUMMARY OF FINAL OFFER
# TO THE EMPLOYEE REPRESENTATIVES' COUNCIL

### May 4, 2005

The following contract changes shall apply to the National Master Agreement and all Local Addendums.  Unless specifically modified herein, all other provisions of the National Master Agreement shall remain in effect in accordance with its terms.  All of the following changes shall be effective on the date of ratification unless otherwise noted:

## 1. SECTION 1113 BANKRUPTCY PROTECTION

- The Company agrees that it shall not seek to reject a ratified National Master Agreement, with the possible exception of the employee pension plans, in the event that it cannot avoid a Chapter 11 bankruptcy filing following the date of ratification.

## 2. PROFIT SHARING

- The following is modeled after the Southwest Airlines Profit Sharing Plan but will pay out annually rather than being deposited into a deferred retirement plan

- Each Plan Year, the Company will contribute an amount equal to 15% of Gate Gourmet Inc. (excluding Gate Safe, Gate Serve, and e-gatematrix) fully-allocated pre-tax profits after allocations for corporate overhead and interest expense and excluding non-operating and non-recurring gains or losses not arising from the Company's usual business operations.

- Each Eligible Participant's award will be determined as a percentage of the total profit sharing pool.  Each participant's share of the profit sharing pool will be calculated based on the percentage that his or her W-2 earnings represent of all W-2 wages for the unit.

- In order to be an Eligible Participant, the Employee must:

    o have more than 1,000 hours of service during the Plan Year,
    o be actively employed by the Company on the date the Profit Sharing Awards are distributed and not in a notice period, and
    o be in "good standing" which means the employee needs to maintain satisfactory job performance and not be on any form of performance warning.

- Awards will be paid out no later than 100 days following the end of the calendar year.

- The Board of Directors has the right to amend or terminate the Plan in accordance with the terms of the Plan.

## 3. APPLICATION OF THE NATIONAL MASTER AGREEMENT

- The National Master Agreement (NMA) shall be amended as described herein and in the following Attachment A and shall replace and supersede all Local Addendums.

- Following the ratification of an amended National Master Agreement, the Company agrees to meet and confer with Local Union Representatives to discuss issues of a local nature at each location. Any local issues agreed upon pursuant to this paragraph shall be incorporated by reference into the NMA as a side letter of agreement.

- All side letters of agreement not expressly identified herein shall be deemed null and void.

- In the event of a conflict between a specific provision of the NMA and mixed practices at multiple locations, the NMA provision shall control and supersede the conflicting practice(s).

- In the event of a conflict between a NMA practice and a former Local Addendum practice, the NMA practice shall control and supersede the Local Addendum practice.

## 4. WAGES

- Effective no earlier than  the first day of the pay period following the date of ratification, reduce current wage scales through the creation of new wage scales applicable to all current and future employees

- 4 - year wage freeze (from the effective date of the wage reductions)

- 5/1/09: 1% lump sum

- 5/1/10: 1% lump sum

- 5/1/11: 1% lump sum

- 5/1/12: 1% lump sum

## 5. PREMIUMS

- CDL premium:  $1.00  per hour if the individual both possesses and is required to utilize a CDL in the performance of his/her duties.

- Lead premium: $0.75 per hour if designated as a Lead.  (As a clarification to existing NMA policy and practice, the Company shall continue to determine the number of leads and the required ratio of lead-to-employees at all locations.)

- Eliminate shift premium

- Eliminate long service premium (LSP)

- The list of premiums shown above is exhaustive; any premium not included herein is eliminated

## 6. PART-TIME EMPLOYEES

- The Company may utilize part-time employees up to 30% of its total hours as measured on a system-wide (vs. location-by-location) basis.
- Part-time employees are defined as employees normally scheduled to work 32 hours or less per week.
- Part-time employees are ineligible for all company benefits (e.g. insurance, retirement, vacation, sick, holidays, etc.).
- Hourly rates shall be the same as full-time employees.
- Part-time employees shall be entitled to receive overtime for any hours worked beyond 40 hours per week

## 7. SEASONAL WORKERS

- The Company may utilize part-time employees between May 15 and September 15 in accordance with Paragraph 5 above, except that the 30% cap shall not apply during this period.

## 8. HEALTH & WELFARE

- Maintain the Company-sponsored medical plan for all bargaining unit employees as modified on 1/1/05 with employer and employee contributions as follows:

### EMPLOYER CONTRIBUTIONS

| Coverage Level | Current Employer Contribution Monthly Rate |
|---|---|
| Employee Only | $151.54 |
| Employee + Child(ren) | $285.49 |
| Employee + Spouse | $300.38 |
| Family | $449.21 |

3

## EMPLOYEE CONTRIBUTIONS

| Coverage Level | Current Employee Contribution Monthly Rate |
|---|---|
| Employee Only | $119.07 |
| Employee + Child(ren) | $228.66 |
| Employee + Spouse | $267.90 |
| Family | $362.61 |

- At the Union's option, the Union can elect to retain existing Union-sponsored health and welfare plans and the existing HAP plan applicable to DTW employees with the same employer contribution maximums as noted above. All future increases in either the Company Plan(s) or the Union-sponsored health and welfare plans to be shared equally between the Company and the employee (i.e., 50% by the Company, 50% by the employee). In the case of the Union-sponsored health and welfare plan future increases, or the HAP plan in DTW, the Company's 50% contribution shall not exceed the total dollar amount that would have been made in accordance with the Company Plan contribution schedule above.

## 9. PENSION

- Freeze the Company Defined Benefit Plan
- Freeze the Company contributions to the Union-sponsored pension plans.
- For employees participating in Union-sponsored pension plans, eliminate the Company 401(k) match and Company contributions to any other pension plan.

## 10. 401(K)

- Standardize the 401(k) plan design for all bargaining unit employees as follows:
  - Reduce the eligibility waiting period from 1 year to 90 days of service.
  - Company match of the first 3% of the employee's pre-tax contributions after 1 year of service.
  - Immediate vesting for the Company match of employee contributions.

4

## 11. HOLIDAYS

- Reduce paid holidays to 7 per year (New Years Day, Memorial Day, Independence Day, Labor Day, Thanksgiving, Christmas and Martin Luther King's Birthday).

## 12. VACATION

- Effective with the Vacation Bid for Calendar Year 2006, modify the current vacation accrual schedule as follows:

| Years of completed service as of 12/31: | Annual Vacation Accrual for the Following Calendar Year: |
|---|---|
| Less than 5 years | 1 week (prorated if less than 1 year) |
| 5 years to 19 years | 2 weeks |
| 20 or more years | 3 weeks |

## 13. SICK LEAVE

- Modify the current annual sick leave accrual to two days per year. Employees shall retain current balances and may cash out up to a maximum of 5 days per year.

## 14. OTHER WORK RULES

- Permit cross-utilization of qualified employees within pay grades and between pay grades to cover unplanned staffing shortages prior to utilizing overtime. Employees shall be paid the higher of their current hourly rate or the hourly rate applicable to the cross-utilized position.

- Modify the definition of "Temporary" in ARTICLE 12 "JOB VACANCY" to "any period of time thirty (30) days or less except where (1) a job is vacated due to a medical leave of absence or (2) the required training to fill multiple vacancies cannot be completed in thirty days or less, in which case the temporary jobs may extend beyond thirty (30) days."

## 15. DURATION

- Date of ratification through December 31, 2012

# Gate Gourmet
## Contract Valuation (excludes Amtrak)
### Company Proposal - 5/3/2005
(in millions)

| | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Comments |
|---|---|---|---|---|---|---|
| **Revised Pay Rate Structure** | | | | | | |
| Reduce Base Pay Rates 9.9% | 17.5 | 17.5 | 17.4 | 17.4 | 17.4 | |
| Eliminate Red Circle, Grandfathered, A-Scale rates | 3.2 | 3.2 | 3.2 | 3.2 | 3.3 | |
| Eliminate Longevity Service Premium | 0.7 | 0.7 | 0.7 | 0.7 | 0.7 | |
| Eliminate Shift and other Premiums | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 | Shift / Misc / Hire above scale / Superior Pay |
| Standardize Lead Premium at $0.75 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | |
| Implement CDL premium | (1.2) | (1.2) | (1.2) | (1.2) | (1.2) | $1.00 CDL premium (assume 40% of drivers) |
| Subtotal Pay Rates | 20.8 | 20.8 | 20.8 | 20.7 | 20.7 | |
| **Healthcare** | | | | | | |
| Health Care Savings: "Mgmt me too" Plans | 5.4 | 4.8 | 4.3 | 3.8 | 3.4 | Change to "Adjusted Core Plan" and make Dental, Life/AD&D, and LTD voluntary.  Company |
| Health Care Savings- Union Plans | 5.4 | 5.3 | 5.3 | 5.3 | 5.3 | and Employee share cost increases 50 / 50. |
| **Pension / 401k** | | | | | | |
| Freeze GG Hourly Pension Plan | 0.9 | 1.9 | 2.0 | 2.1 | 2.2 | Freeze current Gate Gourmet Hourly Pension Plan effective 6/30/05 |
| Eliminate 401k Contributions (Union Plans) | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | Eliminate 401k Contributions Employees covered under Union Pension Plans |
| Standardize 401k Contributions | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | Standardize 401k Contributions (3%) at all locations not covered by Union Pension Plans |
| **Paid Time Off** | | | | | | |
| Reduce Paid Holidays | 1.9 | 1.9 | 1.9 | 1.9 | 1.9 | Reduce Holidays to a total of 7 per year |
| Reduce Vacation Accrual | 2.1 | 2.1 | 2.2 | 2.3 | 2.4 | 1-5 Years: 5 days;  5-19 years: 10 days; 20+ years: 15 days |
| Reduce Sick Leave Accrual | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 2 days per year |
| Increase Part-Time Limits | 3.1 | 5.2 | 4.9 | 4.6 | 4.4 | Up to 30% of hours can be part-time workers.  PT ineligible for company benefits. |
| Eliminate Paid Meal Periods | 0.9 | 0.9 | 0.9 | 0.9 | 0.9 | |
| | 41.6 | 44.0 | 43.3 | 42.7 | 42.1 | |

1

# EXHIBIT C

## Summary of General Economic Proposal to Gate Gourmet by the IBT/HERE Council
## 2/25/2005 2:31 PM

## Proposed changes supercede any existing benefit levels in all agreements, however addenda language remains in tact regarding implementation of the benefit and local practices.

1. **WAGES** –
   - Ratification: 4% reduction across the board
   - 6/1/06: No change
   - 6/1/07: Wage re-opener with interest arbitration in the event an agreement can't be reached.
   - 6/1/08: 3% increase

2. **PROFIT SHARING** – Union proposes a 25% contribution of pre-distribution, pre tax operating income of GG Division Americas to the annual profit pool' to be shared with bargaining unit based on one's proportional W-2 contribution to total wages for the unit, pay out no later than 45 days following the end of the calendar year. Other accounting assumptions to be identified.

3. **PART-TIMERS** – Allow up to 20% of bargaining unit in each kitchen to be part-time, as long as they are scheduled 25 30 hours or less per week. Part-time employees are ineligible for all company benefits. National start rate of $8.00/hr., Six months: $9.00/hr., One Year: $9.50. After two years, receive any % increase earned by the rest of the bargaining unit. PTers will receive OT for any hours worked after 30 hours/shift.

4. **HEALTH & WELFARE** – Company Plan as currently imposed with employer contribution as follows:

   | | |
   |---|---|
   | Employee only: | $151.54 per month |
   | Employee & child: | $285.49 per month |
   | Employee & spouse: | $300.38 per month |
   | Employee & family: | $449.21 per month |

   All future increases, including all Trust Plans, will be shared on a split of 85% by the company and 15% by the employee. Company agrees to maintain current level of contributions to the Plans.

5. **PENSION –** no change, current rates remain. We can agree to employers proposed revisions to the 401 k plan.

6. **DURATION –** ratification through 5/31/09

7. **VACATION –** Modify all vacation schedules to reflect the following: 1 week @ 1 year, 2 wks @ 3 years, 3 weeks @ 8 years, 4 weeks @ 15 years, 5 weeks @ 30 years.

8. **HOLIDAYS –** reduce to seven per year (New Years Day, MLK Day, Memorial Day, July 4, Labor Day, Thanksgiving Day, Christmas Day) with holiday pay at 1.5 times the rate.

9. **SICK LEAVE –** reduce to three days per year.

# EXHIBIT D



## IBT/HERE EMPLOYEE REPRESENTATIVES' COUNCIL

Steven P. Vairma
10 Lakeside Lane, Suite 3-A
Denver, CO 80212
Phone (303) 458-1600
Fax (303) 480-1015

Ken Paulsen
1219 28th St., NW
Washington, DC 20007
Phone (202) 393-4373
Fax (202) 342-2129

David N. Siegel
Chairman & CEO
Gate Gourmet Division Americas
5100 Poplar Avenue
Memphis, TN  38137

December 2, 2004
Via fax and overnight mail

RE:  Gate Gourmet Contract Negotiations and Grievance Filing

Dear Mr. Siegel:

Following up our communication of November 29, 2004 this will serve as a grievance filing in accordance with Article 9 GRIEVANCE PROCEDURE of our National Master Agreement (NMA).

As a result, please note the following:

Gate Gourmet is in violation of the NMA by unilaterally altering the health care benefit/life plan, in violation of Article 34 SUPERIORITY AGREEMENT.

Responses should be made directly to Ken Paulsen, Vice Director, on behalf of the Council c/o 1219 28th Street, NW Washington, DC 20007.

Please note that in addition to violating the NMA the Company's announced unilateral alteration of the health care benefit/life plan also violates Section 2 Seventh of the Railway Labor Act.  We will address this violation in a separate, appropriate manner.

Sincerely,

*Steven P. Vairma/lc*

Steven P. Vairma, Council Director
IBT/HERE Employee Representatives' Council

*Kenneth C. Paulsen/lc*

Kenneth C. Paulsen, Vice Director
IBT/HERE Employee Representatives' Council

:lc

cc:    Gate Gourmet Local Units
       Council Unions

# EXHIBIT E



# IBT/HERE EMPLOYEE REPRESENTATIVES' COUNCIL

Steven P. Vairma
10 Lakeside Lane, Suite 3-A
Denver, CO 80212
Phone (303) 458-1600
Fax (303) 480-1015

Ken Paulsen
1219 28th St., NW
Washington, DC 20007
Phone (202) 393-4373
Fax (202) 342-2129

December 10, 2004
Via Fax and U.S. Mail

David N. Siegel
Chairman & CEO
Gate Gourmet Division Americas
5100 Poplar Avenue
Memphis, TN 38137

RE: Gate Gourmet Contract Negotiations and Grievance Filing

Dear Mr. Siegel:

Following up our communication of December 2, 2004 this will serve as notice that we have not received a response to our grievance filing, in accordance with Article 9 GRIEVANCE PROCEDURE of our National Master Agreement (NMA); as a result of Gate Gourmet unilaterally altering the health care benefit/life plan.

If this grievance is not satisfactorily settled, it will be necessary for us to appeal this matter further.

Responses should be made directly to Ken Paulsen, Vice Director, on behalf of the Council c/o 1219 28th Street, NW Washington, DC 20007.

Please note that in addition to violating Article 34 SUPERIORITY AGREEMENT of our NMA the Company's announced unilateral alteration of the health care benefit/life plan also violates Section 2 Seventh of the Railway Labor Act. As previously advised, this violation will be addressed separately.

Sincerely,

*Steven P. Vairma/lc*

Steven P. Vairma, Council Director
IBT/HERE Employee Representatives' Council

*Kenneth C. Paulsen/lc*

Kenneth C. Paulsen, Vice Director
IBT/HERE Employee Representatives' Council

cc:    Gate Gourmet Local Units
       Sr. Area Human Resource Managers
       Council Unions

# EXHIBIT F

# Gategourmet

Gate Gourmet
11710 Plaza America Drive
Suite 800
Reston, VA 20190

April 8, 2005

Mr. Steven P. Vairma, Council Director
IBT/HERE Employee Representatives' Council
10 Lakeside Lane, Suite 3-A
Denver, CO 80212

Mr. Kenneth C. Paulsen, Vice Director
IBT/HERE Employee Representatives' Council
1219 28th St. NW
Washington, DC 20007

Dear Steve and Ken:

This letter shall serve as a follow-up to your joint correspondence to David N. Siegel on November 29, 2004, December 2, 2004 and December 10, 2004 regarding "Gate Gourmet Contract Negotiations and Grievance Filing". For future reference, please be advised that David Siegel is not the Chairman and CEO of Gate Gourmet Division Americas. He is the Chairman and CEO of Gate Gourmet International. Mr. Peter Pappas is the President and highest ranking officer of Gate Gourmet Division Americas.

As you are aware, the parties have been in discussions at the bargaining table with respect to changes to the health care benefits raised in your correspondence and the Company remains hopeful that these current health care issues can be resolved to our mutual satisfaction as part of an overall agreement. However, in order to reiterate the company's position as it relates to the Council's charge that "Gate Gourmet is in violation of the NMA by unilaterally altering the health care benefit/life plan, in violation of Article 34 SUPERIORITY AGREEMENT" please consider this as further clarification of the Company's position as it relates to the above-referenced correspondence.

The health care benefit changes that became effective on January 1, 2005 for represented employees of Gate Gourmet covered by the Company-sponsored plan are consistent with the "me-too" provision contained in Article 24, HEALTH AND LIFE BENEFIT, of the NMA which provides in part that "... should there be any change in the benefit level of the Health Care and Life Insurance Plans during the term of this Agreement it *will apply* to the Employees covered under this Collective Bargaining Agreement" (italics added for emphasis).

As I mentioned in prior discussions, the Company reviewed the life insurance and ADD plan provisions of the applicable Local Addendums after the changes were originally announced but prior to implementing any of the changes on January 1, 2005. As a result of that review, the Company revised some of the changes and believes that it is in compliance with the life insurance and ADD plan provisions as specified in the applicable Local Addendums. Attached for your review is a summary of the life insurance/ADD plan provisions that the Company believes should be provided at each applicable Unit location. If you disagree with any of the determinations in the attached summary, I will be happy to discuss it with you to determine if further adjustments are warranted.

While I understand that your December 2, 2004 correspondence was intended to serve as a grievance filing, I have reviewed "Article 9 GRIEVANCE PROCEDURE" and am unclear as to which provision in Article 9 you are referencing that would permit the Union to bypass the first step in the grievance process and/or to submit the grievance to a senior officer of the Company (although in this case it was actually filed with an officer of Gate Gourmet International). If it was the Union's intent to bypass the first step in the grievance process, I am also unclear as to which step the grievance would currently be at based on the December 2 filing. Until the Company understands the Union's contractual basis for the manner in which the December 2 grievance filing was put forth, it is preserving its right to contest whether the grievance was properly filed in accordance with Article 9. Please provide me with the Union's position on this matter. Notwithstanding all of the foregoing, the Company remains willing to reach a mutually satisfactory resolution to this issue during the course of our negotiations.

With regard to the Council's assertion that the aforementioned changes violate Section 2 Seventh of the Railway Labor Act, the Company respectfully disagrees that its actions were or are in violation of the Act.

Sincerely,

Anthony J. Bralich Jr.
Vice President Labor Relations
Gate Gourmet Division Americas

# GATE GOURMET
## Summary of Collective Bargaining Agreements
### Life/AD&D 4/8/2005 Insurance

| Contract | Union | Units | # of EE's | Location | LIFE / AD&D |
|---|---|---|---|---|---|
| Gate Gourmet Dobbs International Master Agreement | IBT/HERE Employee Representatives' Council (the "Council") | 117, 128, 165, 201, 234, 239, 244, 245, 246, 425, 427, 566, 731, 734, 735, 740 | 2,271 | Various | Article 24 - the minimum life insurance provided will be in the amount of $8,000. |
| Gate Gourmet at Atlanta Hartsfield International Airport | IBT - Local 528 | 300, 301, 302, 321 | 898 | Atlanta | Article XXI, Section 2 - the Company agrees to provide EE's who are eligible for Gate Gourmet Health Care Plans 1/2 of their annual base salary (rounded to the nearest $1,000) or a minimum of $8,000, which ever is greater. |
| Dobbs International Services, Inc. & IAM | IAM - District Lodge 142 | 231,812 | 283 | Boston | Article XXII - The minimum life insurance provided will be in the amount of $8,000. |
| Dobbs Int'l Services O'Hare Int'l Airport & Midway Airport | HERE - Local 1 | 240,241,824 | 708 | Chicago | Same as Management |
| Dobbs Int'l Services, Inc. at O'Hare Int'l Airport | IBT - Local 705 | 240,241,323 | 187 | Chicago | Article XXXII - The minimum life insurance provided will be in the amount of $8,000. |
| Gate Gourmet / Dobbs Airport | Bakery, Confectionery & Tobacco Workers & Grain Millers - Local 111 | 800 | 90 | Dallas/Fort Worth | Article XX, Section 2 - the Company agrees to provide EE's who are eligible for Gate Gourmet Health Care Plans 1/2 of their annual base salary (rounded to the nearest $1,000) or a minimum of $10,000, whichever is greater. |
| Dobbs Int'l Services, Inc. DBA Gate Gourmet | Drivers, Chauffeurs and Helpers - IBT Local 659 | 235,818 | 724 | Dulles | Article XXIX - the minimum life insurance provided will be one times your base salary. |
| Gate Gourmet, Division Americas Unit 746 | United Catering, Restaurant, Bar and Hotel Workers Union - Local 1064 RWDSU | 746 | 50 | Detroit | Article XVIII, Section 4 - The Basic Life Insurance and Accidental Death will be provided by the Company valued at $10,000. |

**GATE GOURMET**
**Summary of Collective Bargaining Agreements**
**Life/AD4/8/2005 Insurance**

| | Contract | Union | Units | # of EE's | Location | LIFE / AD&D |
|---|---|---|---|---|---|---|
| | Gate Gourmet, Inc. Units 888 & 810 | RWDSU | 888,810 | 28 | Hartford | Not Specified, may be included in Union sponsored Plan. |
| 3) | Gate Gourmet Inc. Unit 212 | IAM - District Lodge 142 | 212 | 25 | Houston | Article XVIII - The minimum life insurance provided will be in the amount of $8,000. |
| 1) | Gate Gourmet / Dobbs | IBT - Local 512 | 122 | 13 | Jacksonville | Article XVIII - regular, FT EE's will also be eligible to participate in the Company's General Life Insurance Plan. All regular FT EE's will be provided life insurance in accordance with plan provisions. The minimum life insurance provided will be in the amount of $8,000. |
| 2) | Gate Gourmet | HERE - Local 226 | 711 | 140 | Las Vegas | Not Specified, may be included in Union sponsored Plan. |
| 3) | Gate Gourmet | IBT - Local 572 | 574,838 | 821 | Los Angeles | Included in Union Sponsored Plan |
| 4) | Gate Gourmet Unit 132 | IBT - Local 667 (Highway Local Motor Freight Employees Local) | 132 | 103 | Memphis | Same as Management |
| 6) | Gate Gourmet / Dobbs In-Flight Catering Operations | Hotel, Motel, Restaurant and High Rise Employees and Bartenders Union - Local 355 | 447,828 | 178 | Miami | Not Specified, may be included in Union sponsored Plan. |
| 6) | Gate Gourmet Int'l / Dobbs Int'l | HERE - Local 69 | 119 | 108 | Newark | Included in Union Sponsored Plan |
| 7) | Gate Gourmet / Dobbs | IBT - Local 270 | 171,830 | 28 | New Orleans | Article XXV - regular FT EE's will also be eligible to participate in the Company's General Life Insurance Program. All regular FT EE's will be provided life insurance in accordance with plan provisions. The minimum life insurance provided will be in the amount of $8,000. |
| 8) | Dobbs Int'l Units 112, 733, 814 and 816 | RWDSU/UFCW - Local 1102 | 112, 733, 814 | 299 | JFK/LGA | Not Specified, may be included in Union sponsored Plan. |
| 9) | Dobbs International Services, Inc. | HERE - Local 2850 | 838 | 19 | Oakland | Not Specified, may be included in Union sponsored Plan. |
| 20) | Gate Gourmet Int'l / Dobbs Int'l | HERE - Local 274 | 108 | 61 | Philadelphia | Not Specified, may be included in Union sponsored Plan. |
| 21) | Gate Gourmet, Inc. Unit 108 | IBT - Local 107 (Highway Truck Drivers and Helpers) | 108 | 27 | Philadelphia | Article XX, Section 2 - the Company will provide regular FT EE's with Basic Group Term Life/AD&D insurance equal to the greater of either 1/2 of their annual base salary (rounded to the nearest $1,000) or a minimum of $8,000. |
| 22) | Gate Gourmet - Local Addendum | HERE Local 340, interim employees | 249 | 533 | San Francisco | Included in Union sponsored Plan |
| 23) | Gate Gourmet - Local Addendum | IBT - Local 278, transportation employees | 249 | 68 | San Francisco | Not Specified, may be included in Union sponsored Plan. |

Page 2 of 3

**GATE GOURMET**
**Summary of Collective Bargaining Agreements**
**Life/AD&D/8/2005 Insurance**

| Contract | Union | Units | # of EE's | Location | LIFE / AD&D |
|---|---|---|---|---|---|
| Gate Gourmet | IBT - Local 888 | 153 | 74 | S. Louis | Article 33 - the Company agrees to continue to provide through their carrier a $10,000 life and an additional $10,000 accidental death and dismemberment policy for all EE's covered by the Agreement. |
| Gate Gourmet, Amtrak | HERE - Local 8 | 840 | 12 | Seattle | Not Specified, may be included in Union sponsored Plan. |
| Dobbs Int'l Services, Inc, Catering | IAM | 725 | 64 | Tampa | Article XXX - The Company agrees to provide EE's who are eligible for Dobbs Health Care Plans 1/2 of their annual salary (rounded to nearest $1,000) or a minimum of $10,000, whichever is greater. |

# EXHIBIT G

**IBT/HERE EMPLOYEE REPRESENTATIVES' COUNCIL**

# Fax

| | | | |
|---|---|---|---|
| **To:** | Anthony Bralich, Jr. ,Vice President Labor Relations, Gate Gourmet Division America | **From:** | Ken Paulsen, Council Director |
| **Fax:** | 703-964-2399 | **Pages:** | (plus cover) 10 |
| **Phone:** | 703-964-2304 | **Date:** | 4/21/05 |
| **Re:** | Gate Gourmet National Master Agreement Negotiations Grievance filing to SBA | **CC:** | |

☐ **Urgent**    ☐ **For Review**    ☐ **Please Comment**    ☐ **Reply**    ☐ **For your info.**

 

## IBT/HERE EMPLOYEE REPRESENTATIVES' COUNCIL

Steven P. Vairma
10 Lakeside Lane, Suite 3-A
Denver, CO 80212
Phone (303) 458-1800
Fax (303) 480-1015

Ken Paulsen
1125 17th Street, NW, Suite 504
Washington, DC 20036
Phone (202) 393-4373
Fax (202) 342-2129

April 20, 2005

Lisa Corona
Secretary to the Board
UNITE HERE! Western Regional Office
243 Golden Gate Avenue
San Francisco CA 94102

Anthony J. Bralich, Jr.
Vice President Labor Relations
Gate Gourmet Division Americas
11710 Plaza America Drive
Suite 800
Reston, VA 20190

Re:   Unilateral Health/Life Plan Changes

Dear Ms. Corona:

Pursuant to the communication received from the Company dated April 8, 2005 regarding the above named grievance and in accordance with the Article 10 of the NMA, the IBT/HERE Employee Representatives' Council is hereby requesting this grievance be moved to the next step, the System Board of Adjustment. Enclosed please find a Request for Hearing form as well as all communications relevant to the grievance.

Should you have additional questions or need further information, feel free to contact me at (202) 393-4373, ext 370.

Sincerely,

Ken C. Paulsen
Council Director

Enclosures

cc:    Steven P. Vairma, Vice Director

# Gate Gourmet System Board of Adjustment

## Request for Hearing
### Attachment #2

Gate Gourmet Unit: <u>All Affected Units*</u>    Local Union: <u>IBT/HERE Employee Rep. Council</u>
Grievant/Complainant: <u>All employees employed by IBT/HERE affected units.</u>
Union Contact Person: <u>Ken Paulsen, Council Director</u> Phone: <u>202-898-4373 ext370</u>
Gate Gourmet Contact Person: <u>Anthony J. Bralich Jr.</u>  Phone: <u>703-964-2804</u>

\* see attached list of Gate Gourmet units.

Nature of Dispute: <u>On or about January 1, 2005 the Company made unilateral changes to</u>
<u>the current Health/Life Insurance plan by lowering benefits and increasing employee</u>
<u>contributions in violation of Article 34, Superiority Agreement, of the NMA as well as Section</u>
<u>2 Seventh of the Railway Labor Act.</u>

Hearing Date Requested: <u>June 7-8, 2005</u>

*I certify that I have complied with the notice requirements of Rule 3 of the Gate Gourmet
System Board of Adjustment Rules of Procedure and that I have sent a copy of this Request
for Hearing to the opposing party on the same date and by the same manner I sent this
request to the Secretary.*

Signature

_4/20/05_
Date

XXXXXXXX    *DO NOT WRITE BELOW THIS LINE*    XXXXXXXX

Docket Number: _____
Date and Time Received: _____
Hearing Date: _____

Decision of The Board: _____
_____
_____

*Affected Gate Gourmet Units:

| City | | Unit | Union | Note |
|---|---|---|---|---|
| Chicago | Unit | 239 | IBT | |
| Chicago | Unit | 240 | IBT | |
| Chicago | Unit | 241 | IBT | |
| Chicago | Unit | 323 | IBT | Garage |
| Denver | Unit | 246 | IBT | |
| Indianapolis | Unit | 165 | IBT | |
| Jacksonville | Unit | 122 | IBT | |
| New Orleans | Unit | 171 | IBT | |
| New Orleans | Unit | 830 | IBT | Amtrak |
| Orlando | Unit | 566 | IBT | |
| Portland | Unit | 234 | IBT | |
| Dulles | Unit | 235 | IBT | |
| Wash. | Unit | 818 | IBT | Amtrak |
| Atlanta | Unit | 300 | IBT | |
| Atlanta | Unit | 301 | IBT | |
| Atlanta | Unit | 302 | IBT | |
| Atlanta | Unit | 321 | IBT | Garage |
| Memphis | Unit | 132 | IBT | |
| Philadelphia | Unit | 108 | IBT | |

| City | | Unit | Union | Note |
|---|---|---|---|---|
| Chicago | Unit | 239 | UNITE HERE! | |
| Chicago | Unit | 240 | UNITE HERE! | |
| Chicago | Unit | 241 | UNITE HERE! | |
| Chicago | Unit | 824 | UNITE HERE! | Amtrak |
| Cincinnati | Unit | 117 | UNITE HERE! | |
| Columbus | Unit | 126 | UNITE HERE! | |
| Ft. Lauderdale | Unit | 426 | UNITE HERE! | |
| Honolulu | Unit | 244 | UNITE HERE! | |
| JFK | Unit | 740 | UNITE HERE! | |
| Maui | Unit | 731 | UNITE HERE! | |
| Phoenix | Unit | 735 | UNITE HERE! | |
| San Antonio | Unit | 201 | UNITE HERE! | |
| San Diego | Unit | 734 | UNITE HERE! | |
| Seattle | Unit | 245 | UNITE HERE! | |
| West Palm | Unit | 427 | UNITE HERE! | |

 

# IBT/HERE EMPLOYEE REPRESENTATIVES' COUNCIL

Steven P. Vairma
10 Lakeside Lane, Suite 3-A
Denver, CO 80212
Phone (303) 458-1600
Fax (303) 480-1015

Ken Paulsen
1219 28th St., NW
Washington, DC 20007
Phone (202) 393-4373
Fax (202) 342-2129

<u>**VIA U.S. MAIL**</u>                                          November 29, 2004
David N. Siegel
Chairman & CEO
Gate Gourmet Division Americas
5100 Poplar Ave
Memphis, TN 38137

Re:    **Gate Gourmet Contract Negotiations**

Dear Mr. Siegel:

      As the representative of Gate Gourmet's Kitchen, Commissary and Catering Employees, the Council is currently engaged in direct negotiations with the Company's representatives over proposed changes in rates of pay, rules and working conditions for craft or class employees. The Master Agreement became amendable on June 1, 2004. Local supplements, of course, are subject to renewal from time to time with respect to economic issues in accordance with Article 33 and Attachment A of the Master Agreement.

      On September 1, 2004, Gate Gourmet's representatives advised us that, due to adverse economic circumstances, the Company will seek wage and benefit concessions from its employees. On October 21, the Company made its proposal for deep, across-the-board cuts in wages and benefits.  Of the concessions sought, none is more important or less attainable than the health benefit reduction proposed by the Company.  Your representatives have been advised that, while the Council is prepared to deal realistically with health cost inflation, it will not acquiesce in the virtual elimination of health benefits.

      Your representatives advised us that, effective January 1, 2005, current health insurance benefits will be lowered and employee contributions will be increased. These changes are to be made unilaterally. Announced on October 27, 2004, employee health premium contributions for the Company-sponsored Core plan will increase to $119.07 from $31.32 per month, or by 280 percent, for single employee coverage. Current employee contributions for family coverage of $155.63 will increase by 133 percent, to $362.61. The cost of dental coverage is to be borne entirely by employees.

David N. Siegel
November 29, 2004
Page 2

It is apparent that the Company's unilateral actions are designed to frustrate bargaining and defeat agreement. Your representatives were told unequivocally on October 21st that, by snatching the health care issue off the bargaining table, they have left us with nothing to talk about. We cannot think of a clearer instance of an employer, whether an air carrier or not, failing in its duty to make every reasonable effort to make and maintain agreements.

For these reasons, if the threatened health insurance changes are made on or after January 1, 2005, we will have to consider whether to terminate conferences on outstanding Section 6 notices. Perhaps the termination of conferences will cause the parties to re-evaluate their positions, using pragmatic self-interest criteria, and thereby lead to ultimate resolution of this dispute.

Very truly yours,

*Steven P Vairma/lc*

Steven P. Vairma, Council Director
IBT/HERE Employee Representatives' Council

Kenneth C. Paulsen, Vice Director
IBT/HERE Employee Representatives' Council

04/21/05  08:55 FAX 4156216620     WESTERN REG. - IBES.     @0077/010

 

# IBT/HERE EMPLOYEE REPRESENTATIVES' COUNCIL

Steven P. Vairma
10 Lakeside Lane, Suite 3-A
Denver, CO 80212
Phone (303) 458-1600
Fax (303) 480-1015

Ken Paulsen
1219 28th St., NW
Washington, DC 20007
Phone (202) 399-4373
Fax (202) 342-2129

David N. Siegel
Chairman & CEO
Gate Gourmet Division Americas
5100 Poplar Avenue
Memphis, TN 38137

December 2, 2004
Via fax and overnight mail

RE: Gate Gourmet Contract Negotiations and Grievance Filing

Dear Mr. Siegel:

Following up our communication of November 29, 2004 this will serve as a grievance filing in accordance with <u>Article 9 GRIEVANCE PROCEDURE</u> of our National Master Agreement (NMA).

As a result, please note the following:

Gate Gourmet is in violation of the NMA by unilaterally altering the health care benefit/life plan, in violation of <u>Article 34 SUPERIORITY AGREEMENT.</u>

Responses should be made directly to Ken Paulsen, Vice Director, on behalf of the Council c/o 1219 28th Street, NW Washington, DC 20007.

Please note that in addition to violating the NMA the Company's announced unilateral alteration of the health care benefit/life plan also violates Section 2 Seventh of the Railway Labor Act. We will address this violation in a separate, appropriate manner.

Sincerely,

Steven P. Vairma, Council Director
IBT/HERE Employee Representatives' Council

Kenneth C. Paulsen, Vice Director
IBT/HERE Employee Representatives' Council

:lc

cc:     Gate Gourmet Local Units
        Council Unions




# IBT/HERE EMPLOYEE REPRESENTATIVES' COUNCIL

Steven P. Vairma
10 Lakeside Lane, Suite 3-A
Denver, CO 80212
Phone (303) 458-1600
Fax (303) 480-1015

Ken Paulsen
1219 28th St., NW
Washington, DC 20007
Phone (202) 393-4373
Fax (202) 342-2129

December 10, 2004
Via Fax and U.S. Mail

David N. Siegel
Chairman & CEO
Gate Gourmet Division Americas
5100 Poplar Avenue
Memphis, TN 38137

RE: Gate Gourmet Contract Negotiations and Grievance Filing

Dear Mr. Siegel:

Following up our communication of December 2, 2004 this will serve as notice that we have not received a response to our grievance filing, in accordance with Article 9 GRIEVANCE PROCEDURE of our National Master Agreement (NMA); as a result of Gate Gourmet unilaterally altering the health care benefit/life plan.

If this grievance is not satisfactorily settled, it will be necessary for us to appeal this matter further.

Responses should be made directly to Ken Paulsen, Vice Director, on behalf of the Council c/o 1219 28th Street, NW Washington, DC 20007.

Please note that in addition to violating Article 34 SUPERIORITY AGREEMENT of our NMA the Company's announced unilateral alteration of the health care benefit/life plan also violates Section 2 Seventh of the Railway Labor Act. As previously advised, this violation will be addressed separately.

Sincerely,

*Steven P Vairma*                    *Kenneth C Paulsen*

Steven P. Vairma, Council Director          Kenneth C. Paulsen, Vice Director
IBT/HERE Employee Representatives' Council   IBT/HERE Employee Representatives' Council

cc:    Gate Gourmet Local Units
       Sr. Area Human Resource Managers
       Council Unions

# ☰Gategourmet

Gate Gourmet
11710 Plaza America Drive
Suite 800
Reston, VA 20190

April 8, 2005

Mr. Steven P. Vairma, Council Director
IBT/HERE Employee Representatives' Council
10 Lakeside Lane, Suite 3-A
Denver, CO 80212

Mr. Kenneth C. Paulsen, Vice Director
IBT/HERE Employee Representatives' Council
1219 28th St. NW
Washington, DC 20007

Dear Steve and Ken:

This letter shall serve as a follow-up to your joint correspondence to David N. Siegel on November 29, 2004, December 2, 2004 and December 10, 2004 regarding "Gate Gourmet Contract Negotiations and Grievance Filing". For future reference, please be advised that David Siegel is not the Chairman and CEO of Gate Gourmet Division Americas. He is the Chairman and CEO of Gate Gourmet International. Mr. Peter Pappas is the President and highest ranking officer of Gate Gourmet Division Americas.

As you are aware, the parties have been in discussions at the bargaining table with respect to changes to the health care benefits raised in your correspondence and the Company remains hopeful that these current health care issues can be resolved to our mutual satisfaction as part of an overall agreement. However, in order to reiterate the company's position as it relates to the Council's charge that "Gate Gourmet is in violation of the NMA by unilaterally altering the health care benefit/life plan, in violation of Article 34 SUPERIORITY AGREEMENT" please consider this as further clarification of the Company's position as it relates to the above-referenced correspondence.

The health care benefit changes that became effective on January 1, 2005 for represented employees of Gate Gourmet covered by the Company-sponsored plan are consistent with the "me-too" provision contained in Article 24, HEALTH AND LIFE BENEFIT, of the NMA which provides in part that "... should there be any change in the benefit level of the Health Care and Life Insurance Plans during the term of this Agreement it *will apply* to the Employees covered under this Collective Bargaining Agreement" (italics added for emphasis).

As I mentioned in prior discussions, the Company reviewed the life insurance and ADD plan provisions of the applicable Local Addendums after the changes were originally announced but prior to implementing any of the changes on January 1, 2005. As a result of that review, the Company revised some of the changes and believes that it is in compliance with the life insurance and ADD plan provisions as specified in the applicable Local Addendums. Attached for your review is a summary of the life insurance/ADD plan provisions that the Company believes should be provided at each applicable Unit location. If you disagree with any of the determinations in the attached summary, I will be happy to discuss it with you to determine if further adjustments are warranted.

While I understand that your December 2, 2004 correspondence was intended to serve as a grievance filing, I have reviewed "Article 9 GRIEVANCE PROCEDURE" and am unclear as to which provision in Article 9 you are referencing that would permit the Union to bypass the first step in the grievance process and/or to submit the grievance to a senior officer of the Company (although in this case it was actually filed with an officer of Gate Gourmet International). If it was the Union's intent to bypass the first step in the grievance process, I am also unclear as to which step the grievance would currently be at based on the December 2 filing. Until the Company understands the Union's contractual basis for the manner in which the December 2 grievance filing was put forth, it is preserving its right to contest whether the grievance was properly filed in accordance with Article 9. Please provide me with the Union's position on this matter. Notwithstanding all of the foregoing, the Company remains willing to reach a mutually satisfactory resolution to this issue during the course of our negotiations.

With regard to the Council's assertion that the aforementioned changes violate Section 2 Seventh of the Railway Labor Act, the Company respectfully disagrees that its actions were or are in violation of the Act.

Sincerely,


Anthony J. Bralich Jr.
Vice President Labor Relations
Gate Gourmet Division Americas

# EXHIBIT H

# Gategourmet



TO:     Division Americas Employees Enrolled in the Company Medical Plan
FROM:   Pete Pappas, President, Division Americas
RE:     Medical Plan Contributions
DATE:   May 12, 2005

Because our Divisional financial performance continues to decline and our labor costs remain uncompetitive under the current labor contract, the company Medical Plan subsidy will end on June 30, 2005 if the new contract is not approved by the union membership.

If the new contract is not approved, we will continue to offer the Medical Plan, but **you will be responsible for the full monthly cost beginning in July.** Your new monthly contribution would be based on your coverage level:

| Coverage Level | Current Monthly Rate | New Monthly Rate |
|---|---|---|
| Employee Only | $119.07 | $390.57 |
| Employee + Child(ren) | $228.66 | $757.25 |
| Employee + Spouse | $267.90 | $796.49 |
| Family | $362.61 | $1,148.27 |

If you want to continue to participate in the Medical Plan after June 30, 2005 <u>you must re-enroll</u>. **You can enroll by calling the Benefit Headquarters at 888-731-8206 between Thursday, May 19 and Wednesday, June 1.**

**If you do not re-enroll during this time, your medical benefits will expire on June 30, 2005** if the labor contract is not approved. If the contract is approved, your prior election will continue and any election changes made during this special enrollment will not be implemented.

The special enrollment line will be open during the following hours:

Monday to Thursday – 8:30 a.m. to 8:00 EST
Friday – 8:30 a.m. to 5:00 p.m.
Saturday – 9:00 a.m. to 1:00 p.m.

Note: The special enrollment line will be closed on Saturday May 28th and Monday May 30th for the Memorial Day holiday.

You will also be able to make the following changes to your medical coverage during this special enrollment period:

- Elect coverage (for yourself as well as any eligible family members)
- Add or drop one or more dependents currently covered

Your new deductions will begin with the Thursday, July 7, 2005 pay for weekly paid employees, and Friday, July 15 for semi-monthly paid employees.

We regret having to make these changes, but if the contract is not approved, we must find other ways to immediately reduce our costs.

**EXHIBIT I**



## IBT/HERE EMPLOYEE REPRESENTATIVES' COUNCIL

Steven P. Vairma
10 Lakeside Lane, Suite 3-A
Denver, CO 80212
Phone (303) 458-1660
Fax (303) 480-1015

Ken Paulsen
1125 17th Street, NW, Suite 504
Washington, DC 20036
Phone (202) 393-4373
Fax (202) 342-2129

June 3, 2005

Anthony J. Bralich, Jr., Vice President Labor Relations
Gate Gourmet Division Americas
11710 Plaza America Drive, Suite 800
Reston, VA 20190

Re:    Unilateral Change to Health Care Plan

Dear Mr. Bralich:

This letter is submitted by the IBT/HERE Employee Representatives' Council on behalf of itself and the employees it has been designated to represent to protest the decision of Gate Gourmet, which the carrier announced by a communication to its employees dated May 12, 2005, to alter the status quo by ceasing the employer contribution to the health plans maintained for Gate Gourmet employees as of July 1, 2005, and by requiring employees to pay increased premiums if they wish to remain covered. Those actions by Gate Gourmet are in violation of the command in the Railway Labor Act that a carrier not change the actual objective working conditions that are in dispute during negotiations for a new agreement, and, as you are well aware, health and welfare costs are very much in dispute during the ongoing negotiations under Section 6 of the Railway Labor Act. We request that Gate Gourmet *immediately* inform the employees represented by the Council that it rescinds its notice of May 12, 2005, and that it will *not* alter the health plan costs for employees or the benefits they receive except in accordance with the provisions of the Railway Labor Act. We ask that you inform us by the close of business on June 10, 2005, whether Gate Gourmet will comply with this request.

This letter is also to inform Gate Gourmet that, in addition to being in violation of the Railway Labor Act, the unilateral changes to the health plan that Gate Gourmet has announced, to be effective on July 1, 2005, constitute a breach of Articles 24 and 34 of the National Master Agreement and the agreement Gate Gourmet has with its employees that it will provide health insurance for its employees. If Gate Gourmet does not immediately rescind its May 12, 2005 notice, this letter is intended to be a grievance filed on behalf of all Gate Gourmet craft or class employees for whom this Council has been designated as the collective bargaining representative, demanding that Gate Gourmet continue to pay its share of the health care coverage, reimburse the employees who may have in the interim paid Gate Gourmet's portion of the health care costs, and restore the employee monthly premiums to the level they were at before Gate Gourmet breached its agreement with the Council and the designated bargaining agents. We further ask that, if Gate

June 3, 2005
Page 2

Gourmet refuses to rescind its May 12, 2005 announcement, the processing of this grievance be expedited.

We await your response.

Sincerely,

Kenneth C. Paulsen
Council Director

CC: Steve Vairma, Vice Director

# EXHIBIT J



# IBT/HERE EMPLOYEE REPRESENTATIVES' COUNCIL

Steven P. Vairma
10 Lakeside Lane, Suite 3-A
Denver, CO 80212
Phone (303) 458-1600
Fax (303) 480-1015

Ken Paulsen
1125 17ᵗʰ Street, NW, Suite 504
Washington, DC 20036
Phone (202) 393-4373
Fax (202) 342-2129

June 7, 2005

Anthony J. Bralich, Jr., Vice President Labor Relations
Gate Gourmet Division Americas
11710 Plaza America Drive, Suite 800
Reston, VA 20190

Re:    Unilateral Change To Health Care Plan

Dear Mr. Bralich:

This letter will follow-up [and is in addition] to my earlier letter of June 3, 2005, submitted by the IBT/HERE Employee Representatives' Council on behalf of itself and the employees it has been designated to represent to protest the decision of Gate Gourmet, which the carrier announced by a communication to its employees dated May 12, 2005, to alter the status quo by ceasing the employer contribution to the health plans maintained for Gate Gourmet employees as of July 1, 2005, and by requiring employees to pay increased premiums if they wish to remain covered. Your improper and illegal action will mean that employees who make as little as $8.10 an hour will be required to pay $1,148.27 per month for family coverage. Clearly, this is cost prohibitive and will force many employees to go without health insurance. This will leave the employees and their families without the ability to receive necessary health care and medication. The harm that they will suffer will be severe and irreparable.

Those actions by Gate Gourmet are in violation of the command in the Railway Labor Act that a carrier not change the actual objective working conditions that are in dispute during negotiations for a new agreement, and, as you are well aware, health and welfare costs are very much in dispute during the ongoing negotiations under Section 6 of the Railway Labor Act. We request that Gate Gourmet *immediately* inform the employees represented by the Council that it rescinds its notice of May 12, 2005, and that it will *not* alter the health plan costs for employees or the benefits they receive except in accordance with the provisions of the Railway Labor Act. We ask that you inform us by the close of business on June 10, 2005, whether Gate Gourmet will comply with this request.

This letter is also to inform Gate Gourmet that, in addition to being in violation of the Railway Labor Act, the unilateral changes to the health plan that Gate Gourmet has announced, to be effective on July 1, 2005, constitute a breach of Articles 24 and 34 of the National Master Agreement and the agreement Gate Gourmet has with its employees that it will provide health

insurance for its employees. If Gate Gourmet does not immediately rescind its May 12, 2005 notice, this letter is intended to be a grievance filed on behalf of all Gate Gourmet craft or class employees for whom this Council has been designated as the collective bargaining representative, demanding that Gate Gourmet continue to pay its share of the health care coverage, reimburse the employees who may have in the interim paid Gate Gourmet's portion of the health care costs, otherwise make whole all employees and restore the employee monthly premiums to the level they were at before Gate Gourmet breached its agreement with the Council and the designated bargaining agents. We further ask that, if Gate Gourmet refuses to rescind its May 12, 2005 announcement, the processing of this grievance be expedited due to the irreparable injury your actions are causing bargaining unit members.

We await your response.

Sincerely,

Kenneth C. Paulsen
Council Director

Cc:  Steve Vairma, Vice Council Director

# EXHIBIT K

**Bralich Tony**

| | |
|---|---|
| **From:** | Cox Sherry |
| **Sent:** | Thursday, May 26, 2005 7:19 PM |
| **To:** | .DL_GGUS_Clark Tower Exchange Users; .DL_GGUS_Reston HQ Management and Administrative; .DL_GGUS_Account Reps; .DL_GGUS_Regional Controllers; Pappas Pete; Goeke Douglas; Bralich Tony; Niemeyer Drew; Coles Donna; Hough Andrew; Mitzel Ed; Cox Sherry; Bronson John; Kuhns David; Gallerani Tina; Duffell Mike; Jones Richard |
| **Subject:** | Memo from Pete Pappas Regarding Retention Program |

# ⊜ategourmet

## MEMORANDUM

**TO:**      All US Administrative and Salaried Plan Division Americas Employees

**FROM:**   Pete Pappas

**DATE:**   May 26, 2005

**SUBJECT:**  Retention Program

Since joining Gate Gourmet as President of Division Americas a few months ago, we have been closely monitoring the retention and recruitment issues facing our company during this period of economic uncertainty. We know that these are challenging times for our company and that we have asked our administrative and salaried employees to make many sacrifices.

To partly address these issues, all administrative and salaried employees with 30 days of completed service as of July 1, 2005, will receive a monthly $500 retention payment. Those employees who have not completed 30 days of service as of July 1, 2005, will become eligible for retention payments beginning with the month following the completion of 30 days of service.

The monthly retention payment will begin on July 1 and will be reviewed on a quarterly basis for continuation prior to the commencement of each successive quarter. The retention payments may be discontinued at any time if financial circumstances so dictate.

While these payments do not reflect the significant sacrifices already made by our administrative and salaried employees, they are being provided to express the

1

company's appreciation for your hard work and dedicated service during these challenging times.

If you have any questions regarding this payment, please contact your immediate supervisor or manager. Thank you for your continued efforts as we work to restructure our company and return it to profitability as quickly as possible. I appreciate your commitment and loyalty.