# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| IBT/HERE EMPLOYEE REPRESENTATIVES' COUNCIL, | ) ) | |
| *Plaintiff,* | ) ) | |
| *v.* | ) ) | No. 1:05CV01210 (RMU) |
| GATE GOURMET DIVISION AMERICAS, and GATE GOURMET, INC., | ) ) ) | |
| *Defendants.* | ) ) | |

## REPLY MEMORANDUM BY PLAINTIFF IN SUPPORT OF
## APPLICATION FOR TEMPORARY RESTRAINING ORDER

John O'B. Clarke, Jr. (Bar No. 044685)
HIGHSAW, MAHONEY & CLARKE, P.C.
1050 17th Street, N.W., Suite 444
Washington, D.C. 20036
(202) 296-8500

Roland P. Wilder, Jr. (Bar No. 69069)
Susan Boyle (Bar No. 441102)
BAPTISTE & WILDER, P.C.
1150 Connecticut Ave., N.W., Suite 500
Washington, DC 20036
(202) 223-0723

DATE: June 30, 2005          Attorneys for Plaintiff Council

## INTRODUCTION

Defendants have responded to plaintiff's application, raising several *factual* disputes. But they failed to raise a genuine factual dispute over whether employees will be irreparably harmed if the Restraining Order is not issued to prevent the loss of Health Care coverage while this Court hears plaintiff's request for a preliminary injunction. Nor have defendants validly questioned this Court's jurisdiction to effectuate the dispute-resolution procedures of the RLA by issuing injunctive relief to preserve the jurisdiction of RLA adjustment boards.

## I.    The Council's Request for Interim Injunctive Relief Was Not Unreasonably Delayed

The Company's assertion that interim relief should be denied because the Council "inexcusably" delayed making its application for an injunction is based on a single premise: that the Council "could have filed more than six weeks ago" and thus "the only emergency here is one the Union created . . . ." Op. Mem., at 19.  That premise is false.  In fact, this case did not become ripe for judicial intervention until late on June 15, 2005 at the earliest.  From June 10, 2005, when the Union terminated conferences (Exh. 7 to Complaint), until the Company applied for mediation on June 15 or 16 (Exh. 8 to Complaint), it was unclear whether the status quo would be maintained or the parties would resort to their self-help remedies.  45 U.S.C. § 156 (status quo to be maintained "unless a period of ten days has elapsed after a termination of conferences of the Mediation Board").  In the latter event, the Company could have implemented unilaterally the health care contribution rate changes it had earlier announced.  There would have been no basis for this litigation.

In reality, the Council placed this matter before the Court just one week after this case became ripe for judicial intervention.  It was the Company's choice, not the Council's, to apply for mediation and thereby require continuation of the status quo.  The Company in general, and Mr. Jerman in particular, knew full well the range of options available to the Company on June 14, 2005.

The dispute would be settled by agreement, the parties would resort to self-help on or after June 21, 2005, or there would be litigation over the Company's departure from the status quo in terminating all employer contributions to the health care program.  Having made the choice that entailed litigation over continuation of the status quo, the Company should not be heard to complain about an application for injunctive relief filed one week later.

## II.    The Company's Vague, Speculative Claim of Potential Economic Injury Is Insufficient to Overbalance The Council's Showing of Irreparable Harm

The Company's claim of economic injury flowing from the injunctive relief sought by the Council is entirely speculative and thus insufficient.  The Goelke Declaration, ¶ 15, does no more than opine that, because the Company's lenders "are closely watching the pending proceedings," "[a]n injunction . . . **could** seriously undermine the Company's restructuring efforts." (Emphasis added).  The following paragraph simply notes the obvious.  Because the Company is in default on its loans, "its lenders **could** force Gate Gourmet into bankruptcy at any time." Id. ¶ 16 (emphasis added).  There is no substantiation that any lender is "likely" to abandon restructuring efforts, or precipitate an involuntary bankruptcy.  Mr. Goelke's bare allegations of what **could** occur are not helpful.  *See WMATC v. Holiday Tours, Inc.*, 182 U.S. App. D.C. 220, 559 F.2d 841, 843 n.2 (D.C. Cir. 1977) (recoverable economic loss constitutes economic harm only when the loss threatens the very existence of the business).  The Company does not and cannot make a showing that any alleged harm is certain to occur as a result of the injunctive relief sought by the Council.  "As with irreparable harm to the movant," the Court tests alleged irreparable harms to the Defendant "for substantial likelihood of occurrence and adequacy of proof."  *Cumo v. United States Nuclear Regulatory Comm'n*, 772 F.2d 972, 977 (D.C. Cir. 1985).

Moreover, since the relief sought here is to vindicate the processes of the Railway Labor Act, it is doubtful that any showing of economic harm would be sufficient to defeat an injunction to preserve the adjustment board's jurisdiction. Carriers cannot achieve exemptions from national labor legislation by presenting arguments"pointing to the[ir] financial debilitation . . . ." *Order of R.R. Telegraphers v. Chicago & N.W. Ry.*, 362 U.S. 330, 342 (1960). See also, *Local Lodge 2144, BRAC v. Railway Express Agency, Inc.*, 409 F.2d 312, 315 (2d Cir. 1969), where the court of appeals declined to disturb an injunction preserving the status quo in a minor dispute despite the carrier's claim that it needed to cut cost considerably due to its heavy operating losses. As a matter of fact and law, Gate Gourmet's speculative economic arguments are wholly unconvincing.

III.     **A Temporary Restraining Order is Necessary to Preserve the Jurisdiction of the System Board of Adjustment**

Defendants have placed before this Court declarations as to what they assert is the past practice at Gate Gourmet, alleging that plaintiff has acquiesced in prior unilateral changes to the Health Care coverage and costs. Defs' Memo. at 12-13. Defendants have also asserted that the management "retention" payment is not a rebate of the increased Health Care costs that managers are being asked to pay. Plaintiff disputes both factual allegations and will be prepared to show at the hearing on its request for a preliminary injunction, first, that the past practice defining the status quo *includes* prior consultation with the Council *before* changes were made to contribution rates, and, second, that contrary to defendants' claim, the Council stands a substantial likelihood of success on its contention that the "retention" payment is in fact a rebate of the increased Health Care contributions.

However, the undisputed evidence before this Court shows that the parties are currently bargaining over Gate Gourmet's proposals (1) to have a contractual right to make mid-year changes to contribution rates (Vairma Dec., Ex. 1 at 16 (Company proposed striking "each year" and adding "monthly" to Art. 24)), and (2) to reduce the carrier's contribution rates to fixed amounts. *Id*, at Ex. 2 at 13 (Company proposed reducing its share of Health Care coverage to $100 per eligible employee per month), Ex. 4 at 3-4. The undisputed evidence further shows that defendants are impermissibly seeking to *implement unilaterally* its contract proposals. And second, the undisputed evidence further shows that Gate Gourmet intends to furnish its *managers* with a "retention" payment that the *managers* see as a means to help them continue Health Care coverage. Declaration of C. Hendricks, executed June 29, 2005, at ¶6 ("I have to keep the insurance from the company and there is no way I could do it without the bonus that me and my wife will get").

Defendants cannot label the severe harm to employees that will result if a temporary restraining order does not issue as "purely economic."  Contrary to the theoretical assertions of Defendants' insurance expert, Cathryn Sreckovich, which essentially argue that employees might be able to obtain state or federal assistance or charity, the Plaintiffs have submitted affidavits from employees who have not been able to obtain alternative insurance and who have medical conditions that require continuing treatment.  Defendants completely ignore the Second Declaration of Annie Rolack, who has been unable to obtain a necessary CAT Scan because the plan would not authorize it without explanation in June even though she followed the same procedures she had previously. They also cast a blind eye to their employees who do not speak English and do not understand the impending changes.  Employees will suffer more than economic harm, which cannot be remedied by an arbitrator.

-4-

Furthermore, the cases cited by Defendants are not relevant. Op. Mem., at 38-39. They do not address the loss of health care in specific circumstances as in this case. The same can be said of the Defendants' flawed logic that, inasmuch as any employee discharge necessarily involves loss of health coverage, and terminations are not typically enjoined pending arbitration, the court should not regard the loss of medical coverage as irreparable harm. Op. Mem., at 38-39. What may or may not constitute irreparable harm elsewhere need not concern us. In the circumstances of this case, involving real people, the deprivation of medical care will cause certain irreparable injury. No amount of legal argument can change that fact. The cases submitted by Plaintiff demonstrates the Court's jurisdiction. P's Opening Mem., at 29-32.

Defendants have identified no irreparable harm that they would suffer if a temporary restraining order issues. They are simply attempting to apply pressure during the mediation process. Contrary to the Defendants' assertion, the increase in contribution rates and the creation of a "retention bonus" for managers and salaried employees are obviously connected. Defendants' vague arguments that they are "two independent changes" are controverted by uncontested facts. On May 4, Defendants proposed a "last, best and final offer" that sought to drastically decrease wages and fringe benefits and increase employees health care contributions. A. Complaint ¶ 19. On May 12, the Defendants attempted to pressure employees to ratify their proposal by threatening to halt all company contributions for the payment of the employees' health insurance premiums if the proposal for a new agreement was rejected. A. Complaint ¶ 20. At that time, it advised the employees of the new rates that they would have to pay beginning July 1, which included a large increase in the total amount of the total cost over that premium paid by employee and employer together as of October 27, 2004. Decl. of S.P.Vairma at ¶¶17-18. Defendants announced the bonus for managers and

salaried employees only at the end of the voting period, on May 26, after the voting was completed and it was apparent that the proposal would be overwhelmingly rejected. Id. ¶ 18. While the final tally may have not been officially provided to Defendants until the close of the voting period, on May 31, most local union affiliates s had conducted the vote before May 26 and the Defendants were well aware of the overwhelming results.

While the Defendants now claim that the bonus is supposedly "an attempt to mitigate a variety of financial constraints that have directly impacted managerial/salaried employees over the past several years," it was never mentioned until it was well known that the proposal would be rejected. Also, Defendants will begin paying the bonus at the same time they stop paying health plan contributions and they will pay it on a monthly basis when the premium payment must be made in the approximate amount of the increase in the employee's contribution.

These facts set forth above strongly refute the Defendants' unsupported claims that bonus is unrelated to the increase in health plan premiums. As the attached declaration of C. Hendricks, demonstrates, managers and salaried employees can and will use this bonus to pay their health plan contributions.

The connection is simple. The Defendants threatened to transfer the entire amount of the premium payment to the employees to obtain significant wage reductions. When that did not work, Gate Gourmet implemented its threat. In order to protect managers and salaried employees from this added financial burden, the Company devised a scheme to pay them a bonus that would cover the increased cost of the premium.

Furthermore, pursuant to Article 24 of the NMA, Union represented employees must be treated the **same** as managers and salaried employees, not similarly. See Def. Memo at p. 32.

Managers and salaried employees were not asked to take drastic cuts in wages and benefits, like the Union represented employees were pressured to do.  Now, managers and salaried employees will receive a bonus to cover the cost of the increase they must pay to retain health insurance, while the Union representative are left to pay the total amount themselves.

**IV    *SOUTHERN RAILWAY* REMAINS GOOD LAW AND IS CONTROLLING ON THE STATUS QUO ISSUE.**

Defendants do not, and indeed cannot, challenge the fact that the parties are currently engaged in a "major dispute" under the RLA and that they are obligated by the RLA's status quo obligation "to preserve and maintain unchanged those actual, objective working conditions and practices, broadly conceived, which were in effect prior to the time the pending dispute arose and which are involved in or related to that dispute." *Detroit & Toledo Shore Line R.R. v. UTU*, 396 U.S. 142, 153 (1969). Instead, they argue that the status quo obligation does not apply here because they claim a *contractual* right to change the status quo. Defs' memo. at 24. They further assert that plaintiff's reliance upon *Southern Ry. v. Brotherhood of locomotive Firemen*, 337 F.2d 127 (D.C. Cir. 1964), is misplaced because "the *Southern Railway* decision has been plainly overruled by four decades of case law, including Supreme Court decisions in *Conrail*, 491 U.S. [299,] . . . 304 [(1989)], and *P&LE*, 491 U.S. 490 (1989), and the D.C. Circuit's decision in *Air Line Pilots Ass'n v. Eastern Air Lines, Inc.*, 863 F2d 891 (D.C. Cir. 1988) . . . ." Defs' Memo. at 24. Defendants' arguments are without merit, for it is they–and not the Court of Appeals in *Southern Railway*–which misreads the RLA.

First, *Southern Railway* is not a "major-minor" case in which the issue before the court–as in *Consolidated Rail Corp. v. RLEA*–was whether the underlying controversy was a major or a minor

-7-

dispute to which the Act's status quo obligation applied. Indeed, there is *no* discussion in *Southern Railway* as to either the distinction between the two types of disputes or the proper test to characterize the underlying dispute, for it was undisputed in that case that the parties were involved in a major dispute and the issue before the court was whether one party to that dispute could change the status quo by adopting a *new* interpretation of the contract. *Southern Railway* recognized, as the Supreme Court subsequently held in *Conrail*, 491 U.S. at 307-11, that "ordinarily" a change in contract interpretation "could not be enjoined." 337 F.2d at 133. But the Circuit in *Southern Railway* also recognized that: "To allow a change in the construction of the contract in the way sought here would in substance and effect change the contract itself, as acted upon and applied by the parties from the beginning [and, thus, part of the status quo]. As the District Court said, to permit this would subvert the purpose and intent of Section 6 of the Act." 337 F.2d at 132. It is that holding in *Southern Railway* upon which plaintiff is relying, and, as plaintiff explained in its opening memorandum, there is no subsequent decision by any court–including the Supreme Court in *Conrail* and in *P&LE*–which brings that holding into question. Pl's Memo. at 22-24.

Defendants, however, seek to find such a decision in *ALPA v. Eastern Air Lines, Inc.*, where the Court of Appeals concluded that the massive furlough of employees amounted to a minor dispute where Eastern claimed a contractual right to take the disputed action, even though in two of the three crafts involved, the parties were negotiating changes to their agreements. What defendants fail to appreciate is that the *Eastern* court did not address the issue presented in *Southern Railway* and presented here as to whether a carrier may *implement* a new interpretation of the governing contract which alters the relevant status quo in a situation, such as here, where the Act's status quo obligation has been indisputably invoked. Indeed, as Judge Edwards pointed out in his dissent from the denial

of *en banc* review, the *Eastern* court did not address the issue presented here–which was also presented and addressed in *Southern Railway*–as to whether a major and a minor dispute may coexist during the Act's status quo period, but assumed without discussion that they could not. 863 F.2d at 921 (Edwards, J., dissenting from denial of rehearing *en banc*). Thus, since *Eastern* was not an *en banc* decision, it cannot be viewed as overruling–even *sub silentio–Southern Railway*. Moreover, as shown by the subsequent decisions of the Supreme Court in *P&LE*, 491 U.S. at 503-04, and of this Circuit in *RLEA v. CSX Transportation, Inc.*, 938 F.2d 224,229 (D.C. Cir. 1991), the decision of a carrier dealing with its *capacity* (such as in *Eastern*, whether to operate certain routes), as contrasted with its *utilization* of labor (or, as here, its labor costs), is not a mandatory subject of bargaining and is, therefore, "not part of the status quo." Here, the amount of monies and benefits Gate Gourmet must pay for the labor it obtains from the craft or class is clearly a mandatory subject of bargaining and subject to the Act's status quo obligation.

In short, *Southern Railway* remains good law and holds that in an appropriate case–such as here–the Act's status quo obligation prohibits a carrier from implementing a new interpretation of a contract that changes the actual, objective working conditions over which the parties are bargaining.[1]

---

[1]     Two points need to be made in response to Gate Gourmet's argument that the dispute raised by its claimed contractual right is properly characterized as a "minor dispute." First, it asserts that if the company's "contractual defense is sufficiently colorable to require a hearing before the board of adjustment, then the Company has the right to assert that defense, and its motivation is immaterial." Defs' Memo. at 31. That assertion is specious, for it fails to recognize the difference between a dispute being arbitrable and whether the underlying controversy is properly classified as a major dispute. *See* Pl's Memo. at 25. Second, defendants' allegation that *all* of its managers have been promised a retention payment raises a dispute of fact, for plaintiff has presented evidence that those managers who have not elected Gate Gourmet's Health Care coverage have not been promised the retention payment. Brainer Dec. at ¶9. But even if defendants' factual allegation is correct, it does

(continued...)

**CONCLUSION**

For the foregoing reasons, and those set forth in our opening memorandum, the Plaintiff's

application for temporary injunctive relief should be granted.

Respectfully Submitted,


_____/s/_____
John O'B. Clarke, Jr. (Bar No. 044685)
HIGHSAW, MAHONEY & CLARKE, P.C.
1050 17th Street, N.W., Suite 444
Washington, D.C. 20036
(202) 296-8500



_____/s/_____
Roland P. Wilder, Jr. (Bar No. 69069)
Susan Boyle (Bar No. 441102)
BAPTISTE & WILDER, P.C.
1150 Connecticut Ave., N.W., Suite 500
Washington, DC 20036
(202) 223-0723

DATE: June 30, 2005                    Attorneys for Plaintiff Council

---

[1](...continued)
not change the fact that the managers *and* the employees see the payment as the employer's Health
care contribution–albeit in a slightly different form.

-10-