**GATE GOURMET, INC. AND THE
IBT/HERE EMPLOYEES REPRESENTATIVES' COUNCIL
MEDICAL PLAN GRIEVANCE
ARBITRATION OPINION AND AWARD
MARCH 3, 2006**

In the Matter of an Arbitration Involving

**GATE GOURMET, INC.**

and

**THE IBT/HERE EMPLOYEES REPRESENTATIVES'
COUNCIL**

## Introduction

Gate Gourmet, Inc. (hereinafter "Gate Gourmet" or the "Company") and the International Brotherhood of Teamsters and the Hotel Employees and Restaurant Employees International Union (hereinafter the "Council" or the "Union") are parties to a so-called "National Master Agreement". On or about July 1, 2005 the Company ceased making contributions to the medical plan applicable to members of the craft or class of Kitchen, Commissary, Catering and Related Employees represented by the Council. As a result, the Council filed a grievance challenging the Company's right to unilaterally cease making said contributions.

When the matter could not be resolved directly during handling in the grievance procedure, the matter was submitted to arbitration in accordance with the applicable collective bargaining agreement.

As a result of that submission arbitration hearings were held on September 8 and 9, 2005 at the offices of the National Mediation Board in Washington, D.C.    At said hearings both the Council and the Company were represented by counsel who were afforded a full opportunity to present relevant evidence through the testimony of witnesses and in documentary proofs.    A broad range of cross-examination was permitted, and counsel raised points and contentions in support of their respective positions in post-hearing briefs.

Counsel entered their appearances as follows:

> **Roland P. Wilder, Jr., Esquire**
> **Susan Boyle, Esquire**
> **Baptiste & Wilder**
> **and**
> **John O'B. Clarke, Jr., Esquire**
> **Highsaw, Mahoney & Clarke**
> **for the Council**
>
> **Carla Siegel, Esquire**
> **Associate General Counsel, IAM&AW**
> **for the IAM&AW**
>
> **Tom A. Jerman, Esquire**
> **Aparna B. Joshi, Esquire**
> **O'Melveny & Myers**
> **for Gate Gourmet, Inc.**

**Background Facts**

As noted above, the grievance arose when Gate Gourmet exercised what it   considered to be its contractual right under Article 24, <u>Health</u>

and Life Benefit, and related sections of the collective bargaining agreement to cease making contributions to the medical plan applicable to members of the craft or class.

The following sections of the National Master Agreement have been cited for the Arbitrator's consideration:

### Article 5
### Maintenance of Standards

**The Employer agrees that all conditions of employment relating to wages, hours of work, overtime differentials and general working conditions, other than those specifically referred to in this Agreement, shall be maintained at not less than the highest standards in effect at the time of the signing of this Agreement, and the conditions of employment shall be changed, upon amendment wherever specific provisions are made elsewhere in this Agreement. It is agreed that the provisions of this Section shall not apply to inadvertent or bona fide errors made by the Employer or the Union in applying the terms and conditions of this Agreement if such error is corrected within ninety (90) days from discovery of the error. This provision does not give the Employer the right to impose or continue wages, hours and working conditions less than those contained in the Agreement.**

### Article 24
### Health and Life Benefit

**Section 1.** **Regular, full-time bargaining Employees will be eligible to participate in the Company's Health Care Program and the Basic and Supplemental Group Term Life/AD&D Insurance. Regular, full-time Employees will become eligible to participate in these plans on the first day of the calendar month following ninety (90) days of continuous employment. The minimum life insurance provided will be in the amount $8,000.00. The provisions of all these plans are contained in the plan descriptions themselves which are incorporated by reference hereto.**

**While administration of the plan remains a Company prerogative, bargaining unit Employee's contribution rates for the various health plans and optional life insurance will be the**

same each year as the contribution rates for management/salaried employees.

Further, the Company agrees that should there be any change in the benefit level of the Health Care and Life Insurance Plans during the term of this Agreement it will apply to the Employees covered under this Collective Bargaining Agreement.

## Article 33
## Transition Agreement

Upon notification of this Master Agreement, the following guidelines must be adhered to:

All local addendums must be extended to have a common amendment date of May 30, 2004 and substitute the Grievance and System Board of Adjustment procedures/processes for any Grievance and/or Arbitration articles in current local addendums. All local issues and interpretations will be governed by the superior conditions clause attached hereto. Local supplement amendments will be for only economic issues relating to the local addendums in place at this time except, that there will be no additional entry or participation by the Company, or its employees, in any multi-employer pension/retirement or Health and Welfare fund/plans. Local supplements will be amended on the dates identify herein as Attachment A, unless amended or extended by mutual agreement. Non-economic language will be frozen in each respective local addendum until May 30, 2004.

In the event any Local Union cannot reach agreement on their local addendum and economic re-openers, the dispute will be taken to the System Board of Adjustment for review and settlement.

## Article 34
## Superiority Agreement

It is understood between the Company and the Union that no employee in any location will suffer a reduction in any wages, or benefits from his present level as a direct result of this Master Agreement. Furthermore, if any local Addendums terms and conditions exceed the terms and conditions of the Master, then the local Addendum shall apply during the term of the Master Agreement. In instances where the Master

**Agreement language and/or benefits are superior to the local addendum, the Master Agreement will apply at the time the Local Addendum is subject to amendment.**

Mr. Kenneth Paulsen, the Vice President of UNITE/HERE and a Director of the Council, testified concerning his involvement in the formation of the Council and the negotiation of the National Master Agreement.

Mr. Paulsen testified that it was his understanding and that of the other Council representatives that Article 24, Health Benefits, would be preserved because of the language of Articles 5, 33 and 34.

Mr. Paulsen testified that when the Company made changes to the contribution rates for members of the craft or class, between the dates of June 1, 2000 to 2005, that those changes were made on a "yearly" basis; and that "rate changes" were normally announced in October of each calendar year in advance of the November open enrollment periods.

Mr. Paulsen testified that subsequent to the September 11, 2001 terrorist attacks both Gate Gourmet and Sky Chefs experienced "cut backs"; and that the Company sought to establish certain "temporary emergency standards" and essentially "froze everything that was in place", including the health and welfare and pension programs applicable both under the National Master Agreement and the Local Addenda. Mr. Paulsen testified that the Council did not grieve certain of these changes in contribution rates because the employees understood the conditions.

Mr. Paulsen testified concerning the negotiations for the new collective bargaining agreement which were initiated on or about December 10, 2003 when the Company presented the Council with its opening proposal (Council Exhibit No. 4); and he traced the exchange of proposals focusing upon the health and welfare benefits. Mr. Paulsen testified that on or about May 4, 2005 the Company presented the Council with its "final offer", which offer was submitted to the Council's membership and was rejected by more than 90% of those who voted.

Mr. Paulsen testified that the Company, as an "incentive" for employees to accept the final offer, had suggested that, if the offer was not accepted, insofar as health and welfare benefits were concerned the Company might cease making any contributions for such employee benefits on June 30, 2005. Mr. Paulsen testified that during the discussions with the Company's chief spokesperson, Vice President of Labor Relations Anthony Bralich, that Mr. Bralich had indicated that the Company was not planning to rescind its health and welfare proposal, insofar as possible rescission of the benefit plans were concerned and so the Council, on June 3, 2005, grieved the Company's stated intention to cease paying its share of employees' health care coverage (Council Exhibit No. 12).

Mr. Paulsen testified that the Council had continuing discussions with Mr. Bralich, and that he was not advised by Mr. Bralich as to why

the Company believed it had the right to cease making such contributions to the medical plan; but that it was his understanding that the Company's proposal was made in the context of the Company's need to generate $50 million in over-all cost savings.

Mr. Paulsen testified that during a conference call with certain local affiliates that he became aware of the fact that the Company had a plan to provide all of its "US Administrative and Salaried Plan Division Americas Employees", who had "30 days of completed service as of July 1, 2005", a monthly $500 retention payment; and that those employees who had not completed 30 days of service as of July 1, 2005 would become eligible for retention payments beginning with the month following the completion of 30 days of service (Council Exhibit No. 23).

Mr. Paulsen testified that during the course of the negotiations with the Company the Council was told that management wages and pensions had been frozen subsequent to September 11, 2001, and that supervisors had not received any wage increases. Mr. Paulsen testified that during these negotiations the Council was never told that the Company might have a need to retain management personnel through the use of bonuses or other inducements.

On cross-examination Mr. Paulsen testified concerning the extent to which the parties engaged in "face to face" negotiations, and the manner in which issues involving Local Addenda would be handled.

Mr. Paulsen testified that Council Exhibit No. 1 was the first and only written proposal exchanged regarding the negotiation for the National Master Agreement.

Mr. Paulsen testified that it was his understanding that Article 34 ensured that no employee subject to the National Master Agreement would suffer a reduction in wages or benefits.

Mr. Paulsen identified Company Exhibit Nos. 1 and 2, documents which reflected changes by year in employee costs and benefits for years 2001 through 2004 and projected for 2005. Mr. Paulsen testified that there were no grievances filed in October, 2000, October, 2001, October, 2002 or October, 2003 when the Company announced and implemented changes in employee benefits, but that the Council did file a grievance in 2004 because of the "extent" of the changes in benefits the Company intended to implement.

Mr. Paulsen testified that during the 2003-2004 negotiations the Company sought concessions in view of its financial condition, and that the Council agreed to open negotiations early in "recognition" of the Company's financial condition.

Mr. Paulsen identified Company Exhibit No. 5, a May 5, 2005 letter from Gate Gourmet Vice President of Labor Relations Anthony Bralich, submitting the Company's final contract offer that if ratified would achieve, from the Company's perspective, "labor cost savings critical to

the successful restructuring of Gate Gourmet." Mr. Paulsen testified that Mr. Bralich advised that if Gate Gourmet's final offer was not accepted the Company would, among other actions taken, cease making contributions to the medical plan.

Mr. James Dyson, who was employed by the Hotel Employees Restaurant Employees International Union (hereinafter the "HERE") beginning approximately in the year 1979, testified that he was involved in contract negotiations as the HERE's lead negotiator with a company known as "Dobbs", a company that operated flight kitchens, and was a predecessor company to Gate Gourmet.

Mr. Dyson testified that the Dobbs/HERE collective bargaining agreement addressed health and welfare benefits, which included language that read "Employee contribution rates for the various health plans and optional life insurance will be the same each year as the contribution rates for management, salaried employees." Mr. Dyson testified that this language was incorporated in "Dobb's contracts" for more than 20 years.

On cross-examination Mr. Dyson testified as follows concerning the language regarding employee and management contribution rates:

**Q.  Let me refer to something Mr. Clarke said and see if you would agree with it.  He had in an earlier conversation, described your potential testimony as the union being agreeable to a provision that the bargaining employees got the**

> **same as the management employees, because you didn't think the management would screw it[self];  is that a fair representation to why it [the HERE] agreed to that language?**
>
> **A.  I would think that's a fair representation.**
>
> **Q.  So you were willing to take whatever management got because you thought the company would unbalance and have -- quit benefits for the management employees?**
>
> **A.  Yes.**

Ms. Jennifer Brainer, a Customer Service Representative/Driver, who has worked for Gate Gourmet at its Chicago O'Hare Gateway since 1994, testified that her starting rate in 1994 was $11.75 per hour, that presently she is paid $14.42 per hour, and that she has had several wage increases deferred beginning in 1999.

Ms. Brainer testified that her contributions to the health plan increased from $18.33 per week in 1994 to approximately $71.00 per week at present.

Ms. Brainer testified that she became aware of the Company's intention to cease making contributions to the medical plan if the Company's final offer was not ratified by the Union's membership, and if that happened employees would then "have to start paying all of the contributions per month".  Ms. Brainer testified that she became aware of the Company's intention when she received a May 6, 2005 letter from the Company (Council Exhibit No. 9) which read, in part, as follows:

> **A "no" vote, would force the company to eliminate its share
> of paying for your medical plan contribution. A "no" vote
> would also significantly increase the risk of bankruptcy and
> loss of our biggest customers.**

Ms. Brainer testified that, when the Company ceased making

contributions on her behalf to the medical plan on or about July 1, 2005,

she did not re-enroll with the Company for medical benefits as she could

not afford the premium.

Ms. Brainer testified that on or about the time she received the

above-referenced letter from the Company she became aware of the fact

that the Company was intending to pay salaried/management employees

a $500 per month retention bonus beginning in July, 2005. Ms. Brainer

testified that she spoke with her general manager regarding this matter

and was told that the bonus was being paid because

salaried/management employees had not received a salary raise for some

five years. Ms. Brainer testified that during her conversation with her

general manager he said that "he had found a way to legally circumvent

our agreement." Ms. Brainer testified as follows concerning her

understanding of the retention bonus:

**Q. What about the agreement were you referring to?**

**A. The fact that we were all supposed to, if we're all paying
the same for insurance and now you want everybody to kick
in all of it, and then all of a sudden, you decide that your
supervisions (sic) may need a retention bonus and the exact
same month that, coincidentally, the insurance is going to go
up, we could kind of see the writing on the wall for that.**

Ms. Brainer testified that she was aware of two supervisors who had left the facility since 2001, and she was aware of 2 to 5 new management personnel who have been hired since that date.

On cross-examination Ms. Brainer testified that she was able to obtain replacement medical insurance through Blue Cross/Blue Shield of Illinois for $367.10 per month.

Mr. Eduardo Diaz-Green, the General Chairman of District Lodge 142 of the International Association of Machinists and Aerospace Workers (hereinafter the "IAM&AW"), testified that his Organization represented employees at Gate Gourmet's Tampa, Boston and Houston facilities and had negotiated collective bargaining agreements, so-called Local Addenda, with the Company at those facilities.

Mr. Diaz-Green identified Council Exhibit No. 26, an excerpt from the 1989-1992 Dobbs and IAM&AW collective bargaining agreement at the Houston facility, which agreement provided in Article XXII, Employee Medical Benefits and Insurance, in part, as follows:

> **While administration of the plans remains a company prerogative, bargaining unit employees' contribution rates for the various health plans and optional life insurance will be the same, each year, as the contribution rates for Management/Salaried employees in the Houston area.**

Mr. Diaz-Green testified that employee and management contribution rates always moved "in tandem".

Mr. Diaz-Green testified that when the Company changed contribution rates for the medical plan such changes were made on a once a year basis. Mr. Diaz-Green testified that having employee medical plan contribution rates track the contribution rates of management employees provided "security" for represented-employees, because if the contribution rates for represented-employees were to be "upped" then the contribution rates for management employees would also be increased.

Mr. Diaz-Green testified that he learned in July, 2005, from local Union representatives and employees, that employee contribution rates were going to be increased "astronomically". Mr. Diaz-Green testified that he was not approached by any management representative to discuss these increased contribution rates in advance of them being implemented.

Mr. Charles Hendricks, an Organizer for UNITE/HERE in Chicago, testified that the Company facility at Chicago O'Hare is the largest Company kitchen in the country.

Mr. Hendricks testified that there are five kitchens at this facility, and that he participated in a "vote no" rally after receiving and distributing the Company's final offer. Mr. Hendricks testified that there are 650 employees in four UNITE/HERE kitchens at the Chicago O'Hare facility, and that 500 of those employees indicated that they would vote against the Company's final offer.

Mr. Hendricks testified that on May 12, 2005 the vote of employees at the Chicago O'Hare Gate Gourmet facility was 449-14 against accepting the Company's final offer.

Mr. Hendricks testified that on May 27, 2005 he became aware of the Company's memorandum indicating that management/salaried employees would be receiving retention bonuses. Mr. Hendricks testified that he spoke with a Gate Gourmet human resources manager who told him that the Company was providing a "small retention bonus" in order that the Company could retain its management, and that this bonus was not intended to replace the health insurance contributions that the Company had previously been making for the benefit of its salaried employees. Mr. Hendricks testified that based upon his conversations with management it was his understanding that the monies to be used for retention bonus would come from the savings the Company achieved from Union-represented employees.

On cross-examination Mr. Hendricks testified that he encouraged Union-represented employees to vote against the Company's final offer.

Mr. Anthony Bralich, Vice President of Labor Relations for Gate Gourmet, testified that he was hired by the Company in November, 2004 after a twenty-two year career with USAirways, during which time he was engaged in a variety of labor relations functions. Mr. Bralich testified

that upon his being hired by Gate Gourmet he assumed responsibility for negotiating a new collective bargaining agreement with the Council.

Mr. Bralich testified regarding Gate Gourmet's tenuous financial condition at the time;  and that the Company was experiencing significant cash flow problems.  Mr. Bralich testified that the Company's financial problems were caused, in substantial part, because its primary customers for its food products, the airlines, were experiencing financial difficulties which resulted in a number of the airlines eliminating or reducing meal services on their flights.  Mr. Bralich testified that to address this problem the Company began an "austerity" program, including something called "Project Lemon", which was intended to curtail all unnecessary expenses;  and that the Company did not grant any 2004 performance bonuses for management.

Mr. Bralich testified that the Company concluded that it needed to save in excess of $50 million in order to avoid bankruptcy and in order to encourage continued support from the investor community;  and that the Company calculated that it could save $11 million annually by eliminating the Company's contributions to the health plan.

Mr. Bralich testified that, before proposing to the Council the elimination of the Company's contribution to the medical plan, he reviewed the collective bargaining agreement and consulted with others and concluded that the Company had the right to take such action, as he

believed there was no restriction upon the Company in terms of changing or eliminating employer contributions to the medical plan under the provisions of Article 24. Mr. Bralich testified that it was also his opinion that Article 5 of the collective bargaining agreement did not apply to health insurance, nor did it restrict the Company's right to cease making contributions to the medical plan.

Insofar as any past practice was concerned, Mr. Bralich testified that his review of the record indicated that in the fall of each year the Company, with the assistance of outside consultants, established new contribution rates and benefits under the existing medical plan, discussed these changes with the representatives of the employees and then notified employees of the changes and implemented those changes. Mr. Bralich testified that, after reviewing this history, he concluded that the Company had the right to make changes to the medical plan including the elimination of Gate Gourmet's contributions to said plan.

Mr. Bralich testified concerning the Company's development of its "final offer" and a meeting he attended with Council representatives on April 13, 2005, at which time he advised the Council concerning the Company's financial concerns and its need to demonstrate to "lenders some positive signs." Mr. Bralich testified that it was his understanding that the Council would remain "neutral" insofar as the final offer was concerned, and that the Company would have to "sell the deal". Mr.

Bralich testified that he advised Council representatives that if the final offer/agreement was not ratified that the Company would have to find additional ways to preserve cash, and that elimination of the Company's contributions to the medical plan could be one of those ways.   Mr. Bralich testified that eliminating the Company's contribution to the medical plan was not his or the Company's "preferred route", but that $11 million in savings "drove the change".

Mr. Bralich testified that when he was first employed by Gate Gourmet he found that the "morale" of the management/salaried employees was "poor".   Mr. Bralich testified that the Company had moved its headquarters from Memphis, Tennessee to Reston, Virginia, and that in addition to this change the September 11, 2001 terrorist attacks and the negative impact upon the airline and catering industries contributed to poor employee morale.   Mr. Bralich testified that management/salaried employees had not received any salary increases since that time, that their defined benefit pension plan had been frozen and that they had not received any annual bonuses.

Mr. Bralich testified that as a result the Company was experiencing attrition problems, as management employees were also being required to work greater hours as the headcount of the management/salaried employees had been reduced.

Mr. Bralich testified that it was for these reasons, among others, that Gate Gourmet decided to implement the "retention bonus" program. Mr. Bralich testified that his review of the retention program, described in Council Exhibit No. 23 a May 26, 2005 memorandum to all US Administrative and Salaried Plan Division Americas Employees, led him to conclude that the Company was not restricted by the collective bargaining agreement from implementing such a program. Mr. Bralich testified that all administrative and salaried plan employees were to receive the same retention bonus of approximately $500 per month.

Mr. Bralich testified that between May 6 and 26, 2005 management became aware the certain "union people" were actively working against the ratification of the "deal"; and that this activity contributed to the demoralization of management whose members were seeking to "sell the deal". Mr. Bralich testified that when the final offer failed ratification the Company believed it had to do something to ensure its operational stability. Mr. Bralich testified that the Company then eliminated its contributions on behalf of Union-represented employees to the established medical plan and implemented the retention bonus program.

Mr. Bralich testified that in early August, 2005 the Company and the Council agreed to submit their bargaining differences to final and binding arbitration; that they agreed that the new collective bargaining

agreement would have a duration date of December 31, 2009; and that in a meeting on or about September 19, 2005 with a federal mediator the Company agreed to resume making medical plan contributions because this represented a "huge issue" for the Council and the employees.

On cross-examination Mr. Bralich testified concerning the interface of the medical plan subject to Article 24 of the National Master Agreement and the health and welfare plans established under the Local Addenda. Mr. Bralich testified concerning the differences in these plans, including among other differences the waiting periods for eligibility.

Mr. Bralich testified that prior to July, 2005 all changes to contribution rates had been made on a yearly/once a year basis.

Continuing on cross-examination Mr. Bralich testified concerning the attrition rates among management/salaried employees over the last several years, and that the attrition of Union-represented employees in the January to July, 2005 time frame was slightly higher than the attrition of management/salaried employees.

Mr. Bralich testified that retention bonuses were offered to management/salaried employees associated with the Company's move of its headquarters from Memphis to Reston, but that he could not testify with specificity as to the relationship of the bonus amounts to the salaries of those individuals who moved with their jobs.

Mr. Bralich testified as follows regarding the relationship of the elimination of the Company's contribution to the medical plan to the attrition of management/salaried employees:

**Q. Was the fact that the company had eliminated the health and welfare subsidy, if we can use that term that the company used, on May 12th, a factor in the attrition rate, attrition that you feared would occur among managers after May 12th?**

**A.  Honestly, I think it was because the GMs [general managers] were saying that if people, if our managers and supervisors lose the company subsidy, in addition to all the other things that they have been hit with, we believe that we're going to see a tremendous departure of employees, to the extent that we're concerned about being able to maintain the operation.**

\*    \*    \*

**Q. One of the problems that you saw after the announcement that the company's health insurance subsidy was being eliminated was that that could be the last straw for managers, and they would just take off?**

**A.  I think that's what Mr. Pappas [Gate Gourmet's President of the Americas Division] testified to.**

**Q. What about you?**

**A. I don't disagree with that characterization.**

**Q.  Is that your feeling too, put the last straw out of the picture?**

**A. I'll just say what I said before.  The GMs were telling me that they had already had a problem with attrition, and that was going to make it worse.**

**Q.  Did the $500 a month retention bonus address that concern, as far as you were concerned?**

**A.  I don't know if it did or it didn't.  Obviously, the other issues are still there, the issues of the uncertainty of whether the company's going to successfully restructure, whether they are going to stay out of bankruptcy, whether Delta flies and**

> **we take additional hits, those things didn't go away. People
> are still attriting at the same rate.**
>
> **Our concern was that it would maybe double, maybe triple.
> We didn't know.**

Mr. Bralich testified that he was not aware of whether there was any limitation insofar as all management/salaried employees receiving the $500 monthly retention bonus. Mr. Bralich testified that some management employees viewed the retention bonus as a "means for them to pay their health insurance"; but that he did not "agree with that perception".

Mr. Bralich testified that he came to know that it was the belief of the Company's General Managers and certain Vice Presidents that "with the loss of the Company contribution to the health care, that their attrition problems would get worse."

Mr. Peter Pappas, the Company's President of the Americas Division, testified that he joined the Company on December 13, 2004.

Mr. Pappas testified that in the January to April, 2005 time frame the Company's cash position was in "crisis mode", and it was expected that the Company would be cash depleted by April, 2005. Mr. Pappas testified that it was decided that the Company had to be restructured, and advised its lenders that Gate Gourmet could not make timely payments on its outstanding debt. Mr. Pappas testified that the

Company began a cost reduction program, which included an effort to obtain $58 million in concessions from its unionized employees.

Mr. Pappas testified that the Company implemented a number of cost saving programs, the programs identified by Mr. Bralich in his direct testimony.

Mr. Pappas testified that he made the decision, after the Company's final offer was not ratified by the Union's membership, to eliminate the Company's contribution to the medical plan, which action would save the Company $11 million.

Mr. Pappas testified that he conferred with his staff regarding the issue of "management retention", and that he was aware of the lack of positive employee morale, which he attributed, in part, to the failure of the Union membership to ratify the Company's final offer.  Mr. Pappas testified as follows concerning his decision to initiate the retention bonus program for management/salaried employees:

**Q.  And can you summarize for the board the reasons you made that decision?**

**A.  Well, in essence, I had been, we had been living with and seeing a 25 percent attrition rate in the salaried management, non-exempt people.**

**We got feedback from the field that with the medical contribution cessation, that that was, in fact, going to increase significantly.**

**In my daily dialogue with general managers and area VPs, they were all concerned about what impact it would have on**

several other people.   So I decided that we needed to implement the retention plan before they jumped out and went to the competition, jumped out, went into the food industry business which, while airline catering was on the demise, certainly the food industry was doing quite well.

Q.  And in making this decision, did you consider what you thought would happen to the management and salaried employees of Gate Gourmet if you did not implement some sort of retention payment?

A. Well, we thought that we would continue to lose them.

On cross-examination Mr. Pappas testified that, in his opinion, management had suffered a disproportionate amount of attrition because management/salaried employees had received no salary increases for a period of time.

Mr. Pappas testified that when the Company paid certain employees who transferred from Memphis to Reston retention bonuses, it did so because those individuals were deemed to be in "critical positions";  and that the same reason applied when certain employees moved from Atlanta, Georgia to the new headquarters in Reston, Virginia.

Mr. Pappas testified as follows concerning the amount of the retention bonus and its relationship, if any, to the elimination of the Company's medical plan contributions:

Q.  The decision that you made to make the bonus available to management on May 26th, the amount that was paid to people was not tied into their salary, was it?

A.  No.  It was a straight $500 fee.

**Q. The attrition problem with the people that you were experiencing in Gate Gourmet, was it aggravated by the announcement that if the union rejected the contract, the health and welfare payments would be eliminated?**

**A. Was it aggravated, was there a direct correlation between attrition and that statement?**

**Q. Was there a direct correlation between that statement and the attrition?**

**A. I didn't do any analysis that kind of tied it back, but I would think that for some people, for those who participated in the plan, that it probably represented some additional concern in their life which said it is time for me to leave.**

**Q. You indicated that the cut into the medical was the last straw?**

**A. Well, for some of those people in the medical plan, it certainly would have been.**

Mr. Pappas testified that as far as he was concerned the elimination of the Company's contribution for medical insurance did not "play a part" in his decision to institute the retention bonus program. Mr. Pappas testified that the retention bonus program was an attempt "to keep people in the company, key people that we needed".

Mr. Pappas testified that he did not rely upon any studies as to what it would cost the Company to implement the retention bonus program.

The issue before the Arbitrator is whether the Company violated the parties' agreement when it unilaterally ceased making contributions to the medical plan, and, if so, what would be the appropriate remedy.

## Position of the Council

The Council submits that Gate Gourmet breached its implied covenant of good faith and fair dealing when it eliminated its contribution to the Company-sponsored health care plan. The Council contends that there is no merit in Gate Gourmet's defense that the only limitation on the Company's discretion is that the rates set forth for employees be the same as the rates set forth for the Company's management/salaried employees. The Council further submits that the evidence does not support Gate Gourmet's assertion that it may exercise its discretion and change rates more than once a year. The Council points out that the language of Article 24 and the language in comparable Local Addenda speak to contribution rates being the same "each year", and that Gate Gourmet has over the years never exercised its discretion to change rates more than once a year.

Citing *Williston on Contracts* and a number of state and federal court cases, the Council maintains that Article 24 established an implied covenant of good faith and fair dealing which prevented Gate Gourmet from taking advantage of its discretion to change contribution rates to the extent that it deprived the employees of the benefit of their contract. Citing Fields v. Thompson Printing Co., Inc., 363 F.3d 259 (3rd Cir. 2004) the Council relies upon the court's stated principle that "where the terms of a contract are not specific, the implied covenant of good faith and fair

dealing may fill in the gaps where necessary to give efficacy to the contract as written." The Council argues that this principle is especially applicable where the claimed contractual right in dispute is the degree of discretion that one party claims the contract gives it to alter the consideration the contract otherwise obligates it to pay. In this case, the Council asserts that Gate Gourmet, the discretion-exercising party, did not have the right to use its purported discretion to deprive the employees of the benefit of their bargain by re-allocating the burdens both parties assumed.

The Council contends that the fact that the case before the Arbitrator involves a labor agreement, and not a commercial contract, does not make the covenant of good faith and fair dealing inapplicable. The Council points out that Section 2, First of the Railway Labor Act requires "all carriers, their officers, agents and employees, . . . [to] exert every reasonable effort to make and maintain agreements concerning rates of pay, rules, and working conditions". This language, in the Council's opinion, militates strongly in favor of finding that the covenant is implicit in all agreements subject to the Railway Labor Act, including the agreement here under consideration.

The Council argues that, whatever discretion Gate Gourmet may have had to adjust contribution rates, Gate Gourmet did not have the right to relieve itself from its obligation to share with its employees the

costs of the health care plan. The Council points out that Article 24 establishes "[r]egular, full-time bargaining employees . . . [as] eligible to participate in the Company's Health Care program . . .." The Council submits that the health plan is subject to the provisions of ERISA, is a "yearly plan" and that enrollment in the plan is limited as required by the Internal Revenue Service's regulations implementing 26 U.S.C. Section 125 to *annual* benefit periods. (emphasis by the Council)

The Council argues that the language under consideration obligated Gate Gourmet to continue its contribution to the health care program, as the contribution was an "essential feature" of the program, and that this same language limited Gate Gourmet's exercise of its discretion to only once each year at the open enrollment time.

The Council further contends that there is no question that Gate Gourmet acted in bad faith, as the Company acknowledged at the hearing that it exercised its discretion to eliminate its obligation to fund, in part, the health care plan. The Council submits that Gate Gourmet's "manipulation" of its discretion for its own advantage, rather than to comport with its contractual obligations, breached the Company's covenant of good faith and fair dealing.

The Council argues that Gate Gourmet's bad faith was further exposed by its institution of the retention bonus program, which Company witnesses admitted was instituted partially in response to its

decision to eliminate its funding of the health care plan. The Council points to the testimony in which the Company's President explained that the decision to eliminate Gate Gourmet's funding of the health care plan was the "last straw" for its managers. The Council points out that, coincidentally, all management/salaried employees irrespective of rank or compensation were given $500 per month bonuses and that those bonuses were to begin on the same day that Gate Gourmet planned to end its funding of the health care program.

Based upon the foregoing facts and arguments, the Council requests that the Arbitrator find that Gate Gourmet breached its agreements with the Council and its designees when the Company eliminated its funding of the health care plan for the months of July and August, 2005. The Council further requests that the Arbitrator direct the parties to confer and arrive at an appropriate remedy and, if the parties are unable to agree, that the Arbitrator conduct a further hearing and impose an appropriate remedy to make the employees whole.

**Position of the Company**

The Company argues that the plain and clear language of the collective bargaining agreement specifically permitted Gate Gourmet to change its contribution rate to the medical plan. Citing Elkouri & Elkouri, How Arbitration Works, the Company contends that when

contract language is clear and unambiguous it must be applied in accordance with its terms despite the equities that might be present on either side.  The Company asserts that Article 24 gives Gate Gourmet the prerogative in terms of the administration of the medical plan, including how frequently and by what amounts changes to the Company's contribution levels are concerned.

The Company argues that the implied covenant of good faith and fair dealing does not prohibit Gate Gourmet from changing its contribution rates.  The Company submits that the implied covenant of good faith and fair dealing does not override the plain language of the collective bargaining agreement.   In support of this assertion the Company also cites *Williston on Contracts*, and points to the language which gives a party "absolute discretion" in circumstances which the Company contends are extant in the instant case.

The Company points out that Union Witness Dyson acknowledged that the Council "gambled" that management would not increase their own health insurance rates, and he testified that the language of Article 24 tying the Union's membership rates to the management/salaried employees rates only meant "a little bit of security on our side."  The Company submits that it was the parties' expectations that the Union's membership would be treated in the same manner as the management/salaried employees were treated insofar as contribution

rates were concerned;  and that that is what happened in July, 2005 when management/salaried employees were required to pay 100 percent of the cost of their health insurance.

The Company argues that, even if the Arbitrator applies the implied covenant of good faith and fair dealing, Gate Gourmet's actions were reasonable in light of the collective bargaining agreement language and the Company's financial condition at the time.  The Company points out that it was in a dire financial situation, that the Company took the contested action only after months of fruitless negotiations, that the Company had explored other avenues of cost savings and instituted austerity programs that adversely affected non-Union employees and only took its action as a last resort.

The Company asserts that its discretion under Article 24 is not limited to allocation of anticipated health care cost increases when it changes the contribution rates.  The Company points out that no such language appears in Article 24 limiting its right to change contribution rates in such circumstances

The Company also contends, citing arbitration decisions, that the Union has failed to establish the existence of a binding past practice, either under what circumstances the Company can change contribution rates or when and how many times during a calendar year such changes can be implemented.  The Company submits that any alleged past

practice in this regard could not have been in existence for a significant period of time, as the National Master Agreement has been in effect for only four years and that the Company has not consistently implemented contribution rate changes based upon health care cost increases only. Additionally, the Company points out that the Summary Plan Document reserves to Gate Gourmet the right "at any time" to change or terminate benefits under the plan. The Company also points out that Article 24 does not require that the Company make a maximum or minimum contribution to the established health care plan. Based upon these facts, the Company submits that it is not bound by any alleged past practice.

Finally, the Company maintains that the retention payment was implemented in good faith in order to alleviate attrition among its management/salaried employees. The Company points out that the retention payment was made to "all" management/salaried employees regardless of whether they were enrolled in the Company's health plan prior to July 1, 2005; and that, in fact, only 40 percent of the Company's management/salaried employees were enrolled in the plan prior to July 1, 2005. The Company maintains that the retention program was instituted to stem the tide of management/salaried employees leaving the Company during a time when the Company needed stability.

Based upon the foregoing facts and arguments, the Company requests that the grievance be denied.

**Gate Gourmet and IBT/HERE Joint Council**
**Medical Plan Contributions Grievance**
**Page 32**

## Findings and Opinion

The Council's primary argument is premised upon its contention that Gate Gourmet, by eliminating contributions to the medical plan on behalf of members of the craft or class, violated the "implied covenant of good faith and fair dealing". The Council cites the following excerpt from *Williston on Contracts* in support of its implied covenant of good faith and fair dealing argument that Gate Gourmet violated Article 24 and related sections of the parties' collective bargaining agreement:

> **[T]he courts have articulated a variety of approaches and responses to these questions [as to when it is appropriate to imply terms], all of which, however, may be distilled into one broadly applicable general principle: Whenever the parties to a bargain are mutually interdependent-that is, when each party is dependent upon the other to gain the fruits of the bargain, and thus, when they are mutually dependent on one another-there is a promise or term implied in the parties' bargain that each will, at a minimum, act in good faith and deal fairly with the other, and will do nothing that will prevent the other party from enjoying the fruits of the contract; and subject to one exception, the greater the mutual interdependence of the parties, the more stringent will be the term implied, that is, the more the promise or term implied will require of the party subject to its operation.**

In opposition to the Council's position Gate Gourmet has argued that the implied covenant of good faith and fair dealing does not trump the plain language of Article 24 of the National Master Agreement. Gate Gourmet also cites *Williston on Contracts*, Section 63.22 and includes the following excerpt in its post-hearing brief:

> [T]here can be no breach of the implied promise or covenant of good faith and fair dealing where the contract expressly permits the actions being challenged, and the defendant acts in accordance with the express terms of the contract. _**This is so even where the contractual provision at issue is one that purports to grant to the defendant absolute discretion to take certain actions or engage in certain conduct under the contract**_; such a provision, stated simply, permits the defendant substantial latitude, and as long as the discretion is exercised as permitted under the contract, and without evident bad faith motive or malice, its exercise cannot be a breach of the more general implied promise of good faith and fair dealing. (Emphasis by the Company)

While the implied covenant of good faith and fair dealing, based upon the Council's citations, is found with some regularity in commercial contracts, there is reason to conclude based upon general labor arbitral experience, that the covenant has been applied only occasionally in the context of claims that a provision(s) of a collective bargaining agreement has been violated.

In reviewing the requirement for "good faith" dealing, in the arena of labor management relations, good faith is often associated with a party's bargaining strategy. There are a legion of cases, most arising under the provisions of the National Labor Relations Act, which have established guidelines and principles concerning what constitutes good faith bargaining. There is no claim before this Arbitrator that the Company failed to bargain in good faith.

In the case at bar, Gate Gourmet used the threat of the elimination of its contributions to the medical plan as a means of convincing

members of the craft or class that they should ratify the Company's final offer.  There is no evidence that this bargaining ploy was challenged as being unfair or motivated by bad faith.

In fact, the Company has convincingly argued that, in the context of Gate Gourmet's dire financial circumstances, reducing health care costs was a necessary goal.

Additionally, the Company has convincingly argued that the clear language of the collective bargaining agreement gave Gate Gourmet broad discretion in terms of contribution rates.  To iterate, that discretion is found in the second paragraph of Section 1 of Article 24 which reads:

> **While administration of the plan remains a Company prerogative, bargaining unit Employee's contribution rates for the various health plans and optional life insurance will be the same each year as the contribution rates for management/salaried employees.**

When the Company eliminated its contributions to the medical plan for both craft or class employees and management/salaried employees it did not, in this Arbitrator's opinion, violate the literal terms of the collective bargaining agreement.

In considering the Council's claim that Gate Gourmet violated the implied covenant of good faith and fair dealing, this Arbitrator finds that Gate Gourmet had substantial latitude in exercising its discretion under the contract, and there has been no showing that Gate Gourmet

exercised that discretion based upon a bad faith motive or malice. Accordingly, this Arbitrator finds, in the absence of a bad faith motive or malice, that the more general implied promise of good faith and fair dealing was not breached.

The Council assumed an understandable and justifiable "gamble" in 2000 when the National Master Agreement was executed. The Council understandably assumed that Gate Gourmet would not drastically cut or eliminate medical plan contributions for Union-represented employees, because existing contribution rates were tied to the Company's contribution rates for management/salaried employees. However, neither the Council nor Gate Gourmet could have anticipated a September 11, 2001 scenario or the devastating financial effect the terrorist attacks would have on the airlines, and then on the food service industry serving those airlines.

However, the above findings do not resolve the issue. This Arbitrator sees the remaining question to be whether Gate Gourmet, by providing a retention payment for all management/salaried employees, in fact, provided a means for those employees to replace the contributions to the medical plan that had previously been made on their behalf by the Company.

While the Company, in its pre-hearing Motion to Quash the Council's subpoena for certain records, rejected the Council's argument

that Gate Gourmet, *sub silentio*, had created a subsidy for management/salaried employees in terms of their health care coverage, this Arbitrator finds that the Company did just that.

The candid testimony of Company witnesses established that the elimination of Gate Gourmet's contributions to the medical plan for management/salaried employees represented the "last straw" for those employees insofar as their suffering wage and benefit freezes and reductions.    The record provides this Arbitrator with a basis for concluding that the Company did, in fact, by the retention bonus program circumvent the spirit, intent and, in fact, the de facto requirement of Article 24.

Simply stated, this Arbitrator concludes that, while contributions were not made directly to the medical plan on behalf of management/salaried employees by the Company, the $500 per month retention bonus was understood as a means for the Company funding management/salaried employees' medical plan coverage, if, in fact, some or all of those employees used those new found dollars to procure medical insurance.

The testimony of Gate Gourmet's witnesses regarding the retention bonus when coupled with the May 26, 2005 memorandum from Company President Pappas to "All US Administrative and Salaried Plan Division Americas Employees", convinces this Arbitrator that the

Company did not directly eliminate its contributions to the medical plan for management/salaried employees.   Instead, the Company used the retention bonus program to evade its obligation to continue contributions at the same level for craft or class employees.

The May 26, 2005 memorandum describing the retention payment program includes the following language:

> **We know that these are challenging times for our company and that we have asked our administrative and salaried employees to make many sacrifices.  To partly address these issues, all administrative and salaried employees with 30 days of completed service as of July 1, 2005, will receive a monthly $500 retention payment.  Those employees who have not completed 30 days of service as of July 1, 2005 will become eligible for retention payments beginning with the month following the completion of 30 days of service.  The monthly retention payment will begin on July 1 and will be reviewed on a quarterly basis for continuation prior to the commencement of each successive quarter.**

When the Company made retention payments to employees who transferred from Memphis to Reston and from Atlanta to Reston those payments were made in the context of "true" retention.   The evidence appears to establish that the employees who transferred were "key" to the continuity of Company operations.

The retention program reflected in the May 26, 2005 memorandum makes   no   distinction   between   a   long-term   management/salaried employee   and   an   employee   with   31   days   of   service.     All   of   these

employees received the same stipend/bonus, irrespective of their salary or tenure. It is only reasonable to conclude that when a number of these management/salaried employees would lose the Company's contribution to the medical plan and become more likely to "jump ship", the Company concluded this "last straw" required some action to circumvent Article 24. Thus, the retention program was given birth.

It is not necessary for this Arbitrator to address the question of whether Gate Gourmet has the authority to change contribution rates more than once a year.

While the Company's bargaining strategy is not here subject to challenge, the Company did, through the retention bonus program, improperly evade its responsibility to continue the contribution rates for the months of July and August, 2005 at the same levels they had been previously made for members of the craft or class who were participants in that plan.

**Award:**    The grievance is sustained in accordance with the above findings. The parties are directed to conduct a joint accounting to determine the damages associated with the violation of the collective bargaining agreement. This Award was signed this 3rd day of March, 2006.

*Richard R. Kasher*

Richard R. Kasher, Arbitrator